UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

———————————————————— x

MARK A. RODRIGUEZ, Individually and on      :   Civil Action No. 1:20-cv-00982
Behalf of All Others Similarly Situated,      :
                                              :   <u>CLASS ACTION</u>
                   Plaintiff,                 :
                                              :
         vs.                                  :
                                              :
CPI AEROSTRUCTURES, INC., DOUGLAS           :
McCROSSON, VINCENT PALAZZOLO,                :
CANACCORD GENUITY LLC and                    :
B. RILEY FBR,                                 :
                                              :
———————————————————— Defendants.   x

RUSSELL GARRETT, Individually and on       :   Civil Action No. 1:20-cv-01026
Behalf of All Others Similarly Situated,      :
                                              :   <u>CLASS ACTION</u>
                   Plaintiff,                 :
                                              :
         vs.                                  :
                                              :
CPI AEROSTRUCTURES, INC., DOUGLAS           :
McCROSSON VINCENT PALAZZOLO,                 :
CANACCORD GENUITY LLC and                    :
B. RILEY FBR,                                 :
                                              :
                   Defendants.                :
                                              :
———————————————————— x


**CONSOLIDATED AMENDED COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

Lead Plaintiff Jeffrey L. Feinberg, individually and as trustee and beneficiary of the Jeffrey L. Feinberg Personal Trust ("Lead Plaintiff"), and on behalf of all other persons similarly situated, by his undersigned attorneys, makes the allegations set forth herein based upon knowledge as to his own acts and upon the investigation of Lead Plaintiff's counsel. The investigation included, *inter alia*, a review of the United States Securities and Exchange Commission ("SEC") filings by CPI Aerostructures, Inc. ("CPI" or the "Company"), analysts' reports and advisories about the Company, press releases, media reports, and other public statements issued by the Company. Lead Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of: (i) purchasers of CPI common stock issued pursuant to and/or traceable to the Company's offering conducted on or about October 17, 2018 (the "Offering") (the "Securities Act Class"), seeking to pursue remedies under Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 (15 U.S.C. §§77k, 77l(a)(2) and 77o) (the "Securities Act"); and (ii) purchasers of CPI common stock between March 22, 2018 through February 14, 2020, inclusive (the "Class Period") (the "Exchange Act Class"), seeking to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).[1]

2.      CPI describes itself as a U.S. supplier of aircraft parts for fixed-wing aircraft in both the commercial and defense markets.

3.      During the Class Period, CPI and its senior officers represented to the public that the Company had adopted Generally Accepted Accounting Principles' ("GAAP") Accounting Standards

---

[1]      The Securities Act Class and the Exchange Act Class are referred to collectively as the "Class."

Codification Topic 606 *Revenue From Contracts With Customers* ("ASC Topic 606"). CPI and its executive officers further stated that the Company's financial results were presented in compliance with the standards and procedures set forth in ASC Topic 606.

4.     On February 14, 2020, however, CPI shocked the market by announcing: (i) it did not follow the dictates of ASC Topic 606; (ii) the Company's financial statements for the 2018 annual period and the 2018 and 2019 interim periods required restatement; and (iii) its internal controls over financial reporting and its disclosure controls for those periods were ineffective. According to the Company, CPI's financial results needed to be restated due to "[e]rrors in connection with revenue recognition under ASC Topic 606" and that "certain revenues and net income were recognized prematurely or inaccurately due to an incorrect application of generally accepted accounting principles." In addition to announcing the need for a restatement, CPI disclosed that its newly hired Chief Financial Officer ("CFO"), Dan Azmon ("Azmon") – who had replaced Defendant Vincent Palazzolo as CFO when he was terminated in November 2019 – abruptly resigned from the Company after joining CPI just three months prior. The market reacted swiftly to these revelations and CPI's share price fell 37% on February 18, 2020.

5.     On August 25, 2020, the Company issued restated financial statements for its interim and annual 2018 periods and its 2019 interim periods (the "Restatement"), which quantified the impact of CPI's failure to apply ASC Topic 606. CPI explained that, during the Class Period, the Company prematurely recognized revenue – in contravention of the dictates ASC Topic 606 – by utilizing "manufacturing program" rather than performance obligations as the unit of accounting for its customer contracts. CPI explained: "The Company now recognizes that accounting guidance under ASC Topic 606 does not support its use of a manufacturing program as the unit of accounting.

Instead, under ASC Topic 606, the performance obligation is the appropriate use [sic] of accounting."

6.     The magnitude of the Restatement was staggering.  For example, for fiscal 2018, CPI's failure to comply with ASC Topic 606 caused the Company to overstate its total assets by 200%, understate its total liabilities by more than 9%, and overstate its total revenue by more than 19%.  Indeed, CPI has admitted that its failure to comply with ASC Topic 606 enabled it to report accumulated, undistributed net income from its *inception* through December 31, 2018 of $22.8 million, when, in reality, it had accumulated a *deficit* of $78.1 million at that date.

7.     Significantly, the Restatement did not simply reveal that CPI had failed to properly apply Topic 606's requirements or report results consistent with GAAP.  The Restatement also exposed that Defendants failed to ensure the Company had designed and implemented sufficient controls over financial reporting as required by Section 13 of the Exchange Act and other applicable regulations.  Indeed, it is now clear that, among other things, during the Class Period: (i) "no controls existed to…to hire qualified external resources with the appropriate accounting expertise"; (ii) CPI "did not maintain effective internal control over financial reporting related to . . . control environment, risk assessment, control activities and monitoring"; and (iii) CPI "did not appropriately design, or effectively operate, internal control over certain aspects of accurate recording, presentation, and disclosure of revenue and related costs."  In addition, the Restatement also revealed that throughout the Class Period, CPI's "[m]anagement lacked sufficient technical proficiency and training" to ensure compliance with financial reporting requirements, and failed to "execute a strategy to hire and retain a sufficient complement of personnel with an appropriate level of knowledge, experience, and training in certain areas important to financial reporting."   This

abdication by Defendants of their responsibilities to design and implement an effective system of controls over financial reporting demonstrates that they acted with knowledge or reckless disregard.

8.      In addition, prior to adopting ASC Topic 606, CPI was afforded ample time to evaluate the effect such guidance would have on its financial results.  Indeed, as noted herein, CPI was *required* to evaluate and disclose the impact ASC Topic 606 would have on its future financial statements prior to its adoption.  Since the guidance set forth in ASC Topic 606 was originally issued by the FASB in May 2014, public companies like CPI were afforded *four years* to implement systems, gather data, and resolve implementation questions concerning ASC Topic 606.  Moreover, ASC Topic 606 received widespread media attention when it was first announced and numerous resource groups were formed to help stakeholders learn about the mandates of the standard.  Despite these numerous advisories, CPI utilized manufacturing program rather than performance obligations as the unit of accounting for its customer contracts.

9.      Investors reasonably assumed that Defendants, given the ample time they were afforded to evaluate the import that the highly publicized new revenue recognition standard would have on CPI's financial results, conducted an intentionally detailed, well-researched investigation into the mandates of ASC Topic 606 prior to issuing the materially false and misleading statements alleged herein.  Defendants did not.

10.     Moreover, during the time that CPI was artificially inflating its financial results by failing to apply ASC Topic 606, CPI conducted the Offering, through which the Company received proceeds in excess of $14 million.  The Offering gave Defendants a powerful motive to artificially inflate CPI's stock price.

11.     Indeed, CPI has disclosed that the SEC's Division of Enforcement (the "Division") is conducting an investigation into CPI's financial reporting for violations of the federal securities

laws. As part of the investigation, the Division issued a subpoena to the Company seeking documents and information relating to, among other things, the Offering, previously disclosed errors in, and restatements of, the Company's financial statements, and the departure of the Company's CFOs.

12.     Collectively, the facts and circumstances revealed by the Restatement demonstrate that Defendants acted with scienter when failing to report results in accordance with GAAP and consistent with the requirements of ASC Topic 606.

13.     As a result of Defendants' wrongful acts and omissions, Lead Plaintiff and other Class members have suffered substantial losses and damages.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331; Section 27 of the Exchange Act (15 U.S.C. §78aa); and Section 22 of the Securities Act (15 U.S.C. §77v).

15.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b) and Section 22 of the Securities Act (15 U.S.C. §77v) as the alleged misconduct was transacted in and emanated in large part from this District, and CPI and other Defendants are located here.

16.     In connection with the acts alleged in the Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

17.     Lead Plaintiff, as set forth in the Certification previously filed with the Court and incorporated herein by reference, purchased CPI's common stock at artificially inflated prices in the Offering and during the Class Period and was damaged thereby.

18.     Defendant CPI is incorporated in New York with its principle executive offices located at 91 Heartland Boulevard, Edgewood, New York, 11717.  The Company's securities are traded on the New York Stock Exchange ("NYSE") under the ticker symbol "CVU."

19.     Defendant Douglas McCrosson ("McCrosson") has served as CPI's Chief Executive Officer ("CEO") since March 6, 2014.  Defendant McCrosson has also served as a Director of the Company's Board of Directors (the "Board") since 2014.

20.     Defendant Vincent Palazzolo ("Palazzolo") served as CPI's CFO from May 2004 until November 18, 2019, when he was terminated.

21.     Defendants McCrosson and Palazzolo are collectively referred to herein as the "Individual Defendants."

22.     Defendant Canaccord Genuity LLC ("Canaccord") is a financial services institution and acted as the sole bookrunning manager in connection with the Offering.

23.     Defendant B. Riley FBR ("FBR") is a financial advisory service and acted as the co-manager in connection with the Offering.

24.     Canaccord and FBR are collectively referred to as the "Underwriter Defendants." CPI, the Individual Defendants, and the Underwriter Defendants are collectively referred to as the "Defendants."

## RELEVANT NON-PARTY

25.     Dan Azmon was named CFO of CPI on November 13, 2019.  Azmon previously served as Vice President, Controller, and Principal Accounting Officer of L3 Technologies, Inc. Azmon resigned from his position as CPI's CFO, effective February 11, 2020, after serving only three months in that capacity.  CPI announced Azmon's resignation in connection with the Company's announcement that its previously issued financial statements should no longer be relied upon and required restatement.

## CLASS ACTION ALLEGATIONS

26.     Lead Plaintiff brings this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of: (i) purchasers of CPI common stock issued pursuant to and/or traceable to the Offering; and (ii) purchasers of CPI common stock during the Class Period.  Excluded from the Class are Defendants, directors and officers of the Company, as well as their families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

27.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, the Company's common stock was actively traded on the NYSE.  While the exact number of Class members is unknown to Lead Plaintiff at this time and can be ascertained only through appropriate discovery, Lead Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

28.     There is commonality in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)     whether Defendants' acts as alleged violated the federal securities laws;

(b)     whether Defendants' statements to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of the Company;

(c)     whether Defendants' statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     whether the Individual Defendants caused the Company to issue false and misleading SEC filings and public statements during the Class Period;

(e)     whether Defendants acted knowingly or recklessly in issuing false and misleading SEC filings and public statements during the Class Period in connection with the Exchange Act Claims;

(f)     whether the prices of the Company's common stock during the Class Period were artificially inflated because of Defendants' conduct complained of herein; and

(g)     whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

29.     Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

30.     Lead Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation.  Lead Plaintiff has no interests that conflict with those of the Class.  Lead Plaintiff has no interests antagonistic to or in conflict with those of the Class.

31.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Further, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members

of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

**Background**

32.     CPI describes itself as a U.S. supplier of aircraft parts for fixed-wing aircraft in both the commercial and defense markets. The Company provides program management, final assembly, kitting, and other services to support aircraft.

**CPI's Materially Misstated Financial Reporting**

33.     SEC Regulation S-X states that financial statements filed with the SEC that are not prepared in compliance with GAAP are "presumed to be misleading or inaccurate[.]" 17 C.F.R. §210.4-01(a)(1). Regulation S-X also requires that interim financial statements filed with the SEC comply with GAAP. 17 C.F.R. §210.10-01(a).

34.     As detailed herein, during the Class Period, CPI falsely represented that its financial statements were presented in conformity with GAAP. In addition, CPI misrepresented in its filings made with the SEC that it adopted the provisions of GAAP's ASC Topic 606 effective January 1, 2018.

35.     Specifically, the Form 10-K that CPI filed with the SEC on April 1, 2019 falsely represented that its revenue recognition on contracts with customers after such adoption "remained materially consistent with historical practice" and that "there was no impact in the year ended December 31, 2018 consolidated financial statements upon adoption [of ASC Topic 606]."

36.     In its Forms 10-Q during the Class Period, CPI also falsely represented, in pertinent part and in all material respects, that:

> Effective January 1, 2018, the Company adopted Accounting Standards Codification Topic 606 Revenue from Contracts with Customers (ASC 606) using the modified retrospective method for all of its contracts.

\*       \*       \*

Following the adoption of ASC 606, the Company's revenue recognition for all of its contracts remained materially consistent with historical practice and there was no impact [on] the consolidated financial statements upon adoption.

37.     These material misrepresentations of fact were repeated and/or incorporated by reference in other filings that the Company made with the SEC during the Class Period.

38.     CPI has now admitted that the financial statements it issued to investors and filed with the SEC for the year ended December 31, 2018, as well as each interim period during 2018 and 2019, were materially misstated, presented in violation of GAAP, and "should no longer be relied upon." In addition, CPI has now admitted it failed to adopt fundamental provisions of ASC Topic 606.

39.     Accordingly, there can be no dispute that: (i) CPI's financial statements and financial related disclosures were not presented in conformity with GAAP during the Class Period; (ii) CPI failed to adopt the provisions of ASC Topic 606 effective January 1, 2018; (iii) CPI's revenue recognition on contracts with customers was materially inconsistent with ASC Topic 606; (iv) CPI's representation that there was "no impact" on its consolidated financial statements upon adoption of ASC Topic 606 was materially false and inaccurate; and (v) each of the financial statements CPI issued to investors and filed with the SEC at all relevant times was not presented pursuant to the rules and regulations of the SEC and is presumed to be misleading and inaccurate pursuant to the SEC's Regulation S-X.

**ASC Topic 606,** *Revenue from Contracts with Customers*

40.     In 2014, the Financial Accounting Standards Board ("FASB") issued a new revenue recognition standard, ASC Topic 606, to help simplify and harmonize revenue recognition practices. The standard sets forth the principles that entities must apply when reporting revenue and cash flows arising from contracts associated with providing goods or services to customers. The revenue

recognition standard affects all entities that enter into contracts with customers to transfer goods or services, unless those contracts are within the scope of other standards that are not at issue here.

41.     The core principle of ASC Topic 606 is that an entity should recognize revenue to depict the transfer of goods or services to customers in an amount that reflects the consideration that the entity expects to be entitled to in exchange for those goods or services.  To achieve this core principle, ASC Topic 606 establishes the following five-step process that entities must apply:

Step 1: Identify the contract with the customer.

Step 2: Identify the performance obligations in the contract.

Step 3: Determine the transaction price.

Step 4: Allocate the transaction price to the performance obligations in the contract.

Step 5: Recognize revenue when (or as) the entity satisfies a performance obligation.

42.     CPI has now admitted that it failed to identify the performance obligations in its contracts (step two of the five-step process).

43.     Pursuant to ASC Topic 606, the second step in accounting for a contract with a customer is to identify the performance obligations.  The revenue recognition standard defines a performance obligation as a promise in a contract with a customer to transfer a good or service to the customer.  Performance obligations are the unit of accounting for purposes of applying the revenue standard and, therefore, form the basis for how and when revenue is recognized.

44.     ASC Topic 606-10-25-14 provides that: at contract inception, an entity shall assess the goods or services promised in a contract with a customer and shall identify as a performance obligation each promise to transfer to the customer which is either:

a.     A good or service (or a bundle of goods or services) that is distinct; or

b.     A series of distinct goods or services that are substantially the same and that have the same pattern of transfer to the customer[.]

- 11 -

45.     Despite CPI's factual representations during the Class Period that the Company adopted ASC Topic 606 for all of its contracts effective January 1, 2018, CPI has now admitted that it utilized a "manufacturing program" rather than performance obligations as the unit of accounting for its customer contacts, stating, in pertinent part:

> The Company now recognizes that accounting guidance under ASC Topic 606 does not support its use of a manufacturing program as the unit of accounting.  Instead, under ASC Topic 606, the performance obligation is the appropriate use [sic] of accounting.

46.     Prior to adopting ASC Topic 606, CPI was afforded ample time to evaluate the effect this guidance would have on its financial results.  Indeed, CPI was **_required_** to evaluate and disclose the impact ASC Topic 606 would have on its future financial statements prior to its adoption.  *See* SEC Staff Accounting Bulletin Topic 11M, *Disclosure Of The Impact That Recently Issued Accounting Standards Will Have On The Financial Statements Of The Registrant When Adopted In A Future Period*.

47.     In this regard, the guidance set forth in ASC Topic 606 was originally issued by the FASB in May 2014 in an Accounting Standards Update.  Such guidance was later revised and clarified in ASC Topic 606.

48.     To allow entities ample time to implement systems, gather data, and resolve implementation questions, public companies were allowed to delay the implementation of ASC Topic 606 for **_four years_**, until the annual period beginning after December 31, 2017.

49.     Moreover, ASC Topic 606 received widespread media attention when it was first announced and numerous resource groups were formed to help stakeholders learn about the mandates of the standard.

50.     For example, shortly after ASC Topic 606 was issued in 2014, the FASB and the International Accounting Standards Board formed the Joint Transition Resource Group for Revenue

Recognition ("TRG") to help entities implement the revenue guidance, solicit and discuss questions arising from implementing the revenue guidance, inform company boards about implementation issues to recommend action as needed, and provide a forum to learn about the guidance.

51.     Thereafter, the Deputy Chief Accountant for the SEC advised SEC registrants to follow the TRG discussions and to consult with the SEC's staff if the registrant reached a different conclusion on applying ASC Topic 606 than the conclusion reached by the TRG.

52.     In addition, the American Institute of Certified Public Accountants ("AICPA") formed sixteen industry task forces, including an aerospace industry task force, to address industry-specific implementation questions relating to ASC Topic 606.  The AICPA also issued a new accounting and auditing guide on revenue recognition in January 2017.

53.     Despite these numerous advisories, CPI utilized a manufacturing program rather than performance obligations as the unit of accounting for its customer contracts.  In doing so, CPI violated a fundamental tenet of ASC Topic 606 and made material misrepresentations of fact stating that its revenue recognition on contracts with customers after adopting ASC Topic 606 "remained materially consistent with historical practice" and that there was "no impact" on the Company's consolidated financial statements upon the adoption of ASC Topic 606.

54.     In fact, CPI has now stated that its financial results and financial condition during the Class Period were inflated to a staggering degree.

55.     Concerning its 2018 annual financial statements, CPI has now determined that its failure to apply ASC Topic 606 caused:

- its total assets to be overstated by *200%*;

- its total liabilities to be understated by more than *9%*;

- it to report *shareholders' equity of $93.4 million* when it actually had a *shareholders' deficit of 7.4 million*;

- its total revenue to be overstated by more than ***19%***;

- its ***operating income of $8.6 million*** to be overstated by ***$14.2 million***;

- its ***pre-tax income of $6.7 million*** to be overstated by ***$14.2 million***;

- its ***net income of $2.2 million*** to be overstated by ***$14.2 million***; and

- its customer order backlog to be overstated by approximately ***12%***.

56.     CPI's interim financial statements were similarly overstated as a result of its failure to apply ASC Topic 606.

57.     As detailed herein, CPI has now also admitted that, despite repeated representations to the contrary during the Class Period, its system of internal control over financial reporting was riddled with "material weaknesses."  A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement in an entity's financial statements will not be prevented or detected on a timely basis.  CPI has also admitted, despite repeated representations to the contrary during the Class Period, that its disclosure controls were "not effective" during the Class Period.

58.     In issuing materially false and misleading statements regarding CPI's internal control over financial reporting, Defendants violated the provisions set forth in Section 13 of the Exchange Act, which required them to: (i) present CPI's business activities in a manner that accurately and fairly reflected its transactions; and (ii) maintain a system of internal accounting controls sufficient to provide reasonable assurances that CPI's financial statements conformed to GAAP, as follows:

> Every issuer which has a class of securities registered pursuant to Section 78l of this title and every issuer which is required to file reports pursuant to Section 78o(d) of this title shall --
>
> A.     make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer;

B.      devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that --

      i.      transactions are executed in accordance with management's general or specific authorization;

      ii.      transactions are recorded as necessary (I) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (II) to maintain accountability for assets;

      iii.      access to assets is permitted only in accordance with management's general or specific authorization; and

      iv.      the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences[.]  15 U.S.C. §77m(2)(A)–(B)(i)-(iv).

59.      In the Company's Restatement, CPI admitted that the Company had "identified material weaknesses from revenue recognition accounting controls that resulted in material errors, as we did not appropriately design, or effectively operate, internal control over certain aspects of accurate recording, presentation, and disclosure of revenue and related costs."

60.      Moreover, CPI's Restatement made clear that the weaknesses and failures in the Company's internal controls were far reaching.  The Company admitted, *inter alia*, to the following weaknesses in the Company's internal controls over financial reporting:

- Management did not effectively execute a strategy to hire and retain a sufficient complement of personnel with an appropriate level of knowledge, experience, and training in certain areas important to financial reporting.

- Management lacked sufficient technical proficiency and training to provide adequate oversight of accounting and financial reporting activities in implementing certain accounting practices and calculations to conform to the Company's policies and U.S. GAAP.

- There were insufficiently documented Company accounting policies and insufficiently detailed Company procedures to put policies into effective action.

- Our internal control lacked procedures for ensuring the period of performance or value of the accounting contract were properly determined.

- Our internal control lacked procedures for ensuring revenue was constrained to funded contract values.

61. In the Restatement, CPI's auditor, CohnReznick LLP, issued an adverse opinion on the Company's internal control over financial reporting, stating, in pertinent part, as follows:

**Adverse Opinion on Internal Control Over Financial Reporting**

We have audited CPI Aerostructures, Inc. and Subsidiaries' (the Company's) internal control over financial reporting as of December 31, 2019, based on criteria established in Internal Control—Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). In our opinion, because of the effect of the material weaknesses described in the following paragraph on the achievement of the objectives of the control criteria, the Company has not maintained effective internal control over financial reporting as of December 31, 2019, based on criteria established in Internal Control—Integrated Framework (2013) issued by COSO.

A material weakness is a control deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the Company's annual or interim consolidated financial statements will not be prevented or detected on a timely basis. The following material weaknesses have been identified and included in management's assessment.

- The Company did not maintain an effective control environment, risk assessment, control activities and monitoring based on the criteria established in the COSO framework and identified deficiencies in the principles associated with the control environment of the COSO framework. Specifically, control deficiencies constituted material weaknesses, either individually or in the aggregate, relating to (1) management's ineffective execution of its strategy to attract, develop, and retain individuals with an appropriate level of knowledge, experience and training in financial reporting; (2) management's lack of sufficient technical proficiency to provide adequate oversight of accounting and financial reporting, and; (3) the Company's insufficient documented accounting policies and procedures. These control deficiencies resulted in material errors and the restatement of previously issued consolidated financial statements.

- The Company did not have adequate controls over accounting for revenue recognition, specifically, the Company lacked controls to ensure that the period of performance or values of the accounting contracts were properly determined and controls to ensure revenue was constrained.

- The Company did not have controls over accounting for significant, nonroutine, complex transactions.

- 16 -

- The Company did not have effective information technology general controls, specifically, the Company's lack of testing and documenting the areas of access to programs and data, program change-management and computer operations.

These material weaknesses were considered in determining the nature, timing, and extent of audit tests applied in our audit of the 2019 consolidated financial statements, and this report does not affect our report dated August 25, 2020, on those consolidated financial statements.

62. The Restatement also detailed the remediation measures that the Company had undertaken to address the widespread weaknesses in the Company's internal controls. Specifically, CPI stated, as follows:

Management regards successful completion of our remediation actions as an important priority. Some of the more significant remediation activities include:

- In 2019 we hired experienced professionals to fill several key positions within our finance leadership team, including Chief Financial Officer, Controller, and Director of Financial Planning & Analysis. These new individuals possess technical proficiency, training, and experience that was partially responsible for identifying the material weaknesses identified herein. The Director of Financial Planning & Analysis, now our Acting Chief Financial Officer, and the Controller remain with the Company and we intend to continue to assess current staffing levels and competencies in our finance team to ensure the optimal complement of personnel with appropriate qualifications and skill sets.

- Management, with advice from a leading global accounting and advisory firm, reviewed and updated its revenue recognition policies and procedures and expects to implement these controls, as well as certain other procedures in 2020. Additionally, management will implement a recurring review by a team of qualified individuals.

- Reevaluating and revising our Sarbanes-Oxley compliance program (our "SOX Program"), and making improvements to our SOX Program governance, risk assessment processes, testing methodologies and corrective action mechanisms.

- Redesigning and implementing necessary changes to the existing system of internal control and then testing of sufficient instances of the performance of controls to determine operational effectiveness.

- Prior to any future requirement for accounting for significant, non-routine, complex transactions, the Company will engage experienced professionals

and outline and execute a set of controls to ensure that the non-routine complex transaction is recorded in a proper manner.

- For years subsequent to 2019, we will implement an improved 404 compliant ITGC testing program.  We will engage experienced professionals to assist with its implementation and execution.

**The SEC Investigates CPI's Restatement of Its Financial Results**

63.     The Company's persistent failure to apply ASC Topic 606, report its financial results in conformity with GAAP, and to maintain effective internal and disclosure controls is now under investigation by the SEC.  On May 22, 2020, CPI received a letter from the SEC Division of Enforcement indicating that Division staff was conducting an investigation into the Company's financial reporting for violations of the federal securities laws.  As part of the investigation, the Division issued a subpoena to the Company seeking documents and information relating to, among other things, previously disclosed errors in and restatements of, the Company's financial statements, the Company's October 16, 2018 equity offering, and the departure of the Company's CFOs.

**ALLEGATIONS UNDER THE SECURITIES ACT**[2]

**CPI's October 2018 Offering**

64.     On August 22, 2017, CPI filed a registration statement on Form S-3 (the "Registration Statement").  The Registration Statement provided that CPI may, from time to time, sell or issue any combination of shelf securities in one or more offerings with a maximum aggregate offering price of $40,000,000.  On October 15, 2018, CPI filed its initial Prospectus Supplement to the Registration Statement (Registration No.: 333-220090) pursuant to Rule 424(b)(5) offering

---

[2]     As alleged elsewhere herein, the Offering Materials (defined below) incorporated by reference various Company filings that contained false and materially inaccurate statements of fact or otherwise failed to disclose material information required to be stated therein.  However, any allegations of fraud in those sections are expressly disclaimed, and not incorporated by reference, in this section or for any claims arising under the Securities Act.

$12,000,000 of shares of its common stock for sale to the public.  The underwriters for the offering were Canaccord and FBR.

65.     On October 17, 2018, CPI filed a second Prospectus Supplement to the Registration Statement offering 2,400,000 shares of common stock.  Proceeds to CPI (before expenses) totaled $14,175,000.   The underwriters were granted a 30-day option to buy up to an additional 360,000 shares of common stock from CPI to cover over-allotments, if any.

66.     The Registration Statement and the initial and second Prospectus Supplements are collectively referred to herein as the "Offering Materials."

67.     The Offering Materials incorporated by reference the following filings CPI made with the SEC, each of which contained materially inaccurate statements of fact: (i) the Annual Report on Form 10-K for the fiscal year ended December 31, 2017, filed on March 22, 2018 (the "2017 Form 10-K"); (ii) the Current Report on Form 8-K filed on May 15, 2018 (the "May 2018 Form 8-K"); (iii) the Form 10-Q for the fiscal periods ended March 31, 2018, filed on May 15, 2018 (the "1Q 2018 Form 10-Q"); and (iv) the Form 10-Q for the fiscal periods ended June 30, 2018, filed on August 9, 2018 (the "2Q 2018 Form 10-Q").

**The Offering Materials Contained Inaccurate Statements of Material
Fact and Omitted Material Information Required to Be Disclosed Therein**

68.     The Offering Materials were negligently prepared and, as a result, contained untrue statements of material fact, omitted to state other facts necessary to make the statements made not misleading, and were not prepared in accordance with the rules and regulations governing their preparation.  Specifically, as set forth below, the Offering Materials, and/or documents incorporated by reference in the Offering Materials, contained the following material misrepresentations of fact: (i) CPI's financial statements were presented pursuant to the rules and regulations of the SEC and in conformity with GAAP; (ii) CPI adopted the provisions of ASC Topic 606 effective January 1,

2018; (iii) CPI's revenue recognition on all of its customer contracts did not change materially as a result of the adoption of ASC Topic 606; (iv) the adoption of ASC Topic 606 had "no impact" on CPI's consolidated financial statements; (v) management's analysis of CPI's financial condition and the results of its operations contained materially false and inaccurate disclosures; and (vi) the Company's internal controls over financial reporting and disclosure controls were operating effectively.

**The 2017 Form 10-K**

69.     On March 22, 2018, CPI filed with the SEC its 2017 Form 10-K signed by Defendants McCrosson and Palazzolo.

70.     The 2017 Form 10-K falsely represented that the Company's adoption of ASC Topic 606 did not cause a material change in CPI's historical practice of revenue recognition stating, in pertinent part, as follows:

> Effective January 1, 2018, the Company adopted Topic 606 using the modified retrospective method for all of its contracts. ***Following the adoption of Topic 606, the Company's revenue recognition for all of its contracts remained materially consistent with historical practice***.[3]

71.     CPI's statement that "the Company's revenue recognition for all of its contracts remained materially consistent with historical practice" was an untrue statement of material fact because, as detailed herein, the Company's adoption of ASC Topic 606 required a fundamental change in the Company's historical practice of revenue recognition.  As CPI has now admitted, the Company's historical practice of using a "manufacturing program" as its unit of accounting on customer contracts violated the dictates of ASC Topic 606, which requires that "performance obligations" be used as the unit of accounting on customer contracts.

---

[3]      All emphasis is added unless otherwise stated.

**May 2018 Form 8-K**

72.    On May 15, 2018, the Company issued a press release announcing its financial results for the 2018 first quarter, the period ended March 31, 2018, which it filed with the SEC on the May 2018 Form 8-K.

73.    The May 2018 Form 8-K falsely represented, in pertinent part, that:

Effective January 1, 2018, the Company adopted Accounting Standards Codification Topic 606 Revenue from Contracts with Customers ("ASC 606") using the modified retrospective method.  Revenue recognition on all of the Company's contracts did not change materially as a result of the adoption of ASC 606.

74.    This statement was materially false and misleading for the reasons set forth in ¶71.

**1Q 2018 Form 10-Q**

75.    On May 15, 2018, CPI filed with the SEC the 1Q 2018 Form 10-Q signed by Defendants McCrosson and Palazzolo.

76.    The 1Q 2018 Form 10-Q falsely represented that CPI's reported revenues of $18.2 million, gross profit of $4.0 million, pre-tax income of $1.6 million and net income of $1.3 million for the three months ended March 31, 2018 were presented "pursuant to the rules and regulations of the Securities and Exchange Commission ("SEC")."

77.    The 1Q 2018 Form 10-Q also falsely represented, in pertinent part, that:

Effective January 1, 2018, the Company adopted Accounting Standards Codification Topic 606 *Revenue from Contracts with Customers* ("ASC 606") using the modified retrospective method for all of its contracts.

*                *                *

Following the adoption of ASC 606, the Company's revenue recognition for all of its contracts remained materially consistent with historical practice and there was no impact in the three months ended March 31, 2018 condensed financial statements upon adoption.

78.    The statements referenced in ¶¶76-77 were materially misleading for the reasons set forth in ¶71.

- 21 -

79.     As a result of CPI's admitted failure to apply ASC Topic 606 and present its financial results pursuant to the rules and regulations of the SEC and in conformity with GAAP, the Company has now acknowledged that for the three months ended March 31, 2018, the 1Q 2018 Form 10-Q overstated its reported revenue by more than 21%, its gross profit was overstated by almost 400%, its reported pre-tax income of $1.6 million was actually a pre-tax *loss* of $1.7 million and its reported net income of $1.3 million was actually a pre-tax *loss* of $2.0 million.

80.     In addition, the 1Q 2018 Form 10-Q contained materially false and inaccurate disclosures about management's analysis of CPI's financial condition and the results of its operations for the period ended March 31, 2018 pursuant to Item 303 of Regulation S-K, *Management's Discussion and Analysis of Financial Condition and Results of Operations* ("MD&A"). This disclosure stated, in pertinent part:

### *Revenue*

Revenue for the three months ended March 31, 2018 was $18,191,623 compared to $20,032,701 for the same period last year, a decrease of $1,841,078 or 9.2%. This decrease is predominantly the result of a normal cyclical decrease in revenue on the Company's E-2D programs for both domestic and foreign sales.

*       *       *

### *Gross Profit*

Gross profit for the three months ended March 31, 2018 was $4,049,868 compared to $4,537,514 for the three months ended March 31, 2017, a decrease of $487,646, predominately the result of lower volume.

*       *       *

### *Income Before Provision for Income Taxes*

Income before provision for income taxes for the three months ended March 31, 2018 was $1,552,765 compared to $1,983,301 for the same period last year, a decrease of $430,536 or 21.7%, predominately the result of lower government subcontractor revenue.

*       *       *

*Net Income*

Net income for the three months ended March 31, 2018 was $1,256,765 or $0.14 per basic share, compared to $1,249,301 or $0.14 per basic share, for the same period last year. Diluted income per share was $0.14 for the three months ended March 31, 2018 calculated utilizing 8,940,385 weighted average shares outstanding. Diluted income per share for the three months ended March 31, 2017 was $0.14, calculated utilizing 8,830,953 average shares outstanding as adjusted for the dilutive effect of outstanding stock options and RSUs.

81.     CPI has now admitted that the MD&A disclosure in the 1Q 2018 Form 10-Q contained materially false and inaccurate disclosures about management's analysis of CPI's financial condition and the results of its operations for the period ended March 31, 2018.

82.     The 1Q 2018 Form 10-Q also falsely represented that CPI's internal controls over financial reporting and its disclosure controls were operating effectively, stating, in pertinent part:

There has been no change in our internal control over financial reporting during the quarter ended March 31, 2018 that has materially affected or is reasonably likely to materially affect our internal control over financial reporting.

*             *             *

Based on an evaluation of the Company's disclosure controls and procedures as of March 31, 2018 made by management, under the supervision and with the participation of the Chief Executive Officer and Chief Financial Officer, the Chief Executive Officer and Chief Financial Officer have concluded that the Company's disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) promulgated under the Exchange Act) were effective as of March 31, 2018.

83.     In addition, the 1Q 2018 Form 10-Q contained false and inaccurate certifications by Defendants McCrosson and Palazzolo on CPI's internal control over financial reporting and its disclosure controls and procedures:

1.      I have reviewed this Quarterly Report on Form 10-Q of CPI Aerostructures, Inc;

2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.      The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   (a)     Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared:

   (b)     Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for the external purposes in accordance with generally accepted accounting principles:

   (c)     Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   (d)     Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's first fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.      The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and to the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   (a)     All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

- 24 -

(b)     Any fraud, whether or not material, that involves management or other employees who have significant role in the registrant's internal control over financial reporting.

84.     The statements set forth in in ¶¶82-83 were untrue statements of material fact because, as CPI has now admitted, the Company's internal control over financial reporting and its disclosure controls and procedures were ineffective and operated with material weaknesses during the quarter ended March 31, 2018.

**2Q 2018 Form 10-Q**

85.     On August 9, 2018, CPI filed with the SEC the 2Q 2018 Form 10-Q signed by Defendants McCrosson and Palazzolo.

86.     The 2Q 2018 Form 10-Q falsely represented that CPI's reported revenues of $38.5 million, gross profit of $8.6 million, pre-tax income of $3.2 million and net income of $2.5 million for the six months ended June 30, 2018 were presented "pursuant to the rules and regulations of the Securities and Exchange Commission ("SEC")."

87.     The 2Q 2018 Form 10-Q also falsely represented, in pertinent part, that:

Effective January 1, 2018, the Company adopted Accounting Standards Codification Topic 606 *Revenue from Contracts with Customers* ("ASC 606") using the modified retrospective method for all of its contracts.

*        *        *

Following the adoption of ASC 606, the Company's revenue recognition for all of its contracts remained materially consistent with historical practice and there was no impact in the six months ended June 30, 2018 condensed financial statements upon adoption.

88.     The statements referenced in  ¶¶86-87 were materially false and misleading for the reasons set forth in ¶71.

89.     As a result of CPI's admitted failure to apply ASC Topic 606 and present its financial results in the 2Q 2018 Form 10-Q pursuant to the rules and regulations of the SEC and in conformity

- 25 -

with GAAP, the Company has now acknowledged that for the six months ended June 30, 2018, its reported revenue was overstated by approximately 20%, its gross profit was overstated by more than 360%, its reported pre-tax income of $3.2 million was actually a pre-tax *loss* of $3.6 million and its reported net income of $2.5 million was actually a pre-tax *loss* of $4.3 million.

90.     In addition, the 2Q 2018 Form 10-Q contained materially false and inaccurate disclosures about management's analysis of CPI's financial condition and the results of its operations for the periods ended June 30, 2018, stating, in pertinent part:

### Revenue

Revenue for the three months ended June 30, 2018 was $20,261,239 compared to $16,731,951 for the same period last year, an increase of $3,529,288 or 21.1%.  This increase is predominantly the result of ramping up of the next generation jammer pod program and the production of T-38 kits, offset by a normal cyclical decrease in revenue on the Company's E-2D programs for both domestic and foreign sales.

Revenue for the six months ended June 30, 2018 was $38,452,862 compared to $36,764,652 for the same period last year, an increase of $1,688,210 or 4.6%.  This increase is predominantly the result of ramping up of the next generation jammer pod program and the production of T-38 kits, offset by a normal cyclical decrease in revenue on the Company's E-2D programs for both domestic and foreign sales.

*       *       *

### Gross Profit

Gross profit for the six months ended June 30, 2018 was $8,634,686 compared to $8,221,262 for the six months ended June 30, 2017, an increase of $413,424 or 5.0%, predominately the result of higher volume.

*       *       *

### Income Before Provision for Income Taxes

Income before provision for income taxes for the three months ended June 30, 2018 was $1,610,225 compared to $1,215,647 for the same period last year, an increase of $394,578 or 32.5%, predominately the result of higher direct military revenue. Income before provision for income taxes for the six months ended June 30, 2018 was $3,162,990 compared to $3,198,948 for the same period last year, a decrease of $35,958 or 1.1%, predominately the result of higher selling, general and administrative expenses.

*          *          *

*Net Income*

Net income for the three months ended June 30, 2018 was $1,257,225 or $0.14 per basic share, compared to $765,647 or $0.09 per basic share, for the same period last year. Net income for the six months ended June 30, 2018 was $2,513,990 or $0.28 per basic share, compared to $2,014,948 or $0.23 per basic share, for the same period last year. Diluted income per share was $0.14 for the three months ended June 30, 2018 calculated utilizing 8,980,155 weighted average shares outstanding. Diluted income per share was $0.28 for the six months ended June 30, 2018 calculated utilizing 8,953,321 weighted average shares outstanding. Diluted income per share was $0.09 for the three months ended June 30, 2017 calculated utilizing 8,865,055 weighted average shares outstanding. Diluted income per share for the six months ended June 30, 2017 was $0.23, calculated utilizing 8,840,309 average shares outstanding as adjusted for the dilutive effect of outstanding stock options and RSUs.

91.     CPI has now admitted that the 2Q 2018 Form 10-Q contained materially false and inaccurate disclosures about management's analysis of CPI's financial condition and the results of its operations for the periods ended June 30, 2018.

92.     The 2Q 2018 Form 10-Q also falsely represented that CPI's internal controls over financial reporting and its disclosure controls were operating effectively, stating, in pertinent part:

Based on an evaluation of the Company's disclosure controls and procedures as of June 30, 2018 made by management, under the supervision and with the participation of the Chief Executive Officer and Chief Financial Officer, the Chief Executive Officer and Chief Financial Officer have concluded that the Company's disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) promulgated under the Exchange Act) were effective as of June 30, 2018.

*          *          *

There has been no change in our internal control over financial reporting during the quarter ended June 30, 2018 that has materially affected or is reasonably likely to materially affect our internal control over financial reporting.

93.     In addition, the 2Q 2018 Form 10-Q contained false and inaccurate certifications by Defendants McCrosson and Palazzolo on CPI's internal control over financial reporting and its disclosure controls and procedures.  These certifications repeated in substance the representations made in  ¶83 above.

94.     The statements set forth in ¶¶92-93 were untrue statements of material fact because, as CPI has now admitted, the Company's internal control over financial reporting and its disclosure controls and procedures were ineffective and operated with material weaknesses during the quarter ended June 30, 2018.

## COUNT I

### For Violation of Section 11 of the Securities Act
### Against All Defendants

95.     For purposes of this Count, Lead Plaintiff incorporates by reference those allegations concerning the Offering Materials, and the Securities Act Class only.  Any allegations of fraud are hereby expressly disclaimed and are not incorporated by reference in this Count.  Specifically, Lead Plaintiff incorporates the allegations in ¶¶1-6, 13-94 only.

96.     This Count is brought pursuant to Section 11 of the Securities Act (15 U.S.C. §77k), on behalf of the Securities Act Class against all Defendants.  For purposes of this Count, Lead Plaintiff does not claim that Defendants committed intentional or reckless misconduct or that Defendants acted with scienter or fraudulent intent.

97.     The Offering Materials were inaccurate and contained untrue statements of material fact, omitted to state other facts necessary to make the statements made therein accurate and omitted to state material facts required to be stated therein.

98.     Lead Plaintiff and other members of the Securities Act Class purchased or otherwise acquired CPI common stock pursuant and/or traceable to the offering, and, at the time of their purchases, Lead Plaintiff and other members of the Securities Act Class were unaware of the facts concerning the wrongful conduct alleged.

99.     The Defendants named herein were responsible for the contents and dissemination of the Offering Materials.

100.     Defendant CPI was the registrant for the Offering.  As such, CPI is strictly liable to Lead Plaintiff and the Securities Act Class under Section 11 of the Securities Act for the materially inaccurate statements contained in the Offering Materials and its failure to be complete and accurate.

101.     The Individual Defendants signed the Offering Materials either personally or through an Attorney-in-Fact and caused its issuance.  The Individual Defendants each had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Offering Materials.  The Individual Defendants had a duty to ensure that such statements were true and accurate and that there were no omissions of material fact that would make the statements in the Offering Materials inaccurate.  By virtue of the Individual Defendants' failure to exercise reasonable care, the Offering Materials contained inaccurate misrepresentations and/or omissions of material fact.  As such, the Individual Defendants are liable to Lead Plaintiff and the Securities Act Class.

102.     The Underwriter Defendants were each underwriters, as that term is used in Section 11(a)(5) of the Securities Act, with respect to the Offering and the Company's common stock sold through the Offering Materials.  The Underwriter Defendants were required to investigate with due diligence the representations contained therein to confirm that they did not contain materially misleading statements or omit material facts.  None of the Underwriter Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements described herein, which were contained in the Offering Materials, were true, were without omission of any material facts, and/or were not inaccurate.

103.     The Defendants were responsible for the contents and dissemination of the Offering Materials.  None of the Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Materials were true, without omission of

any material fact, and were not inaccurate.  By reasons of the conduct herein alleged, Defendants

violated Section 11 of the Securities Act.

## COUNT II

### For Violation of Section 12(a)(2) of the Securities Act
### Against All Defendants

104.    For purposes of this Count, Lead Plaintiff incorporates by reference those allegations

concerning the Offering Materials, and the Securities Act Class only.  Any allegations of fraud are

hereby expressly disclaimed and are not incorporated by reference in this Count.  Specifically, Lead

Plaintiff incorporates the allegations in ¶¶1-6, 13-103.

105.    This count is brought pursuant to Section 12(a)(2) of the Securities Act against all

Defendants.  For the purposes of this Count, Lead Plaintiff does not allege that any of these

Defendants acted with scienter or fraudulent intent.  Defendants named in this Count were sellers

and offerors and/or solicitors of purchasers of the common stock offered pursuant to the Offering

Materials issued in connection with the Offering.  Lead Plaintiff and other members of the Securities

Act Class purchased or otherwise acquired CPI common stock pursuant to the Offering.  The

Offering Materials were used to induce investors, such as Lead Plaintiff and the other members of

the Securities Act Class, to purchase the common stock registered in the Offering.

106.    The Offering Materials contained untrue statements of material fact, and concealed

and failed to disclose material facts required to be stated therein.  Defendants owed Lead Plaintiff

and other members of the Securities Act Class who purchased CPI common stock pursuant to the

Offering Materials the duty to make a reasonable and diligent investigation into the statements

contained in the Offering Materials to ensure that such statements were true and that there was no

omission to state a material fact required to be stated in order to make the statements contained

therein not misleading.  Defendants, in the exercise of reasonable care, should have known that the

Offering Materials contained material misstatements and omissions of fact.  Lead Plaintiff did not

know, nor in the exercise of reasonable diligence could have known, of the untruths and omissions

contained in the Offering Materials at the time Lead Plaintiff purchased or otherwise acquired CPI

common stock.

107.   Defendants were sellers and offerors and/or solicitors of purchasers of the securities

offered pursuant to the Offering Materials.  The Individual Defendants issued, caused to be issued

and/or signed the Offering Materials in connection with the Offering.  The Offering Materials

contained a Prospectus that was used to induce investors, such as Lead Plaintiff and other members

of the Securities Act Class, to purchase CPI common stock.

108.   The Underwriter Defendants participated in the preparation and dissemination of the

defective and inaccurate Offering Materials for their own financial benefit.  But for their

participation in the Offering, including their solicitation as set forth herein, the Offering could not

and would not have been accomplished.  Specifically, the Underwriter Defendants:

(a)   made the decision to conduct the Offering and do it at the price set forth in the

Offering Materials.  The Underwriter Defendants drafted, revised and/or approved the Prospectus

and participated in its being declared effective by the SEC.  The Offering Materials were calculated

to create interest in CPI common stock and was widely distributed by or on behalf of the

Underwriter Defendants for that purpose; and

(b)   conceived and planned the Offering and orchestrated all activities necessary to

affect the sale of these securities to the investing public, by issuing securities promoting the

securities and supervising their distribution and ultimate sale to the investing public.

109.   By reason of the conduct alleged herein, Defendants violated Section 12(a)(2) of the

Securities Act.  Accordingly, Lead Plaintiff, individually and on behalf of the Securities Act Class,

hereby offers to tender to the Defendants those common shares that Lead Plaintiff and the other Securities Act Class members continue to own, in return for the consideration paid for those common shares together with interest thereon.  Class members who have sold their common shares are entitled to rescissory damages.

## COUNT III

### For Violation of Section 15 of the Securities Act
### Against the Individual Defendants

110.    For purposes of this Count, Lead Plaintiff incorporates by reference those allegations concerning the Offering Materials, and the Securities Act Class only.  Any allegations of fraud are hereby expressly disclaimed and are not incorporated by reference in this Count.  Specifically, Lead Plaintiff incorporates the allegations in ¶¶1-6, 13-109 only.

111.    This Count is asserted by Lead Plaintiff against the Individual Defendants for violations of Section 15 of the Securities Act (15 U.S.C. §77o).  For purposes of this Count, Lead Plaintiff does not claim that Defendants committed intentional or reckless misconduct or that Defendants acted with scienter or fraudulent intent.

112.    By reason of their ownership interest, senior management positions and/or directorships at the Company, the Individual Defendants, individually and acting pursuant to a common plan, had the power to influence and exercised the same to cause CPI to engage in the conduct complained of herein and were therefore control persons of CPI.  By reason of such conduct, the Individual Defendants are liable pursuant to Section 15 of the Securities Act.

113.    Each of the Individual Defendants was a culpable participant in the violations of Sections 11 and/or 12(a)(2) of the Securities Act alleged in Counts I and II above, based on their having signed the Offering Materials and/or having otherwise participated in the process that allowed the Offering to be successfully completed.

## ALLEGATIONS UNDER THE EXCHANGE ACT

114.    For the purposes of this section of the Complaint, the term "Defendants" refers, collectively, to CPI, McCrosson and Palazzolo.

115.    During the Class Period, the Defendants knowingly and/or recklessly issued the following materially false and misleading statements of fact: (i) CPI's financial statements were presented pursuant to the rules and regulations of the SEC and in conformity with GAAP; (ii) CPI adopted the provisions of ASC Topic 606 effective January 1, 2018; (iii) CPI's revenue recognition on the Company's contracts did not change materially upon the adoption of ASC Topic 606; (iv) the adoption of ASC Topic 606 had "no impact" CPI's consolidated financial statements; and (v) management's analysis of CPI's financial condition and the results of its operations contained materially false and inaccurate disclosures.

116.    In addition, CPI knew and/or recklessly disregarded that, despite repeated representations by Defendants to the contrary during the Class Period, the Company's system of internal control over financial reporting and disclosure controls were ineffective and operated with "material weaknesses."

117.    The Class Period begins on March 22, 2018.  On that date, CPI filed with the SEC its 2017 Form 10-K signed by Defendants McCrosson and Palazzolo.

**2017 Form 10-K**

118.    The 2017 Form 10-K falsely and misleadingly represented that the Company's adoption of ASC Topic 606 did not cause a material change in CPI's historical practice of revenue recognition stating, in pertinent part, as follows:

> Effective January 1, 2018, the Company adopted Topic 606 using the modified retrospective method for all of its contracts. ***Following the adoption of Topic 606, the Company's revenue recognition for all of its contracts remained materially consistent with historical practice***.

- 33 -

119.    CPI's statement that "the Company's revenue recognition for all of its contracts remained materially consistent with historical practice" was an untrue statement of material fact because, as detailed herein, Defendants knew and/or recklessly disregarded that the Company's adoption of ASC Topic 606 required a fundamental change in its historical practice of revenue recognition.  As CPI has now admitted, the Company's historical practice of using a "manufacturing program" as its unit of accounting on customer contracts violated the dictates of ASC Topic 606, which requires that "performance obligations" be used as the unit of accounting on customer contracts.

**1Q 2018 Financial Results**

120.    On May 15, 2018, the Company issued a press release announcing its financial results for the 2018 first quarter, the period ended March 31, 2018, which it filed with the SEC on the May 2018 Form 8-K.

121.    The May 2018 Form 8-K falsely represented, in pertinent part, that:

Effective January 1, 2018, the Company adopted Accounting Standards Codification Topic 606 Revenue from Contracts with Customers ("ASC 606") using the modified retrospective method.  ***Revenue recognition on all of the Company's contracts did not change materially as a result of the adoption of ASC 606***.

122.    This statement was materially false and misleading for the reasons set forth in ¶119.

123.    Also on May 15, 2018, following the issuance of its quarterly results for the period ended March 31, 2018, CPI held a conference call with analysts and investors to discuss its financial performance.  Defendants Palazzolo and McCrosson participated in the call.  In addressing CPI's application of ASC Topic 606, Defendant Palazzolo stated, in pertinent part, as follows:

. . . Before I review our first quarter results, I want to bring to your attention a change in our accounting policies.  Effective January 1, 2018, we adopted the new revenue recognition standard known as ASC Topic 606.  For those of you who aren't familiar with ASC 606, it requires sales and gross profit to be recognized over the contract period as work is performed, based on the relationship between actual cost incurred and total estimated cost at the completion of the contract.  ***Following the adoption of***

- 34 -

*ASC 606, our revenue recognition on all of our current contracts has not changed materially for both the first quarter and over the life of those contracts*. . . .

124.    Defendant Palazzolo's statement that "our revenue recognition on all of our current contracts has not changed materially for both the first quarter and over the life of those contracts" was false and misleading for the reasons set forth in ¶119.

125.    In addition, on May 15, 2018, CPI filed with the SEC the 1Q 2018 Form 10-Q signed by Defendants McCrosson and Palazzolo.

126.    The 1Q 2018 Form 10-Q falsely represented that CPI's reported revenues of $18.2 million, gross profit of $4.0 million, pre-tax income of $1.6 million and net income of $1.3 million for the three months ended March 31, 2018 were presented "pursuant to the rules and regulations of the Securities and Exchange Commission ("SEC")."

The 1Q 2018 Form 10-Q also falsely stated, in pertinent part, that:

Effective January 1, 2018, the Company adopted Accounting Standards Codification Topic 606 *Revenue from Contracts with Customers* ("ASC 606") using the modified retrospective method for all of its contracts.

\*        \*        \*

Following the adoption of ASC 606, the Company's revenue recognition for all of its contracts remained materially consistent with historical practice and there was no impact in the three months ended March 31, 2018 condensed financial statements upon adoption.

127.    This statement was materially misleading for the reasons set forth in ¶119.

128.    As a result of CPI's admitted failure to apply ASC Topic 606 and present its financial results pursuant to the rules and regulations of the SEC and in conformity with GAAP, the Company has now acknowledged that for the three months ended March 31, 2018, the 1Q 2018 Form 10-Q overstated its reported revenue by more than 21%, its gross profit was overstated by almost 400%, its reported pre-tax income of $1.6 million was actually a pre-tax *loss* of $1.7 million and its reported net income of $1.3 million was actually a pre-tax *loss* of $2.0 million.

129.    In addition, the MD&A in the 1Q 2018 Form 10-Q contained materially false and

misleading statements of fact about CPI's financial condition and the results of its operations for the

period ended March 31, 2018, stating, in pertinent part:

*Revenue*

Revenue for the three months ended March 31, 2018 was $18,191,623 compared to $20,032,701 for the same period last year, a decrease of $1,841,078 or 9.2%.  This decrease is predominantly the result of a normal cyclical decrease in revenue on the Company's E-2D programs for both domestic and foreign sales.

                    *       *       *

*Gross Profit*

Gross profit for the three months ended March 31, 2018 was $4,049,868 compared to $4,537,514 for the three months ended March 31, 2017, a decrease of $487,646, predominately the result of lower volume.

                    *       *       *

*Income Before Provision for Income Taxes*

Income before provision for income taxes for the three months ended March 31, 2018 was $1,552,765 compared to $1,983,301 for the same period last year, a decrease of $430,536 or 21.7%, predominately the result of lower government subcontractor revenue.

                    *       *       *

*Net Income*

Net income for the three months ended March 31, 2018 was $1,256,765 or $0.14 per basic share, compared to $1,249,301 or $0.14 per basic share, for the same period last year.  Diluted income per share was $0.14 for the three months ended March 31, 2018 calculated utilizing 8,940,385 weighted average shares outstanding.  Diluted income per share for the three months ended March 31, 2017 was $0.14, calculated utilizing 8,830,953 average shares outstanding as adjusted for the dilutive effect of outstanding stock options and RSUs.

130.    CPI has now admitted that the MD&A disclosure in the 1Q 2018 Form 10-Q

contained materially false and misleading disclosures about management's analysis of CPI's

financial condition and the results of its operations for the period ended March 31, 2018.

- 36 -

131.    The 1Q 2018 Form 10-Q also falsely represented that CPI's internal controls over

financial reporting and its disclosure controls were operating effectively, stating, in pertinent part:

> Based on an evaluation of the Company's disclosure controls and procedures as of March 31, 2018 made by management, under the supervision and with the participation of the Chief Executive Officer and Chief Financial Officer, the Chief Executive Officer and Chief Financial Officer have concluded that the Company's disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) promulgated under the Exchange Act) were effective as of March 31, 2018.

> \*        \*        \*

> There has been no change in our internal control over financial reporting during the quarter ended March 31, 2018 that has materially affected or is reasonably likely to materially affect our internal control over financial reporting.

132.    In addition, the 1Q 2018 Form 10-Q contained false and misleading certifications by

Defendants McCrosson and Palazzolo on CPI's internal control over financial reporting and its

disclosure controls and procedures.  The certifications stated, in pertinent part:

1.    I have reviewed this Quarterly Report on Form 10-Q of CPI Aerostructures, Inc;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant including its consolidated subsidiaries, is made known to us

- 37 -

by others within those entities, particularly during the period in which this report is being prepared:

(b)   Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for the external purposes in accordance with generally accepted accounting principles:

(c)   Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)   Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's first fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.   The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and to the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a)   All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)   Any fraud, whether or not material, that involves management or other employees who have significant role in the registrant's internal control over financial reporting.

133.   These false and misleading certifications were repeated, in all material respects, during the remainder of the Class Period.

134.   The statements set forth in ¶¶131-133 were untrue statements of material fact because Defendants knew and/or recklessly disregarded that the Company's internal control over financial reporting and its disclosure controls and procedures were ineffective, were not designed to provide

reasonable assurance regarding the reliability of the Company's financial statements, and operated with material weaknesses during this period.

### 2Q 2018 Financial Results

135.     On August 9, 2018, CPI filed with the SEC the 2Q 2018 Form 10-Q signed by Defendants McCrosson and Palazzolo.

136.     The 2Q 2018 Form 10-Q falsely represented that CPI's reported revenues of $38.5 million, gross profit of $8.6 million, pre-tax income of $3.2 million and net income of $2.5 million for the six months ended June 30, 2018 were presented "pursuant to the rules and regulations of the Securities and Exchange Commission ("SEC")."

137.     The 2Q 2018 Form 10-Q also falsely represented, in pertinent part, that:

Effective January 1, 2018, the Company adopted Accounting Standards Codification Topic 606 *Revenue from Contracts with Customers* ("ASC 606") using the modified retrospective method for all of its contracts.

*        *        *

Following the adoption of ASC 606, the Company's revenue recognition for all of its contracts remained materially consistent with historical practice and there was no impact in the six months ended June 30, 2018 condensed financial statements upon adoption.

138.     The statements referenced in ¶¶136-137 were materially false and misleading for the reasons set forth in ¶119.

139.     As a result of CPI's admitted failure to present its financial results in the 2Q 2018 Form 10-Q pursuant to the rules and regulations of the SEC and in conformity with GAAP, CPI has now acknowledged that for the six months ended June 30, 2018, its reported revenue was overstated by approximately 20%, its gross profit was overstated by more than 360%, its reported pre-tax income of $3.2 million was actually a pre-tax *loss* of $3.6 million and its reported net income of $2.5 million was actually a pre-tax *loss* of $4.3 million.

140.    In addition, the 2Q 2018 Form 10-Q contained materially false and misleading MD&A disclosures about management's analysis of CPI's financial condition and the results of its operations for the periods ended June 30, 2018, stating, in pertinent part:

### Revenue

Revenue for the three months ended June 30, 2018 was $20,261,239 compared to $16,731,951 for the same period last year, an increase of $3,529,288 or 21.1%.  This increase is predominantly the result of ramping up of the next generation jammer pod program and the production of T-38 kits, offset by a normal cyclical decrease in revenue on the Company's E-2D programs for both domestic and foreign sales.

Revenue for the six months ended June 30, 2018 was $38,452,862 compared to $36,764,652 for the same period last year, an increase of $1,688,210 or 4.6%.  This increase is predominantly the result of ramping up of the next generation jammer pod program and the production of T-38 kits, offset by a normal cyclical decrease in revenue on the Company's E-2D programs for both domestic and foreign sales.

*       *       *

### Gross Profit

Gross profit for the six months ended June 30, 2018 was $8,634,686 compared to $8,221,262 for the six months ended June 30, 2017, an increase of $413,424 or 5.0%, predominately the result of higher volume.

*       *       *

### Income Before Provision for Income Taxes

Income before provision for income taxes for the three months ended June 30, 2018 was $1,610,225 compared to $1,215,647 for the same period last year, an increase of $394,578 or 32.5%, predominately the result of higher direct military revenue. Income before provision for income taxes for the six months ended June 30, 2018 was $3,162,990 compared to $3,198,948 for the same period last year, a decrease of $35,958 or 1.1%, predominately the result of higher selling, general and administrative expenses.

*       *       *

### Net Income

Net income for the three months ended June 30, 2018 was $1,257,225 or $0.14 per basic share, compared to $765,647 or $0.09 per basic share, for the same period last year. Net income for the six months ended June 30, 2018 was $2,513,990 or $0.28 per basic share, compared to $2,014,948 or $0.23 per basic share, for the same period

- 40 -

last year.  Diluted income per share was $0.14 for the three months ended June 30, 2018 calculated utilizing 8,980,155 weighted average shares outstanding.  Diluted income per share was $0.28 for the six months ended June 30, 2018 calculated utilizing 8,953,321 weighted average shares outstanding.  Diluted income per share was $0.09 for the three months ended June 30, 2017 calculated utilizing 8,865,055 weighted average shares outstanding.  Diluted income per share for the six months ended June 30, 2017 was $0.23, calculated utilizing 8,840,309 average shares outstanding as adjusted for the dilutive effect of outstanding stock options and RSUs.

141.    CPI has now admitted that the MD&A disclosure in the 2Q 2018 Form 10-Q contained materially false and misleading statements about management's analysis of CPI's financial condition and the results of its operations for the periods ended June 30, 2018.

142.    The 2Q 2018 Form 10-Q also falsely represented that CPI's internal controls over financial reporting and its disclosure controls were operating effectively, stating, in pertinent part:

> Based on an evaluation of the Company's disclosure controls and procedures as of June 30, 2018 made by management, under the supervision and with the participation of the Chief Executive Officer and Chief Financial Officer, the Chief Executive Officer and Chief Financial Officer have concluded that the Company's disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) promulgated under the Exchange Act) were effective as of June 30, 2018.

> *     *     *

> There has been no change in our internal control over financial reporting during the quarter ended June 30, 2018 that has materially affected or is reasonably likely to materially affect our internal control over financial reporting.

143.    The statements referenced in ¶142 above were materially false and misleading because, Defendants knew and/or recklessly disregarded that CPI's internal control over financial reporting and its disclosure controls and procedures during the relevant time period were ineffective and operated with material weaknesses.

144.    In addition, the 2Q 2018 Form 10-Q contained false and inaccurate certifications by Defendants McCrosson and Palazzolo on CPI's internal control over financial reporting and its disclosure controls and procedures.  These certifications repeated in substance the representations made in ¶132 above and were materially false and misleading for the reasons set forth in ¶134.

- 41 -

145.    Also on August 9, 2018, following the issuance of CPI's 2Q 2018 results, the Company held a conference call with analysts and investors.  Defendants Palazzolo and McCrosson participated in the call.  In addressing CPI's application of ASC Topic 606, Defendant Palazzolo stated, in pertinent part, as follows:

> . . .Before I review our second quarter results, I want to remind you, that effective January 1, 2018, we adopted a new revenue recognition standard known as ASC Topic 606. Following the adoption of ASC 606, our revenue recognition on all of our current contracts has not changed materially over the life of those contracts….

146.    Defendant Palazzolo's statement that "our revenue recognition on all of our current contracts has not changed materially over the life of those contracts" was false and misleading for the reasons set forth in ¶119.

### 3Q 2018 Financial Results

147.    On November 8, 2018, following the issuance of CPI's quarterly results for the period ended September 30, 2018, the Company held a conference call with analysts and investors. Defendants McCrosson and Palazzolo participated in the call.

148.    In addressing CPI's application of ASC Topic 606, Defendant Palazzolo stated, in pertinent part, as follows:

> . . . Before I review our third quarter results, I want to remind you that effective January 1, 2018, we adopted a new revenue recognition standard known as ASC Topic 606. Following the adoption of ASC 606, *our revenue recognition on all of our current contracts had not changed materially over the life of those contracts*. . . .

149.    Defendant Palazzolo's statement that "our revenue recognition on all of our current contracts had not changed materially over the life of those contracts" was materially false and misleading for the reasons set forth in ¶119.

150.    On November 13, 2018, CPI filed with the SEC its Form 10-Q for the period ended September 30, 2018 (the "3Q 2018 Form 10-Q") signed by Defendants McCrosson and Palazzolo.

151.    The 3Q 2018 Form 10-Q falsely represented that CPI's reported revenues of $19.9 million, gross profit of $4.8 million, pre-tax income of $1.6 million and net income of $1.3 million for the three months ended September 30, 2018 were presented "pursuant to the rules and regulations of the Securities and Exchange Commission ("SEC")."

152.    The 3Q 2018 Form 10-Q also falsely represented, in pertinent part, that:

Effective January 1, 2018, the Company adopted Accounting Standards Codification Topic 606 *Revenue from Contracts with Customers* ("ASC 606") using the modified retrospective method for all of its contracts.

*       *       *

Following the adoption of ASC 606, the Company's revenue recognition for all of its contracts remained materially consistent with historical practice and there was no impact in the nine months ended September 30, 2018 condensed financial statements upon adoption.

153.    The statements in ¶¶151-152 were materially false and misleading for the reasons set forth in ¶119.

154.    As a result of CPI's admitted failure to apply ASC Topic 606 and present its financial results pursuant to the rules and regulations of the SEC and in conformity with GAAP, the Company has now acknowledged that for the three months ended September 30, 2018, the 3Q 2018 Form 10-Q overstated its reported revenue by approximately 20%, its gross profit was overstated by more than 412%, its reported pre-tax income of $3.9 million was actually a pre-tax *loss* of $6.2 million and its reported net income of $3.1 million was actually a pre-tax *loss* of $7.0 million.

155.    In addition, the 3Q 2018 Form 10-Q contained materially false and misleading disclosures about management's discussion and analysis of CPI's financial condition and the results of operations for the period ended September 30, 2018, stating, in pertinent part:

*Revenue*

Revenue for the three months ended September 30, 2018 was $19,944,558 compared to $20,706,460 for the same period last year, a decrease of $761,902 or 3.7%.  This

- 43 -

decrease is predominantly the result of the wind-down of our current Northrop Grumman E-2D multi-year program as we begin transitioning to a new multi-year contract, partially offset by increased revenue from our prime contracts direct with the U.S. Government for F-16 components and T-38 kits.

Revenue for the nine months ended September 30, 2018 was $58,397,420 compared to $57,471,112 for the same period last year, an increase of $926,308 or 1.6%. This increase is predominantly the result of ramping up of the next generation jammer pod program and the production of T-38 kits, offset by a normal cyclical decrease in revenue on the Company's E-2D programs for both domestic and foreign sales.

\*       \*       \*

*Gross Profit*

Gross profit for the nine months ended September 30, 2018 was $13,433,164 compared to $13,133,698 for the nine months ended September 30, 2017, an increase of $299,466 or 2.3%, predominately the result of higher volume.

Gross profit for the three months ended September 30, 2018 was $4,798,478 compared to $4,912,436 for the three months ended September 30, 2017, a decrease of $113,958 or 2.3%, predominately the result of lower volume.

\*       \*       \*

*Income Before Provision for Income Taxes*

Income before provision for income taxes for the three months ended September 30, 2018 was $1,639,153 compared to $2,465,513 for the same period last year, a decrease of $826,360 or 33.5%, predominately the result of higher selling, general and administrative expenses. Income before provision for income taxes for the nine months ended September 30, 2018 was $4,802,143 compared to $5,664,461 for the same period last year, a decrease of $862,318 or 15.2%, predominately the result of higher selling, general and administrative expenses.

\*       \*       \*

*Net Income*

Net income for the three months ended September 30, 2018 was $1,328,153 or $0.15 per basic share, compared to $1,695,513 or $0.19 per basic share, for the same period last year. Net income for the nine months ended September 30, 2018 was $3,842,143 or $0.43 per basic share, compared to $3,710,461 or $0.42 per basic share, for the same period last year. Diluted income per share was $0.15 for the three months ended September 30, 2018 calculated utilizing 8,977,075 weighted average shares outstanding. Diluted income per share was $0.43 for the nine months ended September 30, 2018 calculated utilizing 8,951,640 weighted average shares outstanding. Diluted income per share was $0.19 for the three months ended

September 30, 2017 calculated utilizing 8,872,810 weighted average shares outstanding. Diluted income per share for the nine months ended September 30, 2017 was $0.42, calculated utilizing 8,841,397 average shares outstanding as adjusted for the dilutive effect of outstanding stock options and RSUs.

156.    CPI has now admitted that the MD&A disclosure in the 3Q 2018 Form 10-Q contained materially false and misleading disclosures about management's analysis of CPI's financial condition and the results of its operations for the periods ended September 30, 2018.

157.    The 3Q 2018 Form 10-Q also falsely represented that CPI's internal controls over financial reporting and its disclosure controls were operating effectively and repeated, in substance, the representations set forth in ¶131 above. In addition, the 3Q 2018 Form 10-Q contained false and inaccurate certifications by Defendants McCrosson and Palazzolo on CPI's internal control over financial reporting and its disclosure controls and procedures as set forth in ¶132. These statements were materially false and misleading for the reasons set forth in ¶134.

### Amendment to 3Q 2018 Financial Results

158.    Before market hours on February 8, 2019, CPI filed a Form 8-K with the SEC which reported that the Company's previously filed 3Q 2018 Form 10-Q should no longer be relied upon and required restatement. Specifically, CPI disclosed that, during the three and nine months ended September 30, 2018, the Company's revenue was overstated by $900,000 to $950,000, net income was overstated by $725,000 to $775,000 and, as a result, earnings per share were overstated by $0.09 per share. The Company's Form 8-K stated, in pertinent part:

**Item 4.02 Non-Reliance on Previously Issued Financial Statements or a Related Audit Report or Completed Interim Review.**

On February 7, 2019, the Audit Committee of the Board of Directors (the "Audit Committee") of CPI Aerostructures, Inc. (the "Company"), determined based on the recommendation of management and in consultation with CohnReznick LLP ("CohnReznick"), the Company's independent registered public accounting firm, that the Company's previously issued financial statements as of and for the three and nine months ended September 30, 2018 included in its Form 10-Q as filed with the Securities and Exchange Commission on November 13, 2018, ***should no longer be***

*relied upon due to an error in the financial statements that was identified by management*.

*This error occurred in the Company's billing process and resulted in the overstatement of revenue* for the three and nine months ended September 30, 2018. The identification of the error was made by management during the Company's review of the billing process for the year ended December 31, 2018 in connection with the preparation of the Company's 2018 financial statements. Management's preliminary conclusion is that the error was limited to one instance and that the effect of correcting the foregoing error in the Company's financial statements for the three and nine months ended September 30, 2018 is (i) a reduction of revenue and income before provision for income taxes of approximately $900,000 to $950,000, (ii) a reduction of net income of approximately $725,000 to $775,000 and (iii) a reduction of fully diluted earnings per share of approximately $ 0.09, for each such period.

159.   CPI also disclosed that management determined that as of September 30, 2018, the Company had a material weakness in its internal controls over financial reporting and that its disclosure controls and procedures were not effective.  CPI stated, in pertinent part, as follows:

In connection with the restatement noted above, management has determined that a *material weakness existed in the Company's internal control over financial reporting as of September 30, 2018*.  As a result, the Company's chief executive officer and chief financial officer have concluded that *the Company's disclosure controls and procedures were not effective at the reasonable assurance level as of September 30, 2018*. A discussion of the Company's plan to remediate the material weakness will be contained in the Company's Annual Report on Form 10-K for the year ended December 31, 2018, which the Company expects to file with Securities and Exchange Commission on or before its filing deadline.

160.   On this news, CPI's stock price fell approximately 8.5% on February 8, 2019.

161.   Defendants, however, continued to mislead the market by failing to disclose the following material facts then known to them:

(a)   CPI's financial statements were not presented in conformity with GAAP;

(b)   CPI failed to adopt ASC Topic 606;

(c)   the adoption of ASC Topic 606 required a material change in CPI's revenue recognition on the Company's contracts;

- 46 -

(d)     the adoption of ASC Topic 606 had a material impact on the Company's consolidated financial statements; and

(e)     each of the financial statements that CPI issued to investors and filed with the SEC during the relevant period were not presented pursuant to the rules and regulations of the SEC.

**2018 Annual Financial Results**

162.    On March 13, 2019, following the issuance of CPI's quarterly and annual results for the period ended December 31, 2018, the Company held a conference call with analysts and investors.  Defendants McCrosson and Palazzolo participated in the call.

163.    In addressing CPI's application of ASC Topic 606, Defendant Palazzolo stated, in pertinent part, as follows:

> [] First, I want to remind you that effective January 1, 2018, we adopted a new revenue recognition standard known as ASC Topic 606. ***Following the adoption of ASC 606, our revenue recognition on all of our current contracts has not changed materially over the life of those contracts*** . . . .

164.    Defendant Palazzolo's statement that "our revenue recognition on all of our current contracts has not changed materially over the life of those contracts" was materially false and misleading for the reasons set forth in ¶119.

165.    On April 1, 2019, CPI filed with the SEC its Annual Report on Form 10-K ("2018 Form 10-K") signed by Defendants McCrosson and Palazzolo.

166.    The 2018 Form 10-K falsely represented that the Company's adoption of ASC Topic 606 did not require a material change in CPI's historical practice of revenue recognition stating, in pertinent part, as follows:

> Effective January 1, 2018, the Company adopted Accounting Standards Codification Topic 606 "Revenue from Contracts with Customers" ("ASC 606") using the modified retrospective method for all of its contracts.

*     *     *

Following the adoption of ASC 606, the Company's revenue recognition for all of its contracts remained materially consistent with historical practice and there was no impact in the year ended December 31, 2018 consolidated financial statements upon adoption.

167.    CPI's statement that "the Company's revenue recognition for all of its contracts remained materially consistent with historical practice" was an untrue statement of material fact because Defendants knew and/or recklessly disregarded that the Company's adoption of ASC Topic 606 required a material change in its historical practice of revenue recognition. As CPI has now admitted, the Company's historical practice of using a "manufacturing program" as its unit of accounting on customer contracts violated the dictates of ASC Topic 606, which requires that "performance obligations" be used as the unit of accounting on customer contracts.

168.    As a result of CPI's admitted failure to apply ASC Topic 606 and present its financial results pursuant to the rules and regulations of the SEC and in conformity with GAAP, the Company has now acknowledged that for the year ended December 31, 2018, the 2018 Form 10-K overstated its reported revenue by approximately 20%, its reported pre-tax income of $6.7 million was actually a pre-tax *loss* of $7.6 million and its reported net income of $2.2 million was actually a pre-tax *loss* of $12.0 million.

169.    In addition, the 2018 Form 10-K contained materially false and misleading disclosures about management's analysis of CPI's financial condition and the results of operations for the period ended December 31, 2018, stating, in pertinent part:

*Revenue*. Revenue for the year ended December 31, 2018 was $83,929,270 compared to $81,283,148 for the year ended December 31, 2017, representing an increase of $2,646,122.

\*       \*       \*

*Gross profit*. Gross profit for the year ended December 31, 2018 was $18,164,263 compared to $18,645,916 for the year ended December 31, 2017, a decrease of $481,653. Gross profit percentage ("gross margin") for the year ended December 31, 2018 was 21.6% compared to 22.9% for the same period last year, predominately the

result of fade in gross margin on the Company's G650 program, as we experienced some production issues in 2018 which resulted in higher labor costs than estimated.

*     *     *

*Income from operations.* We had income from operations for the year ended December 31, 2018 of $8,635,380 compared to income from operations of $10,196,322 for the year ended December 31, 2017. The decrease was predominately the result in the decrease in gross profit described above, and the increase in selling, general and administrative expenses described above.

170.   CPI has now admitted that the MD&A disclosure in the 2018 Form 10-K contained materially false and misleading disclosures about management's analysis of CPI's financial condition and the results of its operations for the period ended December 31, 2018.

171.   The 2018 Form 10-K noted a material weakness existed in the Company's internal control over financial reporting for the period ended September 30, 2018. CPI stated, in pertinent part, as follows:

**Evaluation of Disclosure Controls and Procedures**

The Company's management has established disclosure controls and procedures designed to ensure that information it is required to disclose in the reports that it files or submits under the Securities Exchange Act of 1934, as amended (the "Exchange Act") is recorded, processed, summarized and reported within time periods specified in the Securities and Exchange Commission rules and forms. Such disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information the Company is required to disclose in the reports that it files or submits under the Exchange Act is accumulated and communicated to the Company's management to allow timely decisions regarding required disclosure.

In connection with the filing of the Company's quarterly report on Form 10-Q as of and for the three and nine months ended September 30, 2018 (the "Original Form 10-Q"), the Company's Chief Executive Officer and Chief Financial Officer evaluated the Company's disclosure controls and procedures and concluded that the Company's disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) promulgated under the Exchange Act) were effective as of September 30, 2018.

Subsequent to that evaluation, in connection with the restatement of the Company's financial statements as of and for the three and nine months ended September 30, 2018, discussed in Note 1 to the condensed financial statements included in the Form

- 49 -

10-Q/A filed with the Securities and Exchange Commission on February 27, 2019, the Chief Executive Officer and Chief Financial Officer reevaluated the effectiveness of the Company's disclosure controls and procedures as of September 30, 2018, and determined that *a material weakness existed in the Company's internal control over financial reporting. The Chief Executive Officer and Chief Financial Officer have identified the following material weakness in the Company's internal control over financial reporting: that the review control procedures failed to identify, in a timely manner, the miscoding of an invoice in the Company's records and the resulting overstatement of revenue*. Because the foregoing material weakness in the Company's internal control over financial reporting had not been remediated by or before the filing of the Original Form 10-Q, the Company's Chief Executive Officer and Chief Financial Officer have concluded that *the Company's disclosure controls and procedures were not effective at the reasonable assurance level as of September 30, 2018. In addition, because the material weakness was not discovered until February of 2019, the Company's Chief Executive Officer and Chief Financial Officer have concluded that the Company's disclosure controls and procedures were not effective at the reasonable assurance level as of December 31, 2018*.

### 1Q 2019 Financial Results

172.   On May 10, 2019, CPI filed with the SEC its Form 10-Q for the period ended September 30, 2018 (the "1Q 2019 Form 10-Q") signed by Defendants McCrosson and Palazzolo.

173.   The 1Q 2019 Form 10-Q falsely represented that CPI's reported revenues of $25.6 million, gross profit of $5.4 million, pre-tax income of $2.1 million, net income of $1.7 for the three months ended March 31, 2019 were presented "pursuant to the rules and regulations of the Securities and Exchange Commission ("SEC")."

174.   The 1Q 2019 Form 10-Q also falsely represented, in pertinent part, that:

Effective January 1, 2018, the Company adopted Accounting Standards Codification Topic 606 Revenue from Contracts with Customers ("ASC 606") using the modified retrospective method for all of its contracts.

*         *         *

Following the adoption of ASC 606, the Company's revenue recognition for all of its contracts remained materially consistent with historical practice and there was no material impact on the consolidated financial statements upon adoption.

175.     The statements referenced in ¶¶173-174 were materially false and misleading for the reasons set forth in ¶119.

176.     As a result of CPI's admitted failure to apply ASC Topic 606 and present its financial results pursuant to the rules and regulations of the SEC and in conformity with GAAP, the Company has now acknowledged that for the three months ended March 31, 2019, the 1Q 2019 Form 10-Q overstated its reported revenue by more than 16%, its gross profit was overstated by more than 118%, its reported pre-tax income of $2.1 million was actually a pre-tax *loss* of $1.0 million and its reported net income of $1.7 million was actually a pre-tax *loss* of $1.3 million.

177.     In addition, the 1Q 2019 Form 10-Q contained materially false and misleading disclosures about management's discussion and analysis of CPI's financial condition and the results of its operations for the period ended March 31, 2019, stating, in pertinent part:

### *Revenue*

Revenue for the three months ended March 31, 2019 was $25,583,531 compared to $18,191,623 for the same period last year, an increase of $7,391,908 or 40.6%. Approximately $2.1 million of this increase is the result of the inclusion of WMI revenue, which we acquired in December of 2018.   Additionally, there was an increase of $4.3 million because of the increasing production rates of the Next Generation Jammer pod program as we continue work on pod version 2.0.  We also had increases of approximately $0.7 million on the Company's E-2D program, $0.7 million on the F-35 Lock program and $0.7 million on the Company's HondaJet program, as these programs are increasing production in 2019.

\*        \*        \*

### *Gross Profit*

Gross profit for the three months ended March 31, 2019, was $5,415,810 compared to $4,049,868 for the three months ended March 31, 2018, an increase of $1,365,942 or 33.7%, predominately the result of higher volume.

\*        \*        \*

***Income Before Provision for Income Taxes***

Income before provision for income taxes for the three months ended March 31, 2019 was $2,098,598 compared to $1,552,765 for the same period last year, an increase of $545,833 or 35%, predominately the result of higher government subcontractor revenue.

*     *     *

***Net Income***

Net income for the three months ended March 31, 2019 was $1,658,599 or $0.14 per basic share, compared to $1,256,765 or $0.14 per basic share, for the same period last year.  Diluted income per share was $0.14 for the three months ended March 31, 2019 calculated utilizing 11,792,818 weighted average shares outstanding. Diluted income per share was $0.14 for the three months ended March 31, 2018 calculated utilizing 8,940,385 weighted average shares outstanding.

178.    CPI has now admitted that the MD&A disclosure in the 1Q 2019 Form 10-Q contained materially false and misleading disclosures about management's analysis of CPI's financial condition and the results of its operations for the period ended March 31, 2018 and March 31, 2019.

179.    The 1Q 2019 Form 10-Q noted a material weakness existed in the Company's internal control over financial reporting for the period ended March 31, 2019.  CPI stated, in pertinent part, as follows:

**Evaluation of Disclosure Controls and Procedures**

We maintain a system of disclosure controls and procedures that is designed to ensure that information required to be disclosed in our Exchange Act reports is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to our management, as appropriate, to allow timely decisions regarding required disclosures.  Disclosure controls and procedures also include, without limitation, controls and procedures designed to ensure that information required to be disclosed by a company in the reports that it files or submits under the Exchange Act is accumulated and communicated to the Company's management, including its principal executive and principal financial officers, or persons performing similar functions, and Board of Directors, as appropriate, to allow timely decisions regarding required disclosure.

Under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, we conducted an evaluation of our disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) as of March 31, 2019. Based on this evaluation and considering the material weakness in internal control over financial reporting described below, we concluded as of March 31, 2019, that our disclosure controls and procedures were not effective at the reasonable assurance level.

A material weakness is a control deficiency or combination of control deficiencies that results in more than a remote likelihood that a material misstatement of the annual or interim financial statements will not be prevented or detected on a timely basis. ***The following material weakness in the Company's internal control over financial reporting was identified subsequent to September 30, 2018 and still exists as of March 31, 2019: that the review control procedures failed to identify, in a timely manner, the miscoding of an invoice in the Company's records and the resulting overstatement of revenue***. Because the foregoing material weakness in the Company's internal control over financial reporting had not been remediated by or before the filing of the Form 10-Q for the three and nine months ended September 30, 2018 as originally filed with the SEC on November 13, 2018, the Company's Chief Executive Officer and Chief Financial Officer have concluded that ***the Company's disclosure controls and procedures were not effective at the reasonable assurance level as of September 30, 2018***. The Company has reviewed its financial closing process and has identified the corrective action to remediate the control failure that was the cause of this error and has implemented this control as well as certain other procedures in the first quarter of 2019. The Company believes that the corrective action and implementation of the new control procedures will provide reasonable assurance that this type of error will not occur in the future; however, we have not concluded our evaluation because we have not fully tested the new control.

**2Q 2019 Financial Statements**

180.    On August 8, 2019, CPI filed with the SEC its Form 10-Q for the period ended June 30, 2019 (the "2Q 2019 Form 10-Q") signed by Defendants McCrosson and Palazzolo.

181.    The 2Q 2019 Form 10-Q falsely represented that CPI's reported revenues of $23.2 million, gross profit of $5.0 million, pre-tax income of $1.7 million, net income of $2.7 million and earnings per diluted share of $0.23 for the quarter were presented "pursuant to the rules and regulations of the Securities Exchange Commission ("SEC")."

182.    The 2Q 2019 Form 10-Q also falsely represented, in pertinent part, that:

Effective January 1, 2018, the Company adopted Accounting Standards Codification Topic 606 "*Revenue from Contracts with Customers*" ("ASC 606") using the modified retrospective method for all of its contracts.

\*       \*       \*

Following the adoption of ASC 606, the Company's revenue recognition for all of its contracts remained materially consistent with historical practice and there was no impact in the three months ended March 31, 2018 consolidated financial statements upon adoption.

183.    The statements referenced in ¶¶181-182 were materially false and misleading for the reasons set forth in ¶119.

184.    As a result of CPI's admitted failure to apply ASC Topic 606 and present its financial results in the 2Q 2019 Form 10-Q pursuant to the rules and regulations of the SEC and in conformity with GAAP, CPI has now acknowledged that for the six months ended June 30, 2019, the 2Q 2019 Form 10-Q overstated its reported revenue by approximately 16%, its gross profit was overstated by more than 127%, its reported pre-tax income of $3.8 million was actually a pre-tax *loss* of $2.0 million and its reported net income of $4.4 million was actually a pre-tax *loss* of $1.4 million.

185.    In addition, the 2Q 2019 Form 10-Q contained materially false and misleading MD&A disclosures about management's discussion and analysis of CPI's financial condition and the results of its operations for the periods ended June 30, 2019, stating, in pertinent part:

***Revenue***

Revenue for the three months ended June 30, 2019 was $23,158,251 compared to $20,261,239 for the same period last year, an increase of $2,897,012 or 14.3%. Approximately $1.8 million of this increase is the result of the inclusion of WMI revenue, which we acquired in December of 2018. Additionally, there was an increase of $3.1 million because of the increasing production rates of the Next Generation Jammer pod program. These increases were offset by a decrease in revenue on the G650 program.

Revenue for the six months ended June 30, 2019 was $48,741,782 compared to $38,452,862 for the same period last year, an increase of $10,288,920 or 26.8%. Approximately $3.9 million of this increase is the result of the inclusion of WMI revenue, which we acquired in December of 2018. Additionally, there was an

increase of $7.4 million because of the increasing production rates of the Next Generation Jammer pod program.

*       *       *

### Gross Profit

Gross profit for the three months ended June 30, 2019 was $4,956,182 compared to $4,584,818 for the three months ended June 30, 2018, an increase of $371,364 or 8.1%, predominately the result of higher volume.

Gross profit for the six months ended June 30, 2019 was $10,371,992 compared to $8,634,686 for the six months ended June 30, 2018, an increase of $1,737,306 or 20.1%, predominately the result of higher volume.

*       *       *

### Net Income

Net income for the three months ended June 30, 2019 was $2,710,457 or $0.23 per basic share, compared to $1,257,225 or $0.14 per basic share, for the same period last year. Diluted income per share was $0.23 for the three months ended June 30, 2019 calculated utilizing 11,644,768 weighted average shares outstanding. Diluted income per share was $0.14 for the three months ended June 30, 2018 calculated utilizing 8,980,155 weighted average shares outstanding.

Net income for the six months ended June 30, 2019 was $4,369,055 or $0.37 per basic share, compared to $2,513,990 or $0.28 per basic share, for the same period last year.  Diluted income per share was $0.37 for the six months ended June 30, 2019 calculated utilizing 11,747,711 weighted average shares outstanding.  Diluted income per share was $0.28 for the six months ended June 30, 2018 calculated utilizing 8,953,321 weighted average shares outstanding.

Net income for the three and six months ended June 30, 2019 includes an approximate $0.09 adjustment for the reversal of tax liability described above.

186.    CPI has now admitted that the MD&A disclosure in the 2Q 2019 Form 10-Q contained materially false and misleading disclosures about management's analysis of CPI's financial condition and the results of its operations for the periods ended June 30, 2018 and June 30, 2019.

- 55 -

187.    The 2Q 2019 Form 10-Q noted a material weakness existed in the Company's internal control over financial reporting for the period ended June 30, 2019.  CPI stated, in pertinent part, as follows:

**Evaluation of Disclosure Controls and Procedures**

We maintain a system of disclosure controls and procedures that is designed to ensure that information required to be disclosed in our Exchange Act reports is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to our management, as appropriate, to allow timely decisions regarding required disclosures.  Disclosure controls and procedures also include, without limitation, controls and procedures designed to ensure that information required to be disclosed by a company in the reports that it files or submits under the Exchange Act is accumulated and communicated to the Company's management, including its principal executive and principal financial officers, or persons performing similar functions, and Board of Directors, as appropriate, to allow timely decisions regarding required disclosure.

Under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, we conducted an evaluation of our disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) as of June 30, 2019. *Based on this evaluation and considering the material weakness in internal control over financial reporting described below, we concluded as of June 30, 2019, that our disclosure controls and procedures were not effective at the reasonable assurance level*.

A material weakness is a control deficiency or combination of control deficiencies that results in more than a remote likelihood that a material misstatement of the annual or interim financial statements will not be prevented or detected on a timely basis. *The following material weakness was identified subsequent to September 30, 2018 and still exists as of June 30, 2019.  The review control procedures were inadequately designed to ensure that sales invoices were coded to the correct contract type. The result was a failure to identify, in a timely manner, the miscoding of an invoice in the Company's records and the resulting overstatement of revenue. Because the foregoing material weakness in the Company's internal control over financial reporting had not been remediated by or before the filing of the Form 10-Q for the three and nine months ended September 30, 2018 as originally filed with the SEC on November 13, 2018, the Company's Chief Executive Officer and Chief Financial Officer have concluded that the Company's disclosure controls and procedures were not effective at the reasonable assurance level as of September 30, 2018*.  The Company has reviewed its financial closing process and has identified the corrective action to remediate the control failure that was the cause of this error and has implemented this control as well as certain other procedures in the first quarter of 2019.  The Company believes that the corrective

- 56 -

action and implementation of the new control procedures will provide reasonable assurance that this type of error will not occur in the future; however, we have not concluded our evaluation because we have not fully tested the new control.

### 3Q 2019 Financial Statements

188.     On November 8, 2019, CPI filed with the SEC its Form 10-Q for the period ended September 30, 2019 (the "3Q 2019 Form 10-Q") signed by Defendants McCrosson and Palazzolo.

189.     The 3Q 2019 Form 10-Q falsely represented that CPI's reported revenues of $25.7 million, gross profit of $5.0 million, pre-tax income of $2.0 million, net income of $1.7 million and earnings per diluted share of $0.14 were presented "pursuant to the rules and regulations of the Securities Exchange Commission ("SEC")."

190.     The 3Q 2019 Form 10-Q also falsely represented, in pertinent part, that:

Effective January 1, 2018, the Company adopted Accounting Standards Codification Topic 606 "*Revenue from Contracts with Customers*" ("ASC 606") using the modified retrospective method for all of its contracts.

\*      \*      \*

Following the adoption of ASC 606, the Company's revenue recognition for all of its contracts remained materially consistent with historical practice and there was no impact in the three months ended March 31, 2018 consolidated financial statements upon adoption.

191.     The statements referenced in ¶¶189-190 were materially misleading for the reasons set forth in ¶119.

192.     As a result of its admitted failure to apply ASC Topic 606 and present its financial results in the 3Q 2019 Form 10-Q pursuant to the rules and regulations of the SEC and in conformity with GAAP, CPI has now acknowledged that for the nine months ended September 30, 2019, the 2Q 2019 Form 10-Q overstated its reported revenue by approximately 15%, its gross profit was overstated by more than 132%, its reported pre-tax income of $5.8 million was actually a pre-tax

*loss* of $3.0 million and its reported net income of $6.0 million was actually a pre-tax *loss* of $2.7 million.

193. In addition, the 3Q Form 2019 Form 10-Q contained materially false and misleading disclosures about management's discussion and analysis of CPI's financial condition and the results of its operations for the period ended September 30, 2019, stating, in pertinent part:

### Revenue

Revenue for the three months ended September 30, 2019 was $25,711,153 compared to $19,017,301 for the same period last year, an increase of $6,693,852 or 35.2%. Approximately $5.2 million of this increase is the result of the inclusion of WMI revenue, which we acquired in December of 2018. Additionally, there was an increase of $1.3 million related to the E-2D program.

Revenue for the nine months ended September 30, 2019 was $74,452,935 compared to $57,470,163 for the same period last year, an increase of $16,982,772 or 29.6%. Approximately $9.1 million of this increase is the result of the inclusion of WMI revenue, which we acquired in December of 2018. Additionally, there was an increase of $8.1 million because of the increasing production rates of the Next Generation Jammer pod program.

*        *        *

### Gross Profit

Gross profit for the three months ended September 30, 2019 was $4,963,088 compared to $3,871,221 for the three months ended September 30, 2018, an increase of $1,091,867 or 28.2%, predominately the result of higher volume. Gross profit percentage three months ended September 30, 2019 was 19.3% compared to 20.4% for the three months ended September 30, 2018, a decrease of 1.1%, predominately the result of a lower margin from WMI.

*        *        *

### Net Income

Net income for the three months ended September 30, 2019 was $1,666,913 or $0.14 per basic share, compared to $585,896 or $0.07 per basic share, for the same period last year. Diluted income per share was $0.14 for the three months ended September 30, 2019 calculated utilizing 11,724,993 weighted average shares outstanding. Diluted income per share was $0.07 for the three months ended September 30, 2018 calculated utilizing 8,977,075 weighted average shares outstanding.

- 58 -

Net income for the nine months ended September 30, 2019 was $6,035,968 or $0.51 per basic share, compared to $3,099,886 or $0.35 per basic share, for the same period last year. Diluted income per share was $0.51 for the nine months ended September 30, 2019 calculated utilizing 11,815,252 weighted average shares outstanding. Diluted income per share was $0.35 for the nine months ended September 30, 2018 calculated utilizing 8,951,640 weighted average shares outstanding.

Net income for the three and nine months ended September 30, 2019 includes an approximate $0.09 adjustment for the reversal of tax liability described above.

194.    CPI has now admitted that the MD&A disclosure in the 3Q 2019 Form 10-Q contained materially false and misleading disclosures about management's analysis of CPI's financial condition and the results of its operations for the periods ended September 30, 2018 and September 30, 2019.

195.    The 3Q 2019 Form 10-Q also falsely represented that CPI's internal controls over financial reporting and its disclosure controls were effective at the reasonable assurance level, stating, in pertinent part, as follows:

**Evaluation of Disclosure Controls and Procedures**

We maintain a system of disclosure controls and procedures that is designed to ensure that information required to be disclosed in our Exchange Act reports is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to our management, as appropriate, to allow timely decisions regarding required disclosures.  Disclosure controls and procedures also include, without limitation, controls and procedures designed to ensure that information required to be disclosed by a company in the reports that it files or submits under the Exchange Act is accumulated and communicated to the company's management, including its principal executive and principal financial officers, or persons performing similar functions, and Board of Directors, as appropriate, to allow timely decisions regarding required disclosure.

Under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, we conducted an evaluation of our disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) as of September 30, 2019.  *Based on this evaluation and considering the material weakness in internal control over financial reporting described below, we concluded as of September 30, 2019, that our disclosure controls and procedures were effective at the reasonable assurance level*.

A material weakness is a control deficiency or combination of control deficiencies that results in more than a remote likelihood that a material misstatement of the annual or interim financial statements will not be prevented or detected on a timely basis. The following material weakness was identified subsequent to September 30, 2018. The review control procedures were inadequately designed to ensure that sales invoices were coded to the correct contract type. The result was a failure to identify, in a timely manner, the miscoding of an invoice in the Company's records and the resulting overstatement of revenue. Because the foregoing material weakness in the Company's internal control over financial reporting had not been remediated by or before the filing of the Form 10-Q for the three and nine months ended September 30, 2018 as originally filed with the SEC on November 13, 2018, the Company's Chief Executive Officer and Chief Financial Officer have concluded that the Company's disclosure controls and procedures were not effective at the reasonable assurance level as of September 30, 2018. The Company has reviewed its financial closing process and has identified the corrective action to remediate the control failure that was the cause of this error and has implemented this control as well as certain other procedures in the first quarter of 2019. The Company has evaluated the effectiveness of the corrective action and has determined that the implementation of the new control procedures provides reasonable assurance that this type of error will not occur in the future.

196.    These statements referenced in ¶195 were materially false and misleading because Defendants knew and/or recklessly disregarded that CPI's internal control over financial reporting and its disclosure controls and procedures were ineffective and operated with material weaknesses during the relevant time period.

197.    In addition, the 3Q 2019 Form 10-Q contained false and inaccurate certifications by Defendants McCrosson and Palazzolo on CPI's internal control over financial reporting and its disclosure controls and procedures. These certifications repeated in substance the representations made in ¶132 above and were materially false and misleading for the reasons set forth in ¶134.

**The Restatement**

198.    On February 14, 2020, CPI issued a press release on Form 8-K (the "2/14/2020 Press Release") announcing that the Company's financial statements which were included in its 2018 Form 10-K, 1Q 2018 Form 10-Q, 2Q 2018 Form 10-Q, and 3Q 2018 Form 10-Q should no longer be relied upon and required restatement. Specifically, CPI disclosed as follows:

[CPI] today announced that the Audit Committee of the Board of Directors of CPI Aero determined, based on the recommendation of management and in consultation with CPI Aero's independent registered public accounting firm, that the Company's financial statements included in its annual report on Form 10-K for the year ended December 31, 2018, quarterly reports on Forms 10-Q for the quarters ended March 31, 2018, June 30, 2018, and September 30, 2018, and quarterly reports on Forms 10-Q for the quarters ended March 31, 2019, June 30, 2019, and September 30, 2019 *should no longer be relied upon due to an error in those financial statements relating to the Company's recognition of revenue from contracts with customers under ASC Topic 606*. Similarly, the independent auditor's reports on the effectiveness of internal control over financial reporting for the year ended December 31, 2018, *management's reports on the effectiveness of internal control over financial reporting, press releases, and investor communications describing the Company's financial statements for such periods should no longer be relied upon*. The Company's cash flows from operations for the affected periods are not expected to be impacted.

The error was uncovered as part of the preparation of the Company's 2019 annual financial statements. After reconsideration of the terms of the Company's contracts with customers, *Management's preliminary conclusion is that certain revenues and net income were recognized prematurely or inaccurately due to an incorrect application of generally accepted accounting principles*. Therefore, previously reported revenue and net income are believed to have been overstated. *The error is also expected to have an impact on the Company's balance sheets for the affected periods. Specifically, retained earnings and contract assets are believed to be overstated*.

199.    In addition, CPI reported that management had determined that there were material weaknesses in the Company's internal control over financial reporting for the affected periods. CPI stated, in pertinent part, as follows:

Management has determined that a material weakness existed in the Company's internal control over financial reporting as of the end of each of the affected periods. The Company has reviewed its financial closing process and believes it has identified the corrective action necessary to remediate the cause of the error. The Company plans to include a discussion of the Company's plan to remediate the material weakness in its annual report on Form 10-K for the year ended December 31, 2019.

200.    The 2/14/2020 Press Release also announced that after only three months in his role as Chief Financial Officer, Dan Azmon resigned from the Company effective February 11, 2020, and that the Board of Directors appointed the then-director of financial planning analysis, Thomas Powers, as acting CFO.

201.    The market reacted swiftly to this news and CPI's stock price fell approximately 37% on February 18, 2020.

**The Staggering Scope of CPI's Restatement**

202.    On August 25, 2020, CPI issued amended annual and quarterly filings for the year-end December 31, 2018 and the first three quarters of 2019.  Those reports made clear the shocking scope of the Restatement.  For fiscal 2018, the Company's total assets were overstated by 200%, its shareholder's equity was reported as $93.4 million (the Company actually had a *deficit* of $7.4 million), its total revenue was overstated by more than 19%, its reported operating income of $8.6 million was actually a pre-tax *loss* of $5.6 million, its reported pre-tax income of $6.7 million was actually a pre-tax *loss* of $7.6 million and its reported net income of $2.2 million was actually a pre-tax *loss* of $12.0 million.

203.    As set forth herein, the Restatement also quantified the Company's misstatements for the first three quarters of 2019.

**NO SAFE HARBOR**

204.    The statutory safe harbor provided for forward-looking statements under certain conditions does not apply to any of the allegedly false statements pleaded in this Complaint.  The specific statements pleaded herein were not identified as forward-looking statements when made.

205.    To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important facts that could cause actual results to differ materially from those in the purportedly forward-looking statements.

**LOSS CAUSATION**

206.    On February 8, 2019, CPI announced that the Company had made "errors" in its billing process which resulted in an overstatement of revenue for the 9-month period ending

September 30, 2018.  The Company also disclosed material weaknesses in its internal controls.  On this news, CPI's stock price fell more than 8.5%.

207.    On February 14, 2020, CPI announced that its financial statements for fiscal 2018, and the first three quarters of 2019 should no longer be relied upon due to errors in those financial statements relating to the Company's recognition of revenue from contracts with customers under ASC Topic 606.  On the news of the Company's Restatement, CPI's stock price fell approximately 37% on February 18, 2020.

## ADDITIONAL FACTS PROBATIVE OF SCIENTER

### (a)    CPI Had Ample Time to Study and Evaluate ASC Topic 606

208.    Prior to adopting ASC Topic 606, CPI was afforded ample time to evaluate the effect such guidance would have on its financial results.  Indeed, as noted herein, CPI was *required* to evaluate and disclose the impact ASC Topic 606 would have on its future financial statements prior to its adoption.

209.    Since the guidance set forth in ASC Topic 606 was originally issued by the FASB in May 2014, public companies like CPI were afforded *four years* to implement systems, gather data, and resolve implementation questions concerning ASC Topic 606.

210.    Moreover, ASC Topic 606 received widespread media attention when it was first announced and numerous resource groups were formed to help stakeholders learn about the mandates of the standard.

211.    The TRG was formed to help entities implement the revenue guidance, solicit and discuss questions arising from implementing the revenue guidance, inform company boards about implementation issues to recommend action as needed, and provide a forum to learn about the guidance.  Thereafter, the Deputy Chief Accountant for the SEC encouraged SEC registrants to follow the TRG's leadership and to consult with the SEC's staff on applying ASC Topic 606.  In

addition, the AICPA issued an aerospace industry accounting and auditing guide in January 2017 that contained industry specific guidance on implementing ASC Topic 606.

212.    Despite these numerous advisories, CPI utilized manufacturing program rather than performance obligations as the unit of accounting for its customer contracts.

213.    Investors reasonably assumed that Defendants, given the ample time they were afforded to evaluate the import that the highly publicized new revenue recognition standard, would have on CPI's financial results, conducted an intentionally detailed, well-researched investigation into the mandates of ASC Topic 606 prior to issuing the materially false and misleading statements alleged herein.

**(b)    CPI's Serious Internal Control Deficiencies**

214.    Throughout the Class Period, the certifications signed by the Individual Defendants, accompanying each of the quarterly and annual financial reports issued by the Company stated that they were "responsible for establishing and maintaining disclosure controls and procedures."  What is more, the certifications specified that Defendants McCrosson and Palazzolo "designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under [their] supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for the external purposes in accordance with generally accepted accounting principles[.]"   The personal participation of Defendants McCrosson and Palazzolo in designing and evaluating the Company's internal controls supports their knowledge of the fundamental and pervasive internal control deficiencies present during the Class Period.

215.    With respect to revenue recognition, in the Company's Restatement, CPI stated that the Company had "identified material weaknesses from revenue recognition accounting controls that

resulted in material errors, as we did not appropriately design, or effectively operate, internal control over certain aspects of accurate recording, presentation, and disclosure of revenue and related costs."

216.    Moreover, the Restatement made clear that the weaknesses and failures in the Company's internal controls were far reaching.  The Company admitted, *inter alia,* to the following additional weaknesses in the Company's internal controls over financial reporting during the Class Period:

- Management did not effectively execute a strategy to hire and retain a sufficient complement of personnel with an appropriate level of knowledge, experience, and training in certain areas important to financial reporting.

- Management lacked sufficient technical proficiency and training to provide adequate oversight of accounting and financial reporting activities in implementing certain accounting practices and calculations to conform to the Company's policies and U.S. GAAP.

- There were insufficiently documented Company accounting policies and insufficiently detailed Company procedures to put policies into effective action.

- Our internal control lacked procedures for ensuring the period of performance or value of the accounting contract were properly determined.

- Our internal control lacked procedures for ensuring revenue was constrained to funded contract values.

### (c)    Ongoing Investigation by the SEC

217.    On May 22, 2020, CPI received a letter from the SEC's Division of Enforcement indicating that its staff was conducting an active investigation of the Company.  The SEC informed the Company that its investigation related to, among other things, the previously disclosed errors in and restatement of, the Company's financial statements, the Company's October 16, 2018 equity offering and the departure of the Company's CFOs.  As part of its investigation, the SEC issued a subpoena to the Company seeking documents and other material relating to these matters.

### (d)    Suspicious, and Multiple, CFO Departures

218.    In November of 2019, several months before the Company's announcement that it would restate its financial results due to its failure to apply ASC Topic 606, CFO Palazzolo suspiciously departed the Company.  Then, on February 14, 2020, in connection with the Company's announcement of the Restatement and deficiencies in internal controls, CPI disclosed that, effective February 11, 2020, Dan Azmon, who had replaced Defendant Palazzolo as CFO, was also departing the Company after only three months on the job.  These two sudden departures of high-level executives at a time when CPI was disclosing various accounting improprieties and internal control deficiencies to the public weigh further in support of the inference of scienter.

### (e)    Prior Restatement of Financial Results

219.    The Restatement is not CPI's only restatement of its financial results during the Class Period.  As detailed above, on February 8, 2019, CPI reported that its previously filed 3Q 2018 10-Q should no longer be relied upon and its internal control over financial reporting contained material weaknesses.  Specifically, the Company admitted that its revenue was overstated by $900,000 to $950,000, net income was overstated by $725,000 to $775,000 and, as a result, earnings per share were overstated by $0.09 per share.  Thus, Defendants knew of certain material weaknesses in CPI's internal controls, but failed to disclose the material weaknesses in internal controls concerning CPI's improper revenue recognition.

### (f)    CPI's Motive to Commit Fraud

220.    Defendants possessed substantial motive for misrepresenting CPI's operating results. One such motive was CPI's desire to maximize proceeds from the Offering, which returned proceeds of $14,175,000 to the Company.

### (g)    The Magnitude of the Restatement

221.    The scope and financial magnitude of CPI's Restatement demonstrates that Defendants acted with knowledge and/or reckless disregard throughout the Class Period when they failed to report financial results in accordance with GAAP and consistent with the requirements of ASC Topic 606.[4]  As alleged herein, this is not an instance where a publicly traded company was required to make non-material adjustments to its historical financial results in order to account for minor misapplication(s) of applicable accounting rules.  To the contrary, as a result of CPI's complete failure to follow ASC Topic 606's requirements, CPI was required to issue restated financial results for fiscal year 2018 and the first three-quarters of 2019 that diverged significantly from the prior results the Company reported to investors.  CPI's failure to comply with ASC Topic 606 caused the Company to overstate its total assets by 20% and its total revenue by 19%, while also understating its total liabilities by more than 9%.  In addition, the restated results demonstrate that while CPI reported accumulated, undistributed net income of $22.8 million from inception through the end of fiscal year 2018, in actuality, the Company had an accumulated *deficit* of more than $78.1 million as of December 31, 2018.  Collectively, the revised financial results issued in connection with the Restatement paint a dramatically different picture of CPI's business and prospects, as well as CPI's value-proposition for investors.

222.    Collectively, the additional facts and circumstances revealed by the Restatement – the dramatic divergence of the restated financial results, Defendants' near-total failure to carry out their obligations to design effective controls, and others described herein – demonstrate that Defendants

---

[4]    The magnitude of CPI's financial misstatements set forth herein is based solely upon CPI's improper revenue recognition and does not reflect other financial or income tax adjustments the Company made to its previously issued financial statements.

acted with scienter when failing to report results in accordance with GAAP and consistent with the requirements of ASC Topic 606.

(h)     **Defendants' Position and Access to Information**

223.    As alleged herein, Defendants acted with scienter in that they knew, and/or recklessly disregarded, that the public documents and statements issued or disseminated in the name of the Company (or in their own name) were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated and acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.   Defendants, by virtue of their receipt of information reflecting the true facts regarding CPI, their control over, and/or receipt and/or modification of CPI's materially false and misleading misstatements, were active and culpable participants in the fraudulent scheme alleged herein.

224.    Because of their positions within CPI, the Individual Defendants had access to non-public information about the Company's business, operations, operational trends, financial statements, markets, and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or Board of Directors meetings and committees thereof, and via reports and other information provided to them in connection therewith.   Because of their possession of such information, the Individual Defendants knew, or recklessly disregarded, that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

225.    The Individual Defendants, by virtue of their high-level position within the Company, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels and were privy to confidential information

concerning the Company and its business, operations, financial statements and financial condition, as alleged herein.

226.    The Individual Defendants, because of their positions of control and authority as officers of the Company, were able to and did control the content of various SEC filings, press releases and other public statements pertaining to the Company during the Class Period.  The Individual Defendants were provided with copies of the documents alleged herein to be false and misleading before or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected.  Accordingly, the Individual Defendants are responsible for the accuracy of the public statements detailed herein and are, therefore, primarily liable for the representations contained therein.

227.    Defendants knew and/or recklessly disregarded the false and misleading nature of the information which they caused to be disseminated to the investing public.  The fraudulent activity alleged herein could not have been perpetrated during the Class Period without the knowledge and complicity or, at least, the reckless disregard of the officers at the highest levels of the Company, including the Individual Defendants.

228.    The Individual Defendants were all executive officers at CPI and, at minimum, would have been aware of key facts related to the Company's operations.  Moreover, the fraud alleged herein relates to the core business and operations of CPI such that knowledge may be imputed to Defendants.

## FRAUD ON THE MARKET

229.    Lead Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine that, among other things:

(a)     Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)     the omissions and misrepresentations were material;

(c)     the Company's securities are traded in efficient markets;

(d)     the Company's securities were liquid and traded with moderate to heavy volume during the Class Period;

(e)     the Company traded on the NYSE, and was covered by multiple analysts;

(f)     the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; Lead Plaintiff and members of the Class purchased and/or sold the Company's securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts; and

(g)     unexpected material news about the Company was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

230.    Based upon the foregoing, Lead Plaintiff and members of the Class are entitled to a presumption of reliance upon the integrity of the market.

231.    Alternatively, Lead Plaintiff and members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. U.S.*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT IV

### Violation of Section 10(b) of the Exchange Act
### and Rule 10b-5 Promulgated Thereunder
### Against CPI and the Individual Defendants

232.    Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

233.    During the Class Period, CPI and the Individual Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

234.    CPI and the Individual Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

235.    Lead Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for CPI common stock.  Lead Plaintiff and the Class would not have purchased CPI common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by CPI and the Individual Defendants' misleading statements.

236.    As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchases of CPI common stock during the Class Period.

## COUNT V

### Violation of Section 20(a) of the Exchange Act
### Against the Individual Defendants

237.    Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

238.    The Individual Defendants acted as controlling persons of CPI within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By reason of their positions as officers and directors of CPI, and their ownership of CPI common stock, the Individual Defendants had the power and authority to cause CPI to engage in the wrongful conduct complained of herein.

239.    By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

### PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for relief and judgment, as follows:

A.    Determining that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Lead Plaintiff as a Class Representative;

B.    Awarding compensatory damages in favor of Lead Plaintiff and other members of the Class against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.    Awarding Lead Plaintiff rescission or a rescissory measures of damages; and

E.    Awarding such equitable/injunctive or other relief as deemed appropriate by the Court.

## JURY DEMAND

Lead Plaintiff demands a trial by jury.

DATED:  September 24, 2020

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
ALAN I. ELLMAN
AVITAL O. MALINA

*/s/ Samuel H. Rudman*
SAMUEL H. RUDMAN

58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
aellman@rgrdlaw.com
amalina@rgrdlaw.com

ROBBINS LLP
BRIAN J. ROBBINS
STEPHEN J. ODDO
ERIC M. CARRINO
5040 Shoreham Place
San Diego, CA  92122
Telephone:  619/525-3990
619/525-3991 (fax)
brobbins@robbinsllp.com
soddo@robbinsllp.com
ecarrino@robbinsllp.com

*Lead Counsel for Lead Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify under penalty of perjury that on September 24, 2020, I authorized a

true and correct copy of the foregoing document to be electronically filed with the Clerk of the

Court using the CM/ECF system, which will send notification of such public filing to all

counsel registered to receive such notice.

*/s/ Samuel H. Rudman*

SAMUEL H. RUDMAN

ROBBINS GELLER RUDMAN
  & DOWD LLP
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com