UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| MARK A. RODRIGUEZ, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>CPI AEROSTRUCTURES, INC., DOUGLAS McCROSSON and VINCENT PALAZZOLO, CANACCORD GENUITY LLC and B. RILEY FBR,<br><br>Defendants. | Civil Action No. 1:20-cv-00982<br><br>CLASS ACTION |
| RUSSELL GARRETT, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>CPI AEROSTRUCTURES, INC., DOUGLAS McCROSSON and VINCENT PALAZZOLO, CANACCORD GENUITY LLC and B. RILEY FBR,<br><br>Defendants. | Civil Action No. 1:20-cv-01026<br><br>CLASS ACTION |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND APPROVAL OF PLAN OF ALLOCATION**

4887-1619-0252.v1

**TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION ...................................................................................................1

II.     FACTUAL AND PROCEDURAL BACKGROUND........................................3

III.    THE COURT SHOULD CERTIFY THE CLASS ..........................................4

IV.     STANDARDS FOR FINAL APPROVAL OF CLASS ACTION
        SETTLEMENTS.................................................................................................5

        A.      The Law Favors and Encourages Settlements ........................................5

        B.      The Settlement Must Be Procedurally and Substantively Fair, Reasonable,
                and Adequate ..........................................................................................6

        C.      The Proposed Settlement Is Procedurally and Substantively Fair,
                Reasonable, and Adequate .......................................................................8

                1.      The Settlement Satisfies the Requirements of Rule 23(e)(2).......8

                2.      The Settlement Satisfies the Remaining *Grinnell* Factors .........15

V.      THE PLAN OF ALLOCATION IS FAIR AND ADEQUATE ......................19

VI.     NOTICE TO THE CLASS SATISFIES THE REQUIREMENTS OF RULE 23
        AND DUE PROCESS ......................................................................................20

VII.    CONCLUSION.................................................................................................22

4887-1619-0252.v1

## TABLE OF AUTHORITIES

**Page**

**CASES**

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997)..................................................................................................5

*Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*,
222 F.3d 52 (2d Cir. 2000)......................................................................................4

*Bellifemine v. Sanofi-Aventis U.S. LLC*,
2010 WL 3119374 (S.D.N.Y. Aug. 6, 2010)...............................................10, 12, 16

*Castagna v. Madison Square Garden, L.P.*,
2011 WL 2208614 (S.D.N.Y. June 7, 2011) ..........................................................18

*Charron v. Pinnacle Grp. N.Y. LLC*,
874 F. Supp. 2d 179 (S.D.N.Y. 2012),
*aff'd sub nom. Charron v. Wiener*, 731 F.3d 241
(2d. Cir. 2013)........................................................................................................10

*Christine Asia Co., Ltd. v. Yun Ma*,
2019 WL 5257534 (S.D.N.Y. Oct. 16, 2019) .............................................. *passim*

*City of Providence v. Aeropostale, Inc.*,
2014 WL 1883494 (S.D.N.Y. May 9, 2014),
*aff'd sub nom. Arbuthnot v. Pierson*, 607 F. App'x 73
(2d Cir. 2015)....................................................................................................15, 18

*Claridge v. N. Am. Power & Gas, LLC*,
2017 WL 3638455 (S.D.N.Y. Aug. 23, 2017)..........................................................5

*Cordes & Co. Fin. Servs. v. A.G. Edwards & Sons, Inc.*,
502 F.3d 91 (2d Cir. 2007)......................................................................................8

*D'Amato v. Deutsche Bank*,
236 F.3d 78 (2d Cir. 2001).......................................................................................9

*Detroit v. Grinnell Corp.*,
495 F.2d 448 (2d Cir. 1974)....................................................................... *passim*

*Dornberger v. Metro Life Ins. Co.*,
203 F.R.D. 118 (S.D.N.Y. 2001) ..........................................................................22

*Hicks v. Morgan Stanley*,
2005 WL 2757792 (S.D.N.Y. Oct. 24, 2005).......................................................13

4887-1619-0252.v1

**Page**

*In re Advanced Battery Techs., Inc. Sec. Litig.*,
298 F.R.D. 171 (S.D.N.Y. 2014) ....................................................................6, 9, 12, 19

*In re Agent Orange Prod. Liab. Litig.*,
597 F. Supp. 740 (E.D.N.Y. 1984),
*aff'd*, 818 F.2d 145 (2d Cir. 1987) ................................................................................18

*In re All. Pharm. Corp. Sec. Litig.*,
279 F. Supp. 2d 171 (S.D.N.Y. 2003) ...........................................................................11

*In re Am. Int'l Grp., Inc. Sec. Litig.*,
689 F.3d 229 (2d Cir. 2012) .........................................................................................4, 5

*In re AOL Time Warner Inc.*,
2006 WL 903236 (S.D.N.Y. Apr. 6, 2006) ...................................................................10

*In re Beacon Assocs. Litig.*,
282 F.R.D. 315 (S.D.N.Y. 2012) .....................................................................................5

*In re Bear Stearns Cos., Inc. Sec., Derivative & ERISA Litig.*,
909 F. Supp. 2d 259 (S.D.N.Y. 2012) ......................................................................16, 18

*In re Chrysler-Dodge-Jeep Ecodiesel Mktg.,*
*Sales Pracs. & Prods. Liability Litig.*,
2019 WL 2554232 (N.D. Cal. May 3, 2019) ..................................................................8

*In re EVCI Career Colls. Holding Corp. Sec. Litig.*,
2007 WL 2230177 (S.D.N.Y. July 27, 2007) .................................................................4

*In re Facebook, Inc., IPO Sec. & Derivative Litig.*,
312 F.R.D. 332 (S.D.N.Y. 2015) .....................................................................................5

*In re Facebook, Inc., IPO Sec. & Derivative Litig.*,
343 F. Supp. 3d 394 (S.D.N.Y. 2018),
*aff'd sub nom. In re Facebook, Inc.*,
822 F. App'x 40 (2d Cir. 2020) .....................................................................9, 16, 18, 19

*In re FLAG Telecom Holdings, Ltd. Sec. Litig.*,
2010 WL 4537550 (S.D.N.Y. Nov. 8, 2010) ................................................................10

*In re Glob. Crossing Sec. & ERISA Litig.*,
225 F.R.D. 436 (S.D.N.Y. 2004) ............................................................................ *passim*

*In re GSE Bonds Antitrust Litig.*,
2020 WL 3250593 (S.D.N.Y. June 16, 2020) .................................................................8

*In re Hi-Crush Partners L.P. Sec. Litig.*,
2014 WL 7323417 (S.D.N.Y. Dec. 19, 2014) ...............................................................16

- iii -

**Page**

*In re Merrill Lynch Tyco Research Sec. Litig.*,
    249 F.R.D. 124 (S.D.N.Y. 2008) ...............................................................................21, 22

*In re Namenda Direct Purchaser Antitrust Litig.*,
    2020 WL 2749223 (S.D.N.Y. May 27, 2020) ....................................................................7

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
    330 F.R.D. 11 (E.D.N.Y. 2019) ....................................................................................7, 8

*In re Sony SXRD Rear Projection Television Class Action Litig.*,
    2008 WL 1956267 (S.D.N.Y. May 1, 2008) ...................................................................18

*In re Telik, Inc. Sec. Litig.*,
    576 F. Supp. 2d 570 (S.D.N.Y. 2008)..............................................................................12

*In re Veeco Instruments Inc. Sec. Litig.*,
    2007 WL 4115809 (S.D.N.Y. Nov. 7, 2007)..............................................................15, 20

*In re WorldCom, Inc. Sec. Litig.*,
    388 F. Supp. 2d 319 (S.D.N.Y. 2005)..............................................................................19

*Martignago v. Merrill Lynch & Co., Inc.*,
    2013 WL 12316358 (S.D.N.Y. Oct. 3, 2013) .................................................................16

*McMahon v. Olivier Cheng Catering & Events, LLC*,
    2010 WL 2399328 (S.D.N.Y. Mar. 3, 2010) ............................................................6, 9, 10, 17

*Monroe Cnty. Emps.' Ret. Sys. v. YPF Sociedad Anonima*,
    15 F. Supp. 3d 336 (S.D.N.Y. 2014)................................................................................11

*Newman v. Stein*,
    464 F.2d 689 (2d Cir. 1972)..............................................................................................18

*Nichols v. Noom, Inc.*,
    2022 U.S. Dist. LEXIS 123146
    (S.D.N.Y. July 12, 2022) ........................................................................................4, 6, 8

*Pelzer v. Vassalle*,
    655 F. App'x 352 (6th Cir. 2016) .....................................................................................14

*Robinson v. Metro-North Commuter R.R. Co.*,
    267 F.3d 147 (2d Cir. 2001)................................................................................................4

*Strougo v. Bassini*,
    258 F. Supp. 2d 254 (S.D.N.Y. 2003)...............................................................................13

*Vargas v. Cap. One Fin. Advisors*,
    559 F. App'x 22 (2d Cir. 2014) ........................................................................................20

4887-1619-0252.v1

**Page**

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
  396 F.3d 96 (2d Cir. 2005)................................................................6, 9, 20, 21

*Yi Xiang v. Inovalon Holdings, Inc.*,
  327 F.R.D. 510 (S.D.N.Y. 2018) ..........................................................4

*Yuzary v. HSBC Bank, USA, N.A.*,
  2013 WL 5492998 (S.D.N.Y. Oct. 2, 2013) .......................................8, 16

## STATUTES, RULES AND REGULATIONS

15 U.S.C.
  §77k.....................................................................................................11

17 C.F.R.
  §240.10b-5 ..........................................................................................19

Federal Rules of Civil Procedure
  Rule 23 ................................................................................................4, 20
  Rule 23(a).............................................................................................4
  Rule 23(b) ............................................................................................5
  Rule 23(b)(3).........................................................................................5
  Rule 23(c).............................................................................................17
  Rule 23(c)(2)(B)....................................................................................20, 22
  Rule 23(e)............................................................................................3, 5, 7, 20
  Rule 23(e)(1)(B)....................................................................................20
  Rule 23(e)(2) ........................................................................*passim*
  Rule 23(e)(2)(A) ...................................................................................9
  Rule 23(e)(2)(B)....................................................................................9
  Rule 23(e)(2)(C)(i)................................................................................10, 13
  Rule 23(e)(2)(C)(ii)...............................................................................13
  Rule 23(e)(2)(C)(iii)..............................................................................14
  Rule 23(e)(2)(C)(iv)..............................................................................14
  Rule 23(e)(2)(D) ...................................................................................15
  Rule 23(e)(3)........................................................................................7, 14

## SECONDARY AUTHORITIES

Laarni T. Bulan and Laura E. Simmons, *Securities Class Action Settlements: 2021 Review and Analysis* (Cornerstone Research 2022) ................................................19

4887-1619-0252.v1

Pursuant to Federal Rule of Civil Procedure ("Rule") 23(e), Jeffrey L. Feinberg, individually and as trustee and beneficiary of the Jeffrey L. Feinberg Personal Trust ("Lead Plaintiff"), on behalf of himself and the Class, respectfully submits this memorandum of law in support of the motion for final approval of the $3,600,000 Settlement (the "Settlement Amount") reached in this action (the "Action") and approval of the proposed Plan of Allocation. The terms of the Settlement are set forth in the Stipulation of Settlement, dated July 9, 2021 (ECF 54-2) (the "Stipulation").[1] The Court preliminarily approved the Settlement on June 7, 2022 (ECF 61) (the "Preliminary Approval Order").

## I.   INTRODUCTION

The $3.6 million recovery, obtained on behalf of: (i) purchasers of CPI common stock issued pursuant to and/or traceable to the Company's common stock offering conducted on or about October 17, 2018; and (ii) purchasers of CPI common stock between March 22, 2018 and February 14, 2020, inclusive (the "Class"), is the result of arm's-length settlement negotiations by experienced and knowledgeable counsel, overseen by a nationally recognized mediator. The Settlement represents a very favorable result for the Class and easily satisfies each of the Rule 23(e)(2) factors, as well as the factors set forth in *Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir. 1974).

The Settlement is especially beneficial to the Class in light of the substantial litigation risks Lead Plaintiff faced. The gravamen of Lead Plaintiff's claims was that throughout the Class Period, Defendants misrepresented that: (i) CPI's financial statements were presented in accordance with

---

[1]   All capitalized terms not otherwise defined herein shall have the meanings set forth in the Stipulation, the accompanying Declaration of Alan I. Ellman in Support of Motions for Final Approval of Class Action Settlement and Approval of Plan of Allocation and an Award of Attorneys' Fees and Expenses ("Ellman Declaration" or "Ellman Decl."), and in the Memorandum of Law in Support of Motion for an Award of Attorneys' Fees and Expenses ("Fee Memorandum"), submitted concurrently herewith. Citations are omitted and emphasis is added throughout, unless otherwise noted.

- 1 -

Generally Accepted Accounting Principles ("GAAP") and governing SEC rules and regulations; (ii) CPI had implemented Accounting Standards Codification Topic *606 Revenue From Contracts With Customers* ("ASC 606"), effective January 1, 2018; (iii) the adoption of ASC 606 did not materially change CPI's recognition of revenue under its contracts; (iv) the adoption of ASC 606 had "no impact" on CPI's consolidated financial statements; and (v) the Company's system of internal controls over financial reporting and disclosure controls were effective.  Ellman Decl., ¶15.

On February 14, 2020, CPI announced that: (i) it did not follow the dictates of ASC 606; (ii) the Company's financial statements for the 2018 annual period and the 2018 and 2019 interim periods required restatements; and (iii) its internal controls over financial reporting and its disclosure controls for those periods were ineffective.  *Id.*, ¶16.  The Restatement also revealed that throughout the Class Period, CPI's "[m]anagement lacked sufficient technical proficiency and training" to ensure compliance with financial reporting requirements and failed to "execute a strategy to hire and retain a sufficient complement of personnel with an appropriate level of knowledge, experience, and training in certain areas important to financial reporting."  *Id.*

While Lead Plaintiff believes in the merit of his claims, Defendants had strong and credible arguments that could ultimately be successful in showing, among other things, that: (i) Defendants did not make any actionable misstatements or omissions during the Class Period; (ii) Lead Plaintiff's claims were hindsight pleading based on after-the-fact disclosures about CPI's accounting errors; and (iii) Lead Plaintiff could not establish Defendants' scienter.  *Id.*, ¶¶13-19.  Had Lead Plaintiff failed to establish any one of the elements of his claims, or failed to refute Defendants' contentions, the entire case would be lost or damages could be found to be much lower than claimed, if damages were found to exist at all.

4887-1619-0252.v1

As detailed in the Ellman Declaration, Lead Plaintiff and Lead Counsel had a thorough understanding of the strengths and weaknesses of the case before reaching the Settlement, as they had conducted a thorough investigation into the claims, consulted with a forensic accountant and a damages expert, drafted a detailed mediation statement, and participated in a formal mediation session and numerous follow-up discussions with the mediator. *See generally* Ellman Decl. Based on the results of this work, Lead Plaintiff knew that Defendants could have succeeded on their pending motion to dismiss, in opposing class certification or in obtaining summary judgment, resulting in a lower recovery or no recovery at all. Likewise, there was no assurance that a trial would provide a better outcome. Moreover, a skilled and highly reputable mediator, John R. Van Winkle, Esq., assisted the parties in reaching a resolution of the case for $3.6 million. Ellman Decl., ¶¶23-26.

Given the risks to proceeding and the very favorable recovery obtained relative to maximum estimated damages, Lead Plaintiff respectfully submits that the $3.6 million Settlement and the Plan of Allocation – which was prepared with the assistance of Lead Plaintiff's damages consultant and is substantially similar to numerous other such plans that have been approved in this Circuit – are fair and reasonable in all respects. Accordingly, Lead Plaintiff respectfully requests that the Court grant final approval of the Settlement under Rule 23(e) of the Federal Rules of Civil Procedure.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

To avoid repetition, Lead Plaintiff respectfully refers the Court to the accompanying Ellman Declaration for a detailed discussion of the factual background and procedural history of the Action, the efforts undertaken by Lead Plaintiff and Lead Counsel during the course of the Action, the risks of continued litigation, and the negotiations leading to the Settlement.

4887-1619-0252.v1

## III.   THE COURT SHOULD CERTIFY THE CLASS

The Court is hearing the proposed Settlement prior to any hearing or ruling on class certification, making it necessary for the Court to certify a class pursuant to Rule 23 prior to approving the proposed Settlement. *See, e.g.*, *In re Am. Int'l Grp., Inc. Sec. Litig.*, 689 F.3d 229, 238 (2d Cir. 2012); *Nichols v. Noom, Inc.*, 2022 U.S. Dist. LEXIS 123146, at *10 (S.D.N.Y. July 12, 2022). Here, all the requirements for class certification are met.

Each of the four Rule 23(a) prerequisites to class certification – (a) numerosity; (b) commonality; (c) typicality; and (d) adequacy of representation – is satisfied. First, numerosity is satisfied in cases involving nationally traded securities as CPI common stock. *See, e.g.*, *In re EVCI Career Colls. Holding Corp. Sec. Litig.*, 2007 WL 2230177, at *12 (S.D.N.Y. July 27, 2007). Second, commonality exists where, as here, all Members of the Class purchased CPI common stock subject to the same alleged misrepresentations and omissions. *See, e.g.*, *Yi Xiang v. Inovalon Holdings, Inc.*, 327 F.R.D. 510, 522 (S.D.N.Y. 2018) (in an action alleging false and misleading statements, the central issue is common to all class members). Third, typicality is satisfied by Lead Plaintiff having suffered losses following the disclosures, as the other Class Members did. *See, e.g.*, *Robinson v. Metro-North Commuter R.R. Co.*, 267 F.3d 147, 155 (2d Cir. 2001) ("'Typicality . . . is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability.'"). Fourth, Lead Plaintiff is an adequate representative because he has no conflicts with the other Class Members, and has been actively involved in the case from its inception, maintaining communication with Lead Counsel, who are qualified, experienced, and able to conduct the litigation. *See, e.g.*, *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 60 (2d Cir. 2000).

- 4 -

A proposed class action must also satisfy one of the tests of Rule 23(b).  *See, e.g.*, *Am. Int'l Grp.*, 689 F.3d at 238.  Here, certification of the Class is appropriate because common questions of law or fact predominate over any individual question and a class action is superior to other available means of adjudication.  *See* Rule 23(b)(3); *see also Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 607 (1997).  This standard is easily met here because the core of the case is Defendants' alleged misrepresentations and omissions in their public statements, which predominates over any theoretical individual issue that may arise.  *See, e.g.*, *In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 312 F.R.D. 332, 341, 346-51 (S.D.N.Y. 2015) (in a securities class action, common questions about misstated registration statement predominated over individual issues).  Additionally, the class action mechanism is the best method of resolving all the individual claims aggregated in this matter because the controversy for each Class Member is identical and will result in the adjudication of all claims in one suit and one forum.  *See, e.g.*, *In re Beacon Assocs. Litig.*, 282 F.R.D. 315, 334 (S.D.N.Y. 2012).

In addition, Rule 23(b)(3) provides a right to opt-out or object to a proposed settlement.  *See, e.g.*, *Claridge v. N. Am. Power & Gas, LLC*, 2017 WL 3638455, at *2 (S.D.N.Y. Aug. 23, 2017).  Here, the Notice provided Class Members with, among other things, a right to object or exclude themselves from the Class.  *See* Declaration of Jack Ewashko Regarding Mailing of Notice and Publication of Summary Notice ("Mailing Decl."), Ex. A (Notice at 2, 8-9), submitted herewith.  Accordingly, the standards for certifying the Class have been met.

## IV.   STANDARDS FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENTS

### A.   The Law Favors and Encourages Settlements

"The claims, issues, or defenses of a certified class . . . may be settled, voluntarily dismissed, or compromised only with the court's approval."  Fed. R. Civ. P. 23(e).  The court may approve a

- 5 -

"class action settlement if it is 'fair, adequate, and reasonable, and not a product of collusion.'" *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 116 (2d Cir. 2005).  The evaluation of a proposed settlement requires the court to consider "both the settlement's terms and the negotiating process leading to settlement."  *Id.*; *Noom*, 2022 U.S. Dist. LEXIS 123146, at *19.  "Courts examine procedural and substantive fairness in light of the 'strong judicial policy favoring settlements' of class action suits."  *McMahon v. Olivier Cheng Catering & Events, LLC*, 2010 WL 2399328, at *3 (S.D.N.Y. Mar. 3, 2010) (citing *Wal-Mart Stores*, 396 F.3d at 116); *see also In re Advanced Battery Techs., Inc. Sec. Litig.*, 298 F.R.D. 171, 174 (S.D.N.Y. 2014) ("The law favors settlement, particularly in class actions and other complex cases where substantial resources can be conserved by avoiding the time, cost, and rigor of prolonged litigation.").  Thus, the Second Circuit has instructed that, while a court should not give "rubber stamp approval" to a proposed settlement, it should "stop short of the detailed and thorough investigation that it would undertake if it were actually trying the case."  *Grinnell*, 495 F.2d at 462.

As set forth below, the $3.6 million Settlement here, particularly in light of the significant litigation risks Lead Plaintiff faced, and the recovery relative to estimated maximum recoverable damages, is manifestly reasonable, fair, and adequate under all of the pertinent factors courts use to evaluate a settlement.  Accordingly, the Settlement warrants final approval by this Court.

**B.     The Settlement Must Be Procedurally and Substantively Fair, Reasonable, and Adequate**

Rule 23(e)(2), as amended, provides that courts should consider certain factors when determining whether a class action settlement is "fair, reasonable, and adequate" such that final approval is warranted:

(A)     the class representatives and class counsel have adequately represented the class;

- 6 -

4887-1619-0252.v1

(B)     the proposal was negotiated at arm's length;

(C)     the relief provided for the class is adequate, taking into account:

    (i)     the costs, risks, and delay of trial and appeal;

    (ii)    the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

    (iii)   the terms of any proposed award of attorneys' fees, including timing of payment; and

    (iv)    any agreement required to be identified under Rule 23(e)(3); and

(D)     the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2).

In addition, the Second Circuit considers the following factors (the "*Grinnell* Factors"), which overlap the Rule 23(e)(2) factors, when determining whether to approve a class action settlement: (1) the complexity, expense, and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all of the attendant risks of litigation. *Grinnell*, 495 F.2d at 463; *see In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 330 F.R.D. 11, 29 (E.D.N.Y. 2019) (explaining that "the new Rule 23(e) factors . . . add to, rather than displace, the *Grinnell* factors," and "there is significant overlap" between the two); *see also In re Namenda Direct Purchaser Antitrust Litig.*, 2020 WL 2749223, at *2-*3 (S.D.N.Y. May 27, 2020) (applying Rule 23(e)(2) along with *Grinnell* factors).

For a settlement to be deemed substantively and procedurally fair, reasonable, and adequate, not every factor need be satisfied. "'[R]ather, the court should consider the totality of these factors

in light of the particular circumstances.'" *Noom*, 2022 U.S. Dist. LEXIS 123146, at \*21.

Additionally, "'[a]bsent fraud or collusion, [courts] should be hesitant to substitute [their] judgment

for that of the parties who negotiated the settlement.'" *Yuzary v. HSBC Bank, USA, N.A.*, 2013 WL

5492998, at \*4 (S.D.N.Y. Oct. 2, 2013); *see also In re Glob. Crossing Sec. & ERISA Litig.*, 225

F.R.D. 436, 455 (S.D.N.Y. 2004) (courts should not substitute their "'business judgment for that of

counsel, absent evidence of fraud or overreaching'").

Under Rule 23(e)(2), courts "must assess at the preliminary approval stage whether the

parties have shown that the court will likely find that the [Rule 23(e)(2)] factors weigh in favor of

final settlement approval." *Payment Card Interchange*, 330 F.R.D. at 28.  The Preliminary Approval

Order made such findings.  Preliminary Approval Order at 1-2.  Courts have noted that satisfaction

of these factors is virtually assured where, as here, little has changed since preliminary approval.

*See, e.g.*, *In re GSE Bonds Antitrust Litig.*, 2020 WL 3250593, at \*1 (S.D.N.Y. June 16, 2020) (court

re-adopted its analysis supporting grant of preliminary approval and limited its focus to any new

developments impacting that analysis); *see also In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales

Pracs. & Prods. Liability Litig.*, 2019 WL 2554232, at \*2 (N.D. Cal. May 3, 2019) ("conclusions

[made in granting preliminary approval] stand and counsel equally in favor of final approval now").

> **C.**      **The Proposed Settlement Is Procedurally and Substantively Fair, Reasonable, and Adequate**

>          **1.**      **The Settlement Satisfies the Requirements of Rule 23(e)(2)**

>                  **a.**      **Lead Plaintiff and Lead Counsel Have Adequately Represented the Class**

The determination of adequacy "typically 'entails inquiry as to whether: 1) plaintiff's

interests are antagonistic to the interest of other members of the class and 2) plaintiff's attorneys are

qualified, experienced and able to conduct the litigation.'" *Cordes & Co. Fin. Servs. v. A.G.*

*Edwards & Sons, Inc.*, 502 F.3d 91, 99 (2d Cir. 2007).  Here, Lead Plaintiff's interests are not antagonistic to, and in fact are directly aligned with, the interests of the other Class Members. Additionally, Lead Plaintiff and Lead Counsel have adequately represented the Class by zealously prosecuting this Action, including by filing a detailed Complaint, opposing Defendants' motion to dismiss, and participating in a mediation session with Defendants and continuing to negotiate through communications with the mediator.  *See generally* Ellman Decl.  Through each step, Lead Plaintiff and Lead Counsel have strenuously advocated for the best interests of the Class.  Lead Plaintiff and Lead Counsel therefore satisfy Rule 23(e)(2)(A) for purposes of final approval.

### b.     The Proposed Settlement Was Negotiated at Arm's Length Before an Experienced Mediator

The Settlement satisfies Rule 23(e)(2)(B) because it is the product of arm's-length negotiations between the parties' counsel before a neutral mediator, with no hint of collusion. Ellman Decl., ¶25.  Indeed, the use of the mediation process provides compelling evidence that the Settlement is not the result of collusion.  *See In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 343 F. Supp. 3d 394, 408-09 (S.D.N.Y. 2018) (settlement was procedurally fair where it was "based on the suggestion by a neutral mediator"), *aff'd sub nom. In re Facebook, Inc.*, 822 F. App'x 40 (2d Cir. 2020); *McMahon*, 2010 WL 2399328, at *4 ("Arm's-length negotiations involving counsel and a mediator raise a presumption that the settlement they achieved meets the requirements of due process.") (citing *Wal-Mart Stores*, 396 F.3d at 116); *D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001) (a "mediator's involvement in . . . settlement negotiations helps to ensure that the proceedings were free of collusion and undue pressure").

It is well-settled in this Circuit that "a class action settlement enjoys a strong 'presumption of fairness' where it is the product of arm's-length negotiations con[duct]ed by experienced, capable counsel." *Advanced Battery*, 298 F.R.D. at 175 (citing *Wal-Mart Stores*, 396 F.3d at 116); *see also*

- 9 -

4887-1619-0252.v1

*Charron v. Pinnacle Grp. N.Y. LLC*, 874 F. Supp. 2d 179, 195 (S.D.N.Y. 2012) ("Recommendations of experienced counsel are entitled to great weight in evaluating a proposed settlement in a class action because such counsel are most closely acquainted with the facts of the underlying litigation."), *aff'd sub nom. Charron v. Wiener*, 731 F.3d 241 (2d. Cir. 2013); *McMahon*, 2010 WL 2399328, at *4 (settlement was "procedurally fair, reasonable, adequate, and not a product of collusion" where it was reached after "arm's-length negotiations between the parties"). Accordingly, this factor weighs heavily in favor of final approval of the Settlement.

c.   <b>The Proposed Settlement Is Adequate in Light of the Litigation Risks, Costs, and Delays of Trial and Appeal</b>

Rule 23(e)(2)(C)(i) and the first, fourth and fifth *Grinnell* Factors overlap, as they address the substantive fairness of the Settlement in light of the risks posed by continuing litigation. As set forth below, these factors weigh in favor of final approval.

<b>(1)  The Risks of Establishing Liability at Trial</b>

In considering this factor, "the Court need only assess the risks of litigation against the certainty of recovery under the proposed settlement." *Glob. Crossing*, 225 F.R.D. at 459. As a preliminary matter, the significant unpredictability and complexity posed by securities class actions weigh in favor of final approval. Indeed, "'[i]n evaluating the settlement of a securities class action, federal courts, including [courts in this District], have long recognized that such litigation is notably difficult and notoriously uncertain.'" *Christine Asia Co., Ltd. v. Yun Ma*, 2019 WL 5257534, at *10 (S.D.N.Y. Oct. 16, 2019); *see also In re FLAG Telecom Holdings, Ltd. Sec. Litig.*, 2010 WL 4537550, at *15 (S.D.N.Y. Nov. 8, 2010) (same); *Bellifemine v. Sanofi-Aventis U.S. LLC*, 2010 WL 3119374, at *4 (S.D.N.Y. Aug. 6, 2010) ("The complexity of the case weighs in favor of approving the proposed settlement."); *In re AOL Time Warner Inc.*, 2006 WL 903236, at *11 (S.D.N.Y. Apr. 6, 2006) ("The difficulty of establishing liability is a common risk of securities litigation."). Although

- 10 -

Lead Plaintiff and Lead Counsel firmly believe that the claims asserted in the Action are meritorious, and that they would prevail at trial, further litigation against Defendants posed risks that made any recovery uncertain.

Defendants have vigorously contested their liability and have denied and continue to deny each and every claim and allegation of wrongdoing. Specifically, Defendants have argued that Lead Plaintiff could not establish his Exchange Act claims because he could not prove that the alleged accounting misstatements were made with the requisite scienter. Ellman Decl., ¶18. According to Defendants, the evidence would show nothing more than good-faith accounting errors, which were disclosed upon discovery, and no motive or opportunity to commit fraud. Likewise, Defendants maintained that the Securities Act claims would be dismissed to the extent they are premised on inactionable opinion statements. *See* ECF 40 at 3. Specifically, Defendants argued that Lead Plaintiff had not established that the opinions were actionably false or misleading. While the parties disagreed about the merits of these and other arguments, Lead Plaintiff recognized that if the Court on motion to dismiss or at summary judgment, or a jury at trial, found them compelling, the Class would recover nothing. *See, e.g.*, *Monroe Cnty. Emps.' Ret. Sys. v. YPF Sociedad Anonima*, 15 F. Supp. 3d 336, 356 (S.D.N.Y. 2014) ("There is no duty to . . . predict the likelihood of future events . . . ."); *In re All. Pharm. Corp. Sec. Litig.*, 279 F. Supp. 2d 171, 189-90 (S.D.N.Y. 2003) (dismissing Section 11 claims on summary judgment).

**(2)      The Risks of Establishing Causation and Damages at Trial**

The risks of establishing liability apply with equal force to establishing damages. Here, while Defendants have the initial burden of showing the absence of loss causation in connection with Lead Plaintiff's Section 11 claims, Defendants maintained that they would demonstrate that even if damages were not eliminated, they were far less than what Lead Plaintiff claimed, especially with

- 11 -

respect to the small secondary offering. Resolving disputed issues regarding causation and damages would require expert testimony, and Defendants would invariably put forth well-credentialed experts. Courts recognize a substantial litigation risk from uncertainty as to which expert's view will be credited by a jury. *See In re Telik, Inc. Sec. Litig.*, 576 F. Supp. 2d 570, 579-80 (S.D.N.Y. 2008) (in this ""'battle of experts,'" it is virtually impossible to predict with any certainty which testimony would be credited, and ultimately, which damages would be found'"); *Glob. Crossing*, 225 F.R.D. at 459 ("'[P]roof of damages in securities cases is always difficult and invariably requires expert testimony which may, or may not be, accepted by a jury.'").

In light of the very significant risks Lead Plaintiff faced at the time of the Settlement with regard to establishing liability and damages, this factor weighs heavily in favor of final approval.

**(3)      The Settlement Eliminates the Additional Costs
and Delay of Continued Litigation**

The anticipated complexity, cost, and duration of the Action were considerable. *See Advanced Battery*, 298 F.R.D. at 175 ("the complexity, expense, and likely duration of litigation are critical factors in evaluating the reasonableness of a settlement"); *Bellifemine*, 2010 WL 3119374, at *3. This case has already been pending for more than two years, with formal discovery not yet started. The Court would need to rule on Defendants' motion to dismiss. If not for the Settlement, assuming the Court denied the pending motion to dismiss, the parties would have engaged in comprehensive fact and expert discovery, including document production, depositions, requests to admit, and third-party discovery.

Undoubtedly, there would also be discovery disputes and motions, requiring Court intervention. In addition to any discovery-related motion practice, Lead Plaintiff would move for class certification and Defendants would likely move for summary judgment. The Court would need to rule on those motions, as well as any *Daubert* challenges. Including the preparation for what

- 12 -

4887-1619-0252.v1

would likely be a multi-week trial, it would be years of litigation before the Class could possibly receive any recovery.

Such a lengthy and highly uncertain process would not serve the best interests of the Class compared to the immediate, certain monetary benefits of the Settlement. *See Strougo v. Bassini*, 258 F. Supp. 2d 254, 261 (S.D.N.Y. 2003) ("even if a shareholder or class member was willing to assume all the risks of pursuing the actions through further litigation . . . the passage of time would introduce yet more risks . . . and would, in light of the time value of money, make future recoveries less valuable than this current recovery"); *Hicks v. Morgan Stanley*, 2005 WL 2757792, at *6 (S.D.N.Y. Oct. 24, 2005) ("Further litigation would necessarily involve further costs [and] justice may be best served with a fair settlement today as opposed to an uncertain future settlement or trial of the action.").

Accordingly, the Rule 23(e)(2)(C)(i) factor, as well as the first, fourth and fifth *Grinnell* Factors, all weigh in favor of final approval of this $3.6 million settlement.

### d.     The Proposed Method for Distributing Relief Is Effective

With respect to Rule 23(e)(2)(C)(ii), Lead Plaintiff and Lead Counsel have taken appropriate steps to ensure that the Class is notified about the Settlement. Pursuant to the Preliminary Approval Order (ECF 61), more than 10,300 copies of the Notice and Proof of Claim were mailed to potential Class Members and nominees, and the Summary Notice was published in *Investor's Business Daily* and transmitted electronically on *PR Newswire*. *See* Mailing Decl., ¶¶8, 10. Additionally, the Settlement-specific website, created pursuant to the Preliminary Approval Order, includes the key Settlement documents – the Stipulation, Notice, Proof of Claim, and Preliminary Approval Order. *Id.*, ¶12. Class Members have until August 19, 2022 to object to the Settlement. While that date has not yet passed, to date there have been no objections to the Settlement. Class Members also have

- 13 -

until September 26, 2022 to submit claim forms.  The claims process is similar to the process typically used in securities class action settlements.  *See Christine Asia*, 2019 WL 5257534, at *14 ("[t]his type of claims processing and method for distributing settlement proceeds is standard in securities and other class actions and is effective").  This factor therefore supports final approval.

### e.   Lead Counsel's Request for Attorneys' Fees Is Reasonable

Rule 23(e)(2)(C)(iii) addresses "the terms of any proposed award of attorney's fees, including timing of payment."  Rule 23(e)(2)(C)(iii).  Consistent with the Notice, and as discussed in the Fee Memorandum, Lead Counsel seek an award of attorneys' fees in the amount of 20% of the Settlement Amount, and expenses in the amount of $20,042.03, in addition to interest on both amounts, to be paid at the time of award.  As set forth in Lead Counsel's Fee Memorandum, this request is in line with fee awards in this District in similar common-fund cases.[2]

Lead Counsel's fee request is reasonable.  The Class is being fully apprised of the terms of the proposed award of attorneys' fees, including the timing of such payments.  Accordingly, this factor supports final approval of the Settlement.

### f.   The Parties Have No Other Agreements Besides an Agreement to Address Requests for Exclusion

Rule 23(e)(2)(C)(iv) requires the consideration of any agreement required to be disclosed under Rule 23(e)(3).  The Settling Parties have entered into a Supplemental Agreement, identified in the Stipulation (¶8.3), which provides that CPI has the option to terminate the Settlement in the event that valid requests for exclusion from the Class exceed a certain agreed-upon threshold.  This type of

---

[2]   The Stipulation provides that any attorneys' fees and expenses awarded by the Court shall be paid when the Court enters the Judgment and an Order awarding such fees and expenses.  *See* Stipulation, ¶7.2; *see also Pelzer v. Vassalle*, 655 F. App'x 352, 365 (6th Cir. 2016) (finding the "quick-pay provision" did "not harm the class members in any discernible way, as the size of the settlement fund available to the class will be the same regardless of when the attorneys get paid").

- 14 -

4887-1619-0252.v1

agreement is commonplace in securities cases.  The Supplemental Agreement and the Stipulation are the only agreements concerning the Settlement entered into by the Settling Parties.

### g.       The Settlement Ensures Class Members Are Treated Equitably

Rule 23(e)(2)(D), the final factor, considers whether class members are treated equitably.  As discussed further below in §V, Lead Counsel developed the Plan of Allocation in consultation with their damages consultant to treat Class Members equitably relative to each other by: (i) calculating each Authorized Claimant's recognized losses in accordance with the amount of alleged artificial inflation in CPI common stock during the Class Period; and (ii) providing that each Authorized Claimant shall receive his, her, or its *pro rata* share of the Net Settlement Fund based on their recognized losses.  Lead Plaintiff will be subject to the same formula for distribution of the Net Settlement Fund as every other Class Member.  This factor therefore merits granting final approval of the Settlement.

Based on the foregoing, Lead Plaintiff and Lead Counsel respectfully submit that each of the Rule 23(e)(2) factors support granting final approval of the Settlement.

### 2.       The Settlement Satisfies the Remaining *Grinnell* Factors

### a.       The Lack of Objections to Date Supports Final Approval

The reaction of the class to the settlement "is considered perhaps 'the most significant factor to be weighed in considering its adequacy,'" *In re Veeco Instruments Inc. Sec. Litig.*, 2007 WL 4115809, at *7 (S.D.N.Y. Nov. 7, 2007), such that the "'"absence of objections may itself be taken as evidencing the fairness of a settlement."'" *City of Providence v. Aeropostale, Inc.*, 2014 WL 1883494, at *5 (S.D.N.Y. May 9, 2014), *aff'd sub nom. Arbuthnot v. Pierson*, 607 F. App'x 73 (2d

- 15 -

Cir. 2015). "A favorable reception by the class constitutes 'strong evidence' of the fairness of a proposed settlement and supports judicial approval." *Bellifemine*, 2010 WL 3119374, at *3.

While the objection deadline has not passed, no objections have been received to date. This positive reaction supports approval of the Settlement. *See Yuzary*, 2013 WL 5492998, at *6 (the "favorable response" from the class "demonstrates that the class approves of the settlement and supports final approval"); *Facebook*, 343 F. Supp. 3d at 410 ("[t]he overwhelmingly positive reaction – or absence of a negative reaction – weighs strongly in favor" of final approval).

**b.       Lead Plaintiff Had Sufficient Information to Make an Informed Decision Regarding the Settlement**

Under the third *Grinnell* Factor, "'the question is whether the parties had adequate information about their claims such that their counsel can intelligently evaluate the merits of plaintiff's claims, the strengths of the defenses asserted by defendants, and the value of plaintiffs' causes of action for purposes of settlement.'" *In re Bear Stearns Cos., Inc. Sec., Derivative & ERISA Litig.*, 909 F. Supp. 2d 259, 267 (S.D.N.Y. 2012); *Martignago v. Merrill Lynch & Co., Inc.*, 2013 WL 12316358, at *6 (S.D.N.Y. Oct. 3, 2013) ("The pertinent question is 'whether counsel had an adequate appreciation of the merits of the case before negotiating.'"). "To satisfy this factor, parties need not have even engaged in formal or extensive discovery." *In re Hi-Crush Partners L.P. Sec. Litig.*, 2014 WL 7323417, at *7 (S.D.N.Y. Dec. 19, 2014) (noting that the PSLRA prohibits discovery until the motion to dismiss is denied); *see also Glob. Crossing*, 225 F.R.D. at 458 ("Formal discovery is not a prerequisite; the question is whether the parties had adequate information about their claims.").

There can be no question that Lead Plaintiff and Lead Counsel had sufficient information to assess the adequacy of the Settlement. As detailed in the Ellman Declaration, Lead Plaintiff and Lead Counsel negotiated the Settlement only after conducting a thorough factual investigation,

- 16 -

which included the review and analysis of SEC filings, news articles, transcripts of conference calls, and analyst reports; interviews with former CPI employees; and consulted with a forensic account and damages expert. The parties also briefed Defendants' motion to dismiss, and drafted detailed mediation statements. *See generally* Ellman Decl. The parties then engaged in a formal mediation session, overseen by John R. Van Winkle, Esq., where the parties' opposing positions and arguments were thoroughly considered, and had follow-up negotiations, facilitated by Mr. Van Winkle, which ultimately resulted in the Settlement. *Id.*

Thus, by the time of the Settlement, Lead Plaintiff was well-versed in the strengths and weaknesses of the case, and was in a position to realistically assess the proposed Settlement. This factor weighs in favor of final approval.

### c. Maintaining Class-Action Status Through Trial Presents a Continuing Risk

Lead Plaintiff's ability to maintain class-action status through trial presented a potential risk in this Action. While a class certification motion had yet to be filed, Defendants undoubtedly would challenge certification. Even if the Court certified a class over Defendants' opposition, Defendants may have moved to decertify the class before trial or on appeal, as class certification may be reviewed at any stage of the litigation. *See Christine Asia*, 2019 WL 5257534, at *13 (stating this risk weighed in favor of final approval because "a class certification order may be altered or amended any time before a decision on the merits"); Rule 23(c) (authorizing a court to decertify a class at any time). "The risk of maintaining class status throughout trial . . . weighs in favor of final approval." *McMahon*, 2010 WL 2399328, at *5.

### d. Defendants' Ability to Withstand a Greater Judgment

This factor is not dispositive when all other factors favor approval because a "'defendant's ability to withstand a greater judgment, standing alone, does not suggest that the settlement is

- 17 -

4887-1619-0252.v1

unfair.'" *Castagna v. Madison Square Garden, L.P.*, 2011 WL 2208614, at *7 (S.D.N.Y. June 7, 2011); *see also Aeropostale*, 2014 WL 1883494, at *9 (courts "generally do not find the ability of a defendant to withstand a greater judgment to be an impediment to settlement when the other factors favor the settlement"). A "defendant is not required to 'empty its coffers' before a settlement can be found adequate." *In re Sony SXRD Rear Projection Television Class Action Litig.*, 2008 WL 1956267, at *8 (S.D.N.Y. May 1, 2008). Here, there was no assurance that Defendants could withstand a greater judgment, as CPI stock no longer trades on the New York Stock Exchange, but rather on the over-the-counter pink sheets, and it has limited insurance policies and other liquid assets to satisfy a judgment. But even if Defendants could pay a larger judgment, all other factors favor final approval.

> **e.** **The Settlement Amount Is Reasonable in View of the Best Possible Recovery and the Risks of Litigation**

The adequacy of the amount offered in a settlement must be judged "not in comparison with the possible recovery in the best of all possible worlds, but rather in light of the strengths and weaknesses of plaintiffs' case." *In re Agent Orange Prod. Liab. Litig.*, 597 F. Supp. 740, 762 (E.D.N.Y. 1984), *aff'd*, 818 F.2d 145 (2d Cir. 1987). A court need only determine whether the settlement falls within a "range of reasonableness" that "recognizes the uncertainties of law and fact" in the case and "the concomitant risks and costs necessarily inherent in taking any litigation to completion." *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972); *see also Glob. Crossing*, 225 F.R.D. at 461 ("the certainty of [a] settlement amount has to be judged in [the] context of the legal and practical obstacles to obtaining a large recovery").

Here, "[b]ecause [Lead Plaintiff] face[s] serious challenges to establishing liability, . . . consideration of [Lead Plaintiff's] best possible recovery must be accompanied by the risk of non-recovery." *Facebook*, 343 F. Supp. 3d at 414; *see also Bear Stearns*, 909 F. Supp. 2d at 270 (stating

- 18 -

4887-1619-0252.v1

this *Grinnell* Factor is "a function of both (1) the size of the amount relative to the best possible recovery; and (2) the likelihood of non-recovery"). The Settlement represents a recovery of approximately 22.5% of reasonably recoverable damages, Ellman Decl., ¶5, an amount that far exceeds the average recovery of 6.1% in cases settled from 2012 through 2021 which allege both Rule 10b-5 and 1933 Act and/or 1934 Act claims.[3] *See* Laarni T. Bulan and Laura E. Simmons, *Securities Class Action Settlements: 2021 Review and Analysis* at 7, Fig. 6 (Cornerstone Research 2022), attached hereto as Exhibit A.

Moreover, the $3.6 million Settlement Amount "was agreed upon only after careful consideration, both by competent Lead Counsel and by [a neutral mediator]" – concluding that the Settlement represented a very good recovery for the Class in light of the substantial litigation risks Lead Plaintiff faced. *Facebook*, 343 F. Supp. 3d at 414; *see also id.* (finding that even if the settlement "amounts to one-tenth – or less – of Plaintiffs' potential recovery," such a recovery is within "the range of reasonableness" where "the risk[s] of a zero – or minimal – recovery scenario are real"). This factor weighs in favor of final approval.

In sum, the *Grinnell* Factors, and the Rule 23(e)(2) factors, individually and collectively, weigh strongly in favor of the Court's approval of the Settlement.

## V.    THE PLAN OF ALLOCATION IS FAIR AND ADEQUATE

The standard for approval of the Plan of Allocation is the same as for approving the Settlement as a whole: namely, "'it must be fair and adequate.'" *In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 344 (S.D.N.Y. 2005). "'When formulated by competent and experienced class counsel,' a plan for allocation of net settlement proceeds 'need have only a reasonable, rational basis.'" *Advanced Battery*, 298 F.R.D. at 180; *see also Christine Asia*, 2019 WL 5257534, at *15-

---

[3]    Not surprisingly, Defendants estimated recoverable damages at a significantly lower amount.

- 19 -

*16.  Here, the Plan of Allocation was prepared with the assistance of Lead Plaintiff's damages consultant and has a rational basis, and is designed to achieve an equitable and rational distribution of the Net Settlement Fund to Authorized Claimants.

The Net Settlement Fund will be distributed to Authorized Claimants who timely submit valid Proof of Claim forms that are approved for payment from the Net Settlement Fund under the Plan of Allocation.  The Plan of Allocation treats all Class Members equitably, as everyone who submits a valid and timely Proof of Claim, and does not otherwise request exclusion from the Class, will receive a *pro rata* share of the Net Settlement Fund in the proportion that the Authorized Claimant's claim bears to the total of all Authorized Claimants' claims, provided the payment amount is $10.00 or more.  *See id.*; *see also* Mailing Decl., Ex. A (Notice) at 13.

Lead Plaintiff and Lead Counsel believe that the Plan of Allocation is fair and reasonable, and respectfully submit that it be approved by the Court.  Notably, there have been no objections to the Plan, which supports the Court's approval.  *See Veeco*, 2007 WL 4115809, at *7.

## VI.   NOTICE TO THE CLASS SATISFIES THE REQUIREMENTS OF RULE 23 AND DUE PROCESS

Rule 23 requires that notice of a settlement be "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort," Rule 23(c)(2)(B), and that it be directed to class members in a "reasonable manner."  Rule 23(e)(1)(B).  Notice of a settlement satisfies Rule 23(e) and due process where it fairly apprises "'members of the class of the terms of the proposed settlement and of the options that are open to them in connection with the proceedings.'"  *Wal-Mart Stores*, 396 F.3d at 114; *Vargas v. Cap. One Fin. Advisors*, 559 F. App'x 22, 26-27 (2d Cir. 2014).  Notice is adequate "if the average person understands the terms of the proposed settlement and the options provided to class members

- 20 -

thereunder." *In re Merrill Lynch Tyco Research Sec. Litig.*, 249 F.R.D. 124, 133 (S.D.N.Y. 2008) (citing *Wal-Mart Stores*, 396 F.3d at 114).

The Notice and the method used to disseminate it to potential Class Members satisfy these standards. The Court-approved Notice and Proof of Claim (the "Notice Packet") inform Class Members of, among other things: (i) the pendency of the Action; (ii) the nature of the Action and the claims; (iii) the essential terms of the Settlement; (iv) the proposed Plan of Allocation; (v) Class Members' rights to object to the Settlement, the Plan of Allocation, or the requested attorneys' fees or expenses; (vi) the binding effect of a judgment on Class Members; and (vii) information regarding Lead Counsel's motion for an award of attorneys' fees and expenses. The Notice also provides specific information regarding the date, time, and place of the Settlement Hearing, and sets forth the procedures and deadlines for: (i) submitting a Proof of Claim; and (ii) objecting to any aspect of the Settlement, including the proposed Plan of Allocation and the request for attorneys' fees and expenses.

The Notice also contains all of the information required by the PSLRA, including: (i) a statement of the amount to be distributed, determined in the aggregate and on an average per share basis; (ii) a statement of the potential outcome of the case; (iii) a statement indicating the attorneys' fees and expenses sought; (iv) identification and contact information of counsel; and (v) a brief statement explaining the reasons why the parties are proposing the Settlement.

In accordance with the Preliminary Approval Order, A.B. Data, Ltd. ("A.B. Data"), the Court-approved Claims Administrator, commenced the mailing of the Notice Packet by First-Class Mail to potential Class Members, brokers, and nominees on June 28, 2022. As of July 31, 2022, more than 10,300 copies of the Notice Packet have been mailed. Mailing Decl., ¶8. A.B. Data also published the Summary Notice in *Investor's Business Daily* and transmitted it electronically via *PR*

- 21 -

*Newswire* on July 4, 2022. *Id.*, ¶10, Exs. B-C.  Additionally, A.B. Data posted the Notice Packet, as well as other important documents, on the website maintained for the Settlement.  *Id.*, ¶12.

The combination of individual First-Class Mail to all potential Class Members who could be identified with reasonable effort, supplemented by mailed notice to brokers and nominees and publication of the Summary Notice in a relevant, widely-circulated publication and internet newswire, was "the best notice . . . practicable under the circumstances."  Rule 23(c)(2)(B); *see also Merrill Lynch Tyco Research*, 249 F.R.D. at 133 ("Notice need not be perfect, but need be only the best notice practicable under the circumstances, and each and every class member need not receive actual notice, so long as class counsel acted reasonably in choosing the means likely to inform potential class members.").  Indeed, this method of providing notice has been routinely approved in securities class actions and other class actions.  *E.g.*, *Christine Asia*, 2019 WL 5257534, at \*16 (finding that direct First-Class Mail combined with print and Internet-based publication of settlement documents was "the best notice practicable under the circumstances"); *Dornberger v. Metro Life Ins. Co.*, 203 F.R.D. 118, 123-24 (S.D.N.Y. 2001) (same).

## VII.   CONCLUSION

The $3.6 million Settlement obtained by Lead Plaintiff and Lead Counsel represents a substantial recovery for the Class, particularly in light of the significant litigation risks Lead Plaintiff faced, including the very real risk of the Class receiving no recovery at all.  For the foregoing reasons, Lead Plaintiff respectfully requests that the Court approve the proposed Settlement and Plan of Allocation as fair, reasonable, and adequate.

4887-1619-0252.v1

DATED:  August 5, 2022

Respectfully submitted,

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
ALAN I. ELLMAN
AVITAL O. MALINA


*s/ Alan I. Ellman*
ALAN I. ELLMAN

58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
aellman@rgrdlaw.com
amalina@rgrdlaw.com

ROBBINS GELLER RUDMAN
      & DOWD LLP
ELLEN GUSIKOFF STEWART
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
elleng@rgrdlaw.com

ROBBINS LLP
BRIAN J. ROBBINS
STEPHEN J. ODDO
ERIC M. CARRINO
5040 Shoreham Place
San Diego, CA  92122
Telephone:  619/525-3990
619/525-3991 (fax)
brobbins@robbinsllp.com
soddo@robbinsllp.com
ecarrino@robbinsllp.com

Lead Counsel for Lead Plaintiff

- 23 -

4887-1619-0252.v1

# EXHIBIT A



# CORNERSTONE RESEARCH
Economic and Financial Consulting and Expert Testimony

# Securities Class Action Settlements

2021 Review and Analysis

# Table of Contents

| | |
|---|---|
| 2021 Highlights | 1 |
| Author Commentary | 2 |
| Total Settlement Dollars | 3 |
| Settlement Size | 4 |
| Type of Claim | 5 |
|     Rule 10b-5 Claims and "Simplified Tiered Damages" | 5 |
|     '33 Act Claims and "Simplified Statutory Damages" | 7 |
| Analysis of Settlement Characteristics | 9 |
|     GAAP Violations | 9 |
|     Derivative Actions | 10 |
|     Corresponding SEC Actions | 11 |
|     Institutional Investors | 12 |
| Time to Settlement and Case Complexity | 13 |
| Case Stage at the Time of Settlement | 14 |
| Cornerstone Research's Settlement Prediction Analysis | 15 |
| Research Sample | 16 |
| Data Sources | 16 |
| Endnotes | 17 |
| Appendices | 18 |
| About the Authors | 23 |

# Table of Figures and Appendices

Figure 1: Settlement Statistics                                                                                          1

Figure 2: Total Settlement Dollars                                                                                       3

Figure 3: Distribution of Settlements                                                                                    4

Figure 4: Median and Average "Simplified Tiered Damages" in Rule 10b-5 Cases                                             5

Figure 5: Median Settlements as a Percentage of "Simplified Tiered Damages" by Damages Ranges in Rule 10b-5 Cases        6

Figure 6: Settlements by Nature of Claims                                                                                7

Figure 7: Median Settlements as a Percentage of "Simplified Statutory Damages" by Damages Ranges in '33 Act Claim Cases  8

Figure 8: Median Settlements as a Percentage of "Simplified Tiered Damages" and Allegations of GAAP Violations           9

Figure 9: Frequency of Derivative Actions                                                                               10

Figure 10: Frequency of SEC Actions                                                                                     11

Figure 11: Median Settlement Amounts and Public Pension Plans                                                           12

Figure 12: Median Settlement by Duration from Filing Date to Settlement Hearing Date                                    13

Figure 13: Median Settlement Dollars and Resolution Stage at Time of Settlement                                         14

Appendix 1: Settlement Percentiles                                                                                      18

Appendix 2: Settlements by Select Industry Sectors                                                                      18

Appendix 3: Settlements by Federal Circuit Court                                                                        19

Appendix 4: Mega Settlements                                                                                            19

Appendix 5: Median and Average Settlements as a Percentage of "Simplified Tiered Damages"                               20

Appendix 6: Median and Average Settlements as a Percentage of "Simplified Statutory Damages"                            20

Appendix 7: Median and Average Maximum Dollar Loss (MDL)                                                                21

Appendix 8: Median and Average Disclosure Dollar Loss (DDL)                                                             21

Appendix 9: Median Docket Entries by "Simplified Tiered Damages" Range                                                  22

Analyses in this report are based on 2,013 securities class actions filed after passage of the Private Securities Litigation Reform Act of 1995 (Reform Act) and settled from 1996 through year-end 2021. See page 16 for a detailed description of the research sample. For purposes of this report and related research, a settlement refers to a negotiated agreement between the parties to a securities class action that is publicly announced to potential class members by means of a settlement notice.

# 2021 Highlights

While the number of settlements increased in 2021 to a 10-year high, several key metrics declined below recent levels. The median total settlement amount decreased to $8.3 million. And, reversing a trend observed in recent years, median "simplified tiered damages" were 42% below the 2020 median value.

- There were 87 settlements, totaling $1.8 billion, in 2021. (page 3)

- The median settlement of $8.3 million fell 22% from 2020 (adjusted for inflation). (page 4)

- Almost 60% of cases (51) settled for less than $10 million, and of these, 14 cases settled for less than $2 million. (page 4)

- There were three mega settlements (equal to or greater than $100 million), ranging from $130 million to $187.5 million. (page 3)

- Median "simplified tiered damages" (among cases with Rule 10b-5 claims) was the lowest since 2017 and the second lowest in the last decade. (page 5)

- In 2021, the number of settlements in cases with only Section 11 and/or Section 12(a)(2) claims ('33 Act claims) was nearly double the annual average from 2017 to 2020. (page 7)

- The proportion of settled cases alleging Generally Accepted Accounting Principles (GAAP) violations in Rule 10b-5 cases was 32%, a record low among all post–Reform Act years. (page 9)

- The rate of settled cases involving a corresponding action by the U.S. Securities and Exchange Commission (SEC) was the lowest in the past decade. (page 11)

- The median time from filing to settlement hearing date was 2.6 years, compared to 3.0 years for 2012 to 2020. (page 13)

**Figure 1: Settlement Statistics**

(Dollars in millions)

| | 2016–2020 | 2019 | 2020 | 2021 |
|---|---|---|---|---|
| Number of Settlements | 395 | 75 | 77 | 87 |
| Total Amount | $20,486.9 | $2.227.5 | $4,395.2 | $1,787.7 |
| Minimum | $0.3 | $0.5 | $0.3 | $0.6 |
| Median | $9.9 | $11.7 | $10.6 | $8.3 |
| Average | $51.9 | $29.7 | $57.1 | $20.5 |
| Maximum | $3,237.5 | $413.0 | $1,266.9 | $187.5 |

Note: Settlement dollars are adjusted for inflation; 2021 dollar equivalent figures are presented.

# Author Commentary

## Findings

There was no slowdown in settlement activity in 2021, even with the backdrop of the COVID-19 pandemic, as the number of securities class action settlements increased to a 10-year high. Since the typical duration from case filing to settlement is approximately three years, the uptick in 2021 settlements is consistent with the unprecedented number of case filings in 2017–2019,[1] which is when the majority of these settled cases were filed.

The record number of cases settled in 2021, however, did not translate into higher total settlement dollars. Both total settlement dollars and median settlement amount declined to their lowest levels since 2017, reflecting an increase in the proportion of smaller settlements (i.e., less than $10 million) compared to prior years.

The decline in settlement sizes can largely be attributed to lower estimates of our proxy for economic losses borne by shareholders, or "simplified tiered damages." Moreover, median issuer defendant total assets were more than 45% smaller for cases settled in 2021 compared to those settled in 2020.

Weaker cases may have contributed to the reduced settlement values as well. For example, the proportion of settled cases alleging a GAAP violation or involving a related SEC action were at record-low levels. Both of these factors are typically associated with higher settlement amounts and are sometimes considered proxies for stronger cases.[2] In addition, the frequency of other factors that our research finds are associated with higher settlement amounts, such as the involvement of an institutional investor as lead plaintiff or the presence of a parallel derivative action, were among the lowest observed in the last decade.

....................................................................

*The mix of cases that settled in 2021 had smaller estimates of potential shareholder losses and lacked many of the plus factors that often contribute to higher settlement outcomes.*

*Dr. Laarni T. Bulan*
*Principal, Cornerstone Research*
....................................................................

Similarly, our research finds that the number of docket entries—a proxy for the time and effort expended by plaintiff counsel and/or case complexity—is positively associated with settlement amounts. The average number of docket entries for cases settled in 2021 was the lowest in the last five years.

....................................................................

*Undeterred by the challenges of the pandemic, securities class action settlements occurred in larger numbers and were resolved more quickly than observed in prior years. The increase in the number of settlements also reflects the unusually high rate of case filings when many of these settled cases were first initiated.*

*Dr. Laura E. Simmons*
*Senior Advisor, Cornerstone Research*
....................................................................

## Looking Ahead

We expect heightened settlement activity to continue in upcoming years given the elevated number of case filings in 2018–2020 compared to earlier years,[3] assuming no increases in dismissal rates. The higher number of smaller settlements observed in 2021 could also continue due to the decline in the median disclosure dollar loss (another proxy for shareholder losses) among case filings during the same time frame (2018–2020).

Several recent trends in case allegations have been observed in case filings since 2017, such as allegations related to cybersecurity, cryptocurrency, cannabis, COVID-19, and special purpose acquisition companies (SPACs).[4] We continue to see a small number of these cases settling, but a large portion remains active. In addition, the spike in SPAC filings in 2021, as shown in Cornerstone Research's *Securities Class Action Filings—2021 Year in Review*, is likely to affect settlement trends in future years.

—*Laarni T. Bulan and Laura E. Simmons*

# Total Settlement Dollars

As has been observed in prior years, the presence or absence of just a few very large settlements can have an outsized effect on total reported settlement dollars.

- In 2021, the absence of these very large settlements contributed to a nearly 60% decline in total settlement dollars from the prior year (adjusted for inflation).

- There were three mega settlements (equal to or greater than $100 million) in 2021, ranging from $130 million to $187.5 million. The maximum settlement value of $187.5 million in 2021 is the lowest maximum value in the last decade.

*The number of settlements in 2021 reached a 10-year high.*

- Only 25% of total settlement dollars in 2021 came from mega settlements, the lowest percentage in the last decade. *(See Appendix 4 for additional information on mega settlements.)*

- The number of settlements in 2021 (87 cases) represented a 19% increase from the prior nine-year average (73 cases).

**Figure 2: Total Settlement Dollars**
**2012–2021**

(Dollars in billions)



| 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 |
|------|------|------|------|------|------|------|------|------|------|
| $4.0 | $5.6 | $1.3 | $3.5 | $6.8 | $1.6 | $5.5 | $2.2 | $4.4 | $1.8 |
| N=56 | N=66 | N=63 | N=77 | N=85 | N=80 | N=78 | N=75 | N=77 | N=87 |

Note: Settlement dollars are adjusted for inflation; 2021 dollar equivalent figures are presented. "N" refers to the number of cases.

# Settlement Size

- The median settlement amount in 2021 was $8.3 million, a 22% decline from 2020 (adjusted for inflation), and a 10% decline from the 2012–2020 median.

- There were 14 cases that settled for less than $2 million in 2021 (historically referred to by commentators as nuisance suits).[5] This compares to an annual average of 10 such settlements during the 2012–2020 period.

- Both the average settlement and median settlement amounts in 2021 were the lowest since 2017. *(See Appendix 1 for an analysis of settlements by percentiles.)*

*Nearly 60% of settlements in 2021 were for less than $10 million.*

- As noted in prior research, three law firms (The Rosen Law Firm, Pomerantz LLP, and Glancy Prongay & Murray LLP) have accounted for more than half of securities class action filings in recent years, and those filings have been dismissed at a higher rate overall than those with other lead plaintiff counsel.[6] For cases that progressed to a settlement in 2021 with one or more of these three firms acting as lead counsel, the median settlement amount was 76% lower than the median for cases involving other lead plaintiff counsel. These three firms were involved as lead counsel in 31 settled cases in 2021, compared to 19 in 2020.

Figure 3: Distribution of Settlements
2012–2021

(Dollars in millions)



# Type of Claim

## Rule 10b-5 Claims and "Simplified Tiered Damages"

"Simplified tiered damages" uses simplifying assumptions to estimate per-share damages and trading behavior for cases involving Rule 10b-5 claims. It provides a measure of potential shareholder losses that allows for consistency across a large volume of cases, thus enabling the identification and analysis of potential trends.[7]

Cornerstone Research's prediction model finds this measure to be the most important factor in predicting settlement amounts.[8] However, this measure is not intended to represent actual economic losses borne by shareholders. Determining any such losses for a given case requires more in-depth economic analysis.

- Similar to settlement amounts, the average "simplified tiered damages" in 2021 declined to the lowest level since 2017. *(See Appendix 5 for additional information on median and average settlements as a percentage of "simplified tiered damages.")*

*Median "simplified tiered damages" was the lowest since 2017 and the second lowest in the last decade.*

- Median values provide the midpoint in a series of observations and are less affected than averages by outlier data. The decrease in median "simplified tiered damages" in 2021 indicates a decline in the number of larger cases relative to 2020 (e.g., cases with "simplified tiered damages" exceeding $250 million).

- Smaller "simplified tiered damages" are typically associated with smaller issuer defendants (measured by total assets or market capitalization of the issuer). However, the median market capitalization of issuer defendants[9] in settled cases increased 30% over 2020, in part reflecting the upward market trend through the end of 2021.

Figure 4: Median and Average "Simplified Tiered Damages" in Rule 10b-5 Cases 2012–2021

(Dollars in millions)



Note: "Simplified tiered damages" are adjusted for inflation based on class period end dates for common stock only; 2021 dollar equivalent figures are presented. Damages are estimated for cases alleging a claim under Rule 10b-5 (whether alone or in addition to other claims).

Type of Claim (continued)

- Cases with larger "simplified tiered damages" are more likely to be associated with factors such as institutional lead plaintiffs, related SEC actions, or criminal charges. *(See Analysis of Settlement Characteristics on pages 9–12 for additional discussion of these factors.)*

- Among cases with Rule 10b-5 claims, the median class period length declined 20% in 2021 from the median class period length observed in 2020, explaining, in part, the relatively low median "simplified tiered damages."

- Fourteen settlements in 2021 had "simplified tiered damages" less than $25 million, the largest proportion of such cases in more than 15 years.

- Cases with less than $25 million in "simplified tiered damages" typically settle more quickly. In 2021, these cases settled within 2.5 years on average, compared to about four years for cases with "simplified tiered damages" greater than $500 million.

- Half of the cases settled in 2021 with "simplified tiered damages" of less than $25 million involved issuers that had been delisted from a major exchange and/or declared bankruptcy prior to settlement.

- Very large cases (more than $1 billion in "simplified tiered damages") typically settle for a smaller percentage of such damages. However, compared to cases with "simplified tiered damages" between $150 million and $1 billion, this pattern did not hold in 2021.

---

Figure 5: Median Settlements as a Percentage of "Simplified Tiered Damages" by Damages Ranges in Rule 10b-5 Cases 2012–2021

(Dollars in millions)



Note: Damages are estimated for cases alleging a claim under Rule 10b-5 (whether alone or in addition to other claims).

Type of Claim (continued)

# '33 Act Claims and "Simplified Statutory Damages"

For '33 Act claim cases—those involving only Section 11 and/or Section 12(a)(2) claims—shareholder losses are estimated using a model in which the statutory loss is the difference between the statutory purchase price and the statutory sales price, referred to here as "simplified statutory damages." Only the offered shares are assumed to be eligible for damages.[10]

"Simplified statutory damages" are typically smaller than "simplified tiered damages," in part reflecting differences in the methodologies used to estimate alleged damages per share, as well as differences in the shares eligible to be damaged. As such, settlements as a percentage of "simplified statutory damages" may be higher than the percentages observed among Rule 10b-5 settlements.

- However, for the first time since 2014, the median settlement as a percentage of "simplified statutory damages" was lower than the median settlement as a percentage of "simplified tiered damages." In 2021, the median settlement as a percentage of "simplified statutory damages" was 4.4%, 10% lower than the median "simplified tiered damages" of 4.9%. (See Appendix 6 for additional information on median and average settlements as a percentage of "simplified statutory damages.")

*The median settlement value for '33 Act claim cases in 2021 was $8.4 million, largely unchanged from 2020 ($8.6 million).*

- In 2021, the number of settlements in cases with only '33 Act claims was nearly double the annual average from 2017 to 2020.

- Cases involving '33 Act claims typically resolve more quickly than cases involving Rule 10b-5 (Exchange Act) claims. In 2021, however, the median interval from filing date to settlement hearing date for both case types narrowed to within 10%.

Figure 6: Settlements by Nature of Claims
2012–2021

(Dollars in millions)

| | Number of Settlements | Median Settlement | Median "Simplified Statutory Damages" | Median Settlement as a Percentage of "Simplified Statutory Damages" |
|---|---|---|---|---|
| Section 11 and/or Section 12(a)(2) Only | 77 | $8.9 | $142.2 | 7.6% |

| | Number of Settlements | Median Settlement | Median "Simplified Tiered Damages" | Median Settlement as a Percentage of "Simplified Tiered Damages" |
|---|---|---|---|---|
| Both Rule 10b-5 and Section 11 and/or Section 12(a)(2) | 116 | $16.0 | $406.9 | 6.1% |
| Rule 10b-5 Only | 543 | $7.9 | $215.2 | 4.8% |

Note: Settlement dollars and damages are adjusted for inflation; 2021 dollar equivalent figures are presented.

Type of Claim (continued)

- More than 80% of cases with only '33 Act claims involved an initial public offering (IPO).

- In 2021, 88% of the settled '33 Act claim cases involved an underwriter (or underwriters) as a named codefendant.

- Among those cases with identifiable contributions, D&O liability insurance provided, on average, more than 90% of the total settlement fund for '33 Act claim cases from 2012 to 2021.[11]

- Median "simplified statutory damages" in 2021 was the highest since 2014, and double the median in 2020.

As noted in previous reports, the March 2018 U.S. Supreme Court decision in *Cyan Inc. v. Beaver County Employees Retirement Fund* (*Cyan*) held that '33 Act claim securities class actions could be brought in state court. While '33 Act claim cases had often been brought in state courts before

*Cyan*, filing rates in state courts increased substantially following this ruling. This trend reversed, however, following the March 2020 Delaware Supreme Court decision in *Salzberg v. Sciabacucchi* upholding the validity of federal forum-selection provisions in corporate charters.[12]

- In 2021, among '33 Act claim only cases filed post-*Cyan* but prior to the *Sciabacucchi* ruling, 13 have settled, six of which were filed in state court.[13]

- In the years since the *Cyan* decision, an increase in the number of overlapping or parallel suits has been observed—for example, a '33 Act claim case filed in state court that is related to a Rule 10b-5 claim case filed in federal court.[14] The number of these overlapping suits that settled in 2021 was nearly triple the average from 2017 to 2020.

Figure 7: Median Settlements as a Percentage of "Simplified Statutory Damages" by Damages Ranges in '33 Act Claim Cases 2012–2021

(Dollars in millions)



| | < $50<br>N=16 | $50–$149<br>N=23 | >= $150<br>N=38 | Total Sample<br>N=77 |
|---|---|---|---|---|
| | 22.8% | 11.1% | 4.4% | 7.6% |

Jurisdictions of Settlements of '33 Act Claim Cases

| | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 |
|---|---|---|---|---|---|---|---|---|---|---|
| State Court | 1 | 1 | 0 | 2 | 4 | 5 | 4 | 4 | 7 | 6 |
| Federal Court | 3 | 7 | 2 | 3 | 6 | 3 | 4 | 5 | 1 | 10 |

Note: "N" refers to the number of cases. Table does not include parallel suits.

# Analysis of Settlement Characteristics

## GAAP Violations

This analysis examines allegations of GAAP violations in settlements of securities class actions involving Rule 10b-5 claims, including two sub-categories of GAAP violations—financial statement restatements and accounting irregularities.[15] For further details regarding settlements of accounting cases, see Cornerstone Research's annual report on *Accounting Class Action Filings and Settlements*.[16]

- In 2021, median "simplified tiered damages" for cases involving GAAP allegations were 38% higher than the 2012–2020 median for such cases.

- As this research has observed, settlements as a percentage of "simplified tiered damages" for cases involving GAAP allegations are typically higher than for non-GAAP cases. This is true even as the rate of accounting allegations has declined in recent years. For example, only 14% of settlements in 2021 involved a restatement of financial statements.

- The frequency of an outside auditor codefendant has declined substantially in recent years. In 2021, an outside auditor was a codefendant in just 3% of settlements.

- The frequency of reported accounting irregularities among settlements from 2017 to 2021 was also low, at just 3.5% of cases. Of those cases, more than 50% also involved criminal charges/indictments related to the allegations in the class action.

*The proportion of settled cases in 2021 with Rule 10b-5 claims alleging GAAP violations was 32%, an all-time low among all post–Reform Act years.*

Figure 8: Median Settlements as a Percentage of "Simplified Tiered Damages" and Allegations of GAAP Violations 2012–2021



Note: "N" refers to the number of cases.

Analysis of Settlement Characteristics (continued)

## Derivative Actions

Historically, settled cases involving an accompanying derivative action have been associated with both larger cases (measured by "simplified tiered damages") and larger settlement amounts. For example, from 2012 to 2020, the median settlement for cases with an accompanying derivative action was nearly 45% higher than for cases without a derivative action.

- However, in 2021, the median settlement for cases with an accompanying derivative action was $8.5 million compared to $7.5 million for cases without a derivative action, a difference of 13%.

- In 2021, median "simplified tiered damages" for settled cases with an accompanying derivative action was more than double the median for cases without an accompanying derivative action.

*In 2021, 43% of settled cases involved an accompanying derivative action, the lowest rate in the last five years.*

- For cases settled during 2017–2021, nearly one-third of parallel derivative suits were filed in Delaware. California and New York were the next most common venues for such actions, representing 22% and 13% of such settlements, respectively.

Figure 9: Frequency of Derivative Actions
2012–2021

■ Settlements without an Accompanying Derivative Action

■ Settlements with an Accompanying Derivative Action



Analysis of Settlement Characteristics (continued)

## Corresponding SEC Actions

- Cases with an SEC action related to the allegations are typically associated with substantially higher settlement amounts.[17]

- In 2021, median settlement amounts for cases that involved a corresponding SEC action were double the median for cases without such an action.

- Settled cases in 2021 with a corresponding SEC action took more than 30% longer to reach settlement compared to cases without such an action. *(See page 13 for additional discussion.)*

- The dramatic decline in corresponding SEC actions (Figure 10) may reflect, in part, the decline in SEC enforcement activity during the filing date years associated with 2021 settlements. For additional details, see Cornerstone Research's *SEC Enforcement Activity: Public Company and Subsidiaries—FY 2021 Update.*

- Cases involving corresponding SEC actions may also include related criminal charges in connection with the allegations covered by the underlying class action. From 2017 to 2021, 40% of settled cases with an SEC action had related criminal charges.[18]

*In 2021, the number of settled cases involving a corresponding SEC action was the lowest in the past decade*

Figure 10: Frequency of SEC Actions
2012–2021



▨ Settlements without a Corresponding SEC Action

◼ Settlements with a Corresponding SEC Action

Analysis of Settlement Characteristics (continued)

# Institutional Investors

As is well known, increasing institutional participation in litigation as lead plaintiffs was a focus of the Reform Act.[19] Institutional investors are often involved in larger cases, that is, cases with higher "simplified tiered damages" and higher total assets.

- In 2021, for cases involving an institutional investor as lead plaintiff, median "simplified tiered damages" and median total assets were six times and 11 times higher, respectively, than the median values for cases without an institutional investor in a lead role.

- The involvement of an institutional investor as a lead plaintiff is correlated with specific law firms serving as lead plaintiff counsel. For example, over the last five years, an institutional investor served as lead plaintiff in 86% of the settled cases in which Robbins Geller Rudman & Dowd LLP and/or Bernstein Litowitz Berger & Grossman LLP served as lead plaintiff counsel. In comparison, an institutional investor served as lead plaintiff in only 15% of cases in which The Rosen Law Firm, Pomerantz, or Glancy served as lead counsel.

Since passage of the Reform Act, public pension plans have been the most frequent type of institutional lead plaintiff, and the presence of a public pension acting as a lead plaintiff is associated with higher settlement amounts. *(See page 15 for further discussion of factors that influence settlement outcomes.)*

- For example, for cases settled in 2021, public pension plans served as lead plaintiffs in almost 76% of cases involving institutions, while union funds appeared as lead plaintiffs in less than 10% of these cases.

- Public pensions are also more likely to be lead plaintiffs in cases involving more established publicly traded issuers. In 2021 settled cases, the median age from IPO to the filing date for cases with a public pension lead plaintiff was more than 8.5 years compared to a median of 4.3 years for cases without a public pension lead.

*Among cases settled in 2021, institutional investor lead plaintiff appointments were among the lowest in more than 15 years.*

Figure 11: Median Settlement Amounts and Public Pension Plans 2012–2021

(Dollars in millions)



Note: Settlement dollars are adjusted for inflation; 2021 dollar equivalent figures are presented.

# Time to Settlement and Case Complexity

- The median time from filing to settlement hearing date was 2.6 years for 2021 settlements, compared to 3.0 years for 2012–2020 settlements. This decline in the time to reach settlement was largely driven by the Ninth Circuit, where the median time to settlement declined by almost 40% in 2021.

- Larger cases (as measured by "simplified tiered damages") often take longer to resolve. Consistent with this, in 2021 all three mega settlements took at least three years to reach a settlement hearing date.

- In 2021, for cases that took at least three years to settle, median "simplified tiered damages" were more than five times higher for settlements with an institutional lead plaintiff than for those without an institutional lead plaintiff.

- Reflecting both the smaller dollar amounts and the shorter interval from filing date to settlement hearing date among 2021 settlements, the number of docket entries for these cases declined, on average, 26% from the prior year.[20]

*Over 55% of cases in 2021 reached a settlement hearing date within three years of filing, compared to under 45% in 2020.*

Figure 12: Median Settlement by Duration from Filing Date to Settlement Hearing Date
2012–2021

(Dollars in millions)



| | Less than 2 Years | 2–3 Years | 3–4 Years | 4–5 Years | More than 5 Years |
|---|---|---|---|---|---|
| 2012–2020 | $3.7 | $7.9 | $10.5 | $14.2 | $24.3 |
| 2021 | $4.9 | $5.6 | $8.5 | $37.0 | $18.3 |
| N (2012–2020) | N=122 | N=201 | N=162 | N=76 | N=96 |
| N (2021) | N=21 | N=30 | N=15 | N=8 | N=13 |

Note: Settlement dollars are adjusted for inflation; 2021 dollar equivalent figures are presented. "N" refers to the number of cases.

# Case Stage at the Time of Settlement

In collaboration with Stanford Securities Litigation Analytics (SSLA),[21] this report analyzes settlements in relation to the stage in the litigation process at the time of settlement.

- Despite the overall smaller size of cases settled in 2021 and the shorter time to reach settlement, the stage at which cases settled remained largely unchanged. For example, in 2021, more than 60% of cases were resolved before a motion for class certification was filed, compared to 57% for 2017–2020 settlements.

- Similarly, approximately 20% of settlements in 2021 reached settlement sometime after a ruling on a motion for class certification, compared to 24% for 2017–2020 settlements.

- In 2021, cases that settled after a motion for class certification was filed were substantially larger than cases that settled at earlier stages. In particular, median "simplified tiered damages" for cases settling after a motion for class certification had been filed was more than eight times the median for cases that resolved prior to such a motion.

- Cases settling at later stages in 2021 were also larger in terms of issuer size. Specifically, the median issuer-reported total assets for 2021 cases that settled after the filing of a motion for summary judgment was more than five times the median for cases that settled prior to such a motion being filed.

*Once a motion for class certification was filed, the median interval to the settlement hearing date for 2021 settlements was around 1.5 years.*

Figure 13: Median Settlement Dollars and Resolution Stage at Time of Settlement 2017–2021

(Dollars in millions)



Note: Settlement dollars are adjusted for inflation; 2021 dollar equivalent figures are presented. "N" refers to the number of cases. MTD refers to "motion to dismiss," CC refers to "class certification," and MSJ refers to "motion for summary judgment." This analysis is limited to cases alleging Rule 10b-5 claims.

# Cornerstone Research's Settlement Prediction Analysis

This research applies regression analysis to examine the relationships between settlement outcomes and certain securities case characteristics. Regression analysis is employed to better understand and predict the total settlement amount, given the characteristics of a particular securities case. Regression analysis can also be applied to estimate the probabilities associated with reaching alternative settlement levels. It can also be helpful in exploring hypothetical scenarios, including how the presence or absence of particular factors affects predicted settlement amounts.

## Determinants of Settlement Outcomes

Based on the research sample of cases that settled from January 2006 through December 2021, the factors that were important determinants of settlement amounts included the following:

- "Simplified tiered damages"

- Maximum Dollar Loss (MDL)—market capitalization change from its class period peak to post-disclosure value

- Most recently reported total assets of the issuer defendant firm

- Number of entries on the lead case docket

- Whether there were accounting allegations

- Whether there was a corresponding SEC action against the issuer, other defendants, or related parties

- Whether there were criminal charges against the issuer, other defendants, or related parties with similar allegations to those included in the underlying class action complaint

- Whether there was an accompanying derivative action

- Whether an outside auditor was named as a codefendant

- Whether Section 11 and/or Section 12(a) claims were alleged in addition to Rule 10b-5 claims

- Whether the issuer defendant was distressed

- Whether a public pension was a lead plaintiff

- Whether securities, in addition to common stock, were included in the alleged class

Regression analyses show that settlements were higher when "simplified tiered damages," MDL, issuer defendant asset size, or the number of docket entries was larger, or when Section 11 and/or Section 12(a) claims were alleged in addition to Rule 10b-5 claims.

Settlements were also higher in cases involving accounting allegations, a corresponding SEC action, criminal charges, an accompanying derivative action, a public pension involved as lead plaintiff, an outside auditor named as a codefendant, or securities in addition to common stock included in the alleged class.

Settlements were lower if the issuer was distressed.

More than 74% of the variation in settlement amounts can be explained by the factors discussed above.

# Research Sample

# Data Sources

- The database compiled for this report is limited to cases alleging Rule 10b-5, Section 11, and/or Section 12(a)(2) claims brought by purchasers of a corporation's common stock. The sample contains cases alleging fraudulent inflation in the price of a corporation's common stock.

- Cases with alleged classes of only bondholders, preferred stockholders, etc., cases alleging fraudulent depression in price, and mergers and acquisitions cases are excluded. These criteria are imposed to ensure data availability and to provide a relatively homogeneous set of cases in terms of the nature of the allegations.

- The current sample includes 2,013 securities class actions filed after passage of the Reform Act (1995) and settled from 1996 through 2021. These settlements are identified based on a review of case activity collected by Securities Class Action Services LLC (SCAS).[22]

- The designated settlement year, for purposes of this report, corresponds to the year in which the hearing to approve the settlement was held.[23] Cases involving multiple settlements are reflected in the year of the most recent partial settlement, provided certain conditions are met.[24]

In addition to SCAS, data sources include Dow Jones Factiva, Bloomberg, the Center for Research in Security Prices (CRSP) at University of Chicago Booth School of Business, Standard & Poor's Compustat, Refinitiv Eikon, court filings and dockets, SEC registrant filings, SEC litigation releases and administrative proceedings, LexisNexis, Stanford Securities Litigation Analytics (SSLA), Securities Class Action Clearinghouse (SCAC), and public press.

# Endnotes

1   *Securities Class Action Filings—2021 Year in Review*, Cornerstone Research (2022).

2   See, for example, Stephen J. Choi, "Do the Merits Matter Less after the Private Securities Litigation Reform Act?," *Journal of Law, Economics, and Organization* 23, no. 3 (2007).

3   *Securities Class Action Filings—2021 Year in Review*, Cornerstone Research (2022).

4   *Securities Class Action Filings—2021 Year in Review*, Cornerstone Research (2022).

5   See, for example, Stephen J. Choi, Karen K. Nelson, and Adam C. Pritchard, "The Screening Effect of the Private Securities Litigation Reform Act," Law & Economics Working Paper, University of Michigan Law School (2007).

6   *Securities Class Action Filings—2021 Year in Review*, Cornerstone Research (2022).

7   The "simplified tiered damages" approach used for purposes of this settlement research does not examine the mix of information associated with the specific dates listed in the plan of allocation, but simply applies the stock price movements on those dates to an estimate of the "true value" of the stock during the alleged class period (or "value line"). This proxy for damages utilizes an estimate of the number of shares damaged based on reported trading volume and the number of shares outstanding. Specifically, reported trading volume is adjusted using volume reduction assumptions based on the exchange on which the issuer defendant's common stock is listed. No adjustments are made to the underlying float for institutional holdings, insider trades, or short-selling activity during the alleged class period. Because of these and other simplifying assumptions, the damages measures used in settlement outcome modeling may be overstated relative to damages estimates developed in conjunction with case-specific economic analysis.

8   Laarni T. Bulan, Ellen M. Ryan, and Laura E. Simmons, *Estimating Damages in Settlement Outcome Modeling*, Cornerstone Research (2017).

9   Median market capitalization as of the most recent quarter-end prior to the settlement hearing date.

10  The statutory purchase price is the lesser of the security offering price or the security purchase price. Prior to the first complaint filing date, the statutory sales price is the price at which the security was sold. After the first complaint filing date, the statutory sales price is the greater of the security sales price or the security price on the first complaint filing date. Similar to "simplified tiered damages," the estimation of "simplified statutory damages" makes no adjustments to the underlying float for institutional holdings, insider trades, or short-selling activity.

11  Based on data for cases where the amount contributed by the D&O liability insurer was verified in settlement materials and/or the issuer defendant's SEC filings—approximately 83% of all '33 Act claims cases. Data are supplemented with additional observations from the SSLA.

12  *Securities Class Action Filings—2021 Year in Review*, Cornerstone Research (2022).

13  This calculation excludes settlements with both '33 Act claims filed in state court and Rule 10b-5 claims filed in federal court.

14  In some instances, the federal action also includes '33 Act claims.

15  The three categories of accounting issues analyzed in Figure 8 of this report are (1) GAAP violations; (2) restatements—cases involving a restatement (or announcement of a restatement) of financial statements; and (3) accounting irregularities—cases in which the defendant has reported the occurrence of accounting irregularities (intentional misstatements or omissions) in its financial statements.

16  *Accounting Class Action Filings and Settlements—2021 Review and Analysis*, Cornerstone Research (2022), forthcoming in spring 2022.

17  As noted previously, it could be that the merits in such cases are stronger, or simply that the presence of a corresponding SEC action provides plaintiffs with increased leverage when negotiating a settlement. For purposes of this research, an SEC action is evidenced by the presence of a litigation release or an administrative proceeding posted on www.sec.gov involving the issuer defendant or other named defendants with allegations similar to those in the underlying class action complaint.

18  Identification of a criminal charge and/or criminal indictment based on review of SEC filings and public press. For purposes of this research, criminal charges and/or indictments are collectively referred to as "criminal charges."

19  See, for example, Michael A. Perino, "Have Institutional Fiduciaries Improved Securities Class Actions? A Review of the Empirical Literature on the PSLRA's Lead Plaintiff Provision," St. John's Legal Studies Research Paper No. 12-0021 (2012).

20  Docket entries reflect the number of entries on the court docket for events in the litigation and have been used in prior research as a proxy for the amount of plaintiff attorney effort involved in resolving securities cases. See Laura Simmons, "The Importance of Merit-Based Factors in the Resolution of 10b-5 Litigation," University of North Carolina at Chapel Hill Doctoral Dissertation (1996); Michael A. Perino, "Institutional Activism through Litigation: An Empirical Analysis of Public Pension Fund Participation in Securities Class Actions," St. John's Legal Studies Research Paper No. 06-0055 (2006).

21  Stanford Securities Litigation Analytics (SSLA) tracks and collects data on private shareholder securities litigation and public enforcements brought by the SEC and the U.S. Department of Justice. The SSLA dataset includes all traditional class actions, SEC actions, and DOJ criminal actions filed since 2000. Available on a subscription basis at https://sla.law.stanford.edu/.

22  Available on a subscription basis. For further details see https://www.issgovernance.com/securities-class-action-services/.

23  Movements of partial settlements between years can cause differences in amounts reported for prior years from those presented in earlier reports.

24  This categorization is based on the timing of the settlement hearing date. If a new partial settlement equals or exceeds 50% of the then-current settlement fund amount, the entirety of the settlement amount is re-categorized to reflect the settlement hearing date of the most recent partial settlement. If a subsequent partial settlement is less than 50% of the then-current total, the partial settlement is added to the total settlement amount and the settlement hearing date is left unchanged.

# Appendices

### Appendix 1: Settlement Percentiles
(Dollars in millions)

|      | Average | 10th | 25th | Median | 75th | 90th |
|------|---------|------|------|--------|------|------|
| 2012 | $72.3   | $1.4 | $3.2 | $11.1  | $41.9 | $135.7 |
| 2013 | $84.1   | $2.2 | $3.5 | $7.6   | $25.8 | $96.0 |
| 2014 | $20.9   | $1.9 | $3.3 | $6.9   | $15.1 | $57.2 |
| 2015 | $45.0   | $1.5 | $2.5 | $7.4   | $18.6 | $107.5 |
| 2016 | $79.7   | $2.1 | $4.7 | $9.7   | $37.3 | $164.8 |
| 2017 | $20.4   | $1.7 | $2.9 | $5.8   | $16.9 | $39.2 |
| 2018 | $70.0   | $1.6 | $3.9 | $12.1  | $26.7 | $53.0 |
| 2019 | $29.7   | $1.6 | $6.0 | $11.7  | $21.2 | $53.0 |
| 2020 | $57.1   | $1.5 | $3.5 | $10.6  | $20.9 | $55.7 |
| 2021 | $20.5   | $1.7 | $3.1 | $8.3   | $17.9 | $58.6 |

Note: Settlement dollars are adjusted for inflation; 2021 dollar equivalent figures are presented.

### Appendix 2: Settlements by Select Industry Sectors
2012–2021

(Dollars in millions)

| Industry | Number of Settlements | Median Settlement | Median "Simplified Tiered Damages" | Median Settlement as a Percentage of "Simplified Tiered Damages" |
|----------|------------------------|-------------------|-------------------------------------|------------------------------------------------------------------|
| Financial | 99 | $16.2 | $409.5 | 5.1% |
| Technology | 101 | $8.6 | $228.9 | 4.7% |
| Pharmaceuticals | 107 | $7.0 | $215.2 | 4.7% |
| Retail | 37 | $10.5 | $254.7 | 4.3% |
| Telecommunications | 23 | $9.3 | $278.8 | 5.4% |
| Healthcare | 19 | $12.3 | $152.8 | 6.7% |

Note: Settlement dollars and "simplified tiered damages" are adjusted for inflation; 2021 dollar equivalent figures are presented. "Simplified tiered damages" are calculated only for cases involving Rule 10b-5 claims.

Appendices (continued)

## Appendix 3: Settlements by Federal Circuit Court
## 2012–2021
(Dollars in millions)

| Circuit | Number of Settlements | Median Settlement | Median Settlement as a Percentage of "Simplified Tiered Damages" |
|---|---|---|---|
| First | 20 | $10.8 | 3.2% |
| Second | 192 | $9.3 | 5.1% |
| Third | 65 | $7.0 | 5.6% |
| Fourth | 24 | $20.1 | 4.1% |
| Fifth | 36 | $9.9 | 5.0% |
| Sixth | 30 | $13.3 | 7.4% |
| Seventh | 35 | $14.2 | 3.9% |
| Eighth | 13 | $14.7 | 6.8% |
| Ninth | 183 | $6.9 | 4.9% |
| Tenth | 17 | $8.5 | 5.3% |
| Eleventh | 38 | $11.0 | 4.9% |
| DC | 4 | $24.8 | 2.2% |

Note: Settlement dollars are adjusted for inflation; 2021 dollar equivalent figures are presented. Settlements as a percentage of "simplified tiered damages" are calculated only for cases alleging Rule 10b-5 claims.

## Appendix 4: Mega Settlements
## 2012–2021

■ Total Mega Settlement Dollars as a Percentage of All Settlement Dollars

■ Number of Mega Settlements as a Percentage of All Settlements



Note: Mega settlements are defined as total settlement funds equal to or greater than $100 million. Settlement dollars are adjusted for inflation; 2021 dollar equivalent figures are presented.

Appendices (continued)

Appendix 5: Median and Average Settlements as a Percentage of "Simplified Tiered Damages" 2012–2021



■ Median Settlement as a Percentage of "Simplified Tiered Damages"
■ Average Settlement as a Percentage of "Simplified Tiered Damages"

Note: "Simplified tiered damages" are calculated only for cases alleging Rule 10b-5 claims.

Appendix 6: Median and Average Settlements as a Percentage of "Simplified Statutory Damages" 2012–2021



■ Median Settlement as a Percentage of "Simplified Statutory Damages"
■ Average Settlement as a Percentage of "Simplified Statutory Damages"

Note: "Simplified statutory damages" are calculated only for cases alleging Section 11 ('33 Act) claims and no Rule 10b-5 claims.

Appendices (continued)

## Appendix 7: Median and Average Maximum Dollar Loss (MDL)
### 2012–2021
(Dollars in millions)



Note: MDL is adjusted for inflation based on class period end dates; 2021 dollar equivalents are presented. MDL is the dollar value change in the defendant firm's market capitalization from the trading day with the highest market capitalization during the class period to the trading day immediately following the end of the class period.

## Appendix 8: Median and Average Disclosure Dollar Loss (DDL)
### 2012–2021
(Dollars in millions)



Note: DDL is adjusted for inflation based on class period end dates; 2021 dollar equivalents are presented. DDL is the dollar value change in the defendant firm's market capitalization between the trading day immediately preceding the end of the class period and the trading day immediately following the end of the class period. This analysis excludes cases alleging '33 Act claims only.

---

Appendix 9: Median Docket Entries by "Simplified Tiered Damages" Range
2012–2021

(Dollars in millions)



Note: "Simplified tiered damages" are calculated only for cases alleging Rule 10b-5 claims.

# About the Authors

**Laarni T. Bulan**

Ph.D., Columbia University; M.Phil., Columbia University; B.S., University of the Philippines

Laarni Bulan is a principal in Cornerstone Research's Boston office, where she specializes in finance. Her work has focused on securities and other complex litigation addressing class certification, damages, and loss causation issues, firm valuation, and corporate governance, executive compensation, and risk management issues. She has also consulted on cases related to insider trading, market manipulation and trading behavior, financial institutions and the credit crisis, derivatives, foreign exchange, and securities clearing and settlement.

Dr. Bulan has published several academic articles in peer-reviewed journals. Her research covers topics in dividend policy, capital structure, executive compensation, corporate governance, and real options. Prior to joining Cornerstone Research, Dr. Bulan had a joint appointment at Brandeis University as an assistant professor of finance in its International Business School and in the economics department.

**Laura E. Simmons**

Ph.D., University of North Carolina at Chapel Hill; M.B.A., University of Houston; B.B.A., University of Texas at Austin

Laura Simmons is a senior advisor with Cornerstone Research. She has more than 25 years of experience in economic and financial consulting. Dr. Simmons has focused on damage and liability issues in securities and ERISA litigation, as well as on accounting issues arising in a variety of complex commercial litigation matters. She has served as a testifying expert in litigation involving accounting analyses, securities case damages, ERISA matters, and research on securities lawsuits.

Dr. Simmons's research on pre– and post–Reform Act securities litigation settlements has been published in a number of reports and is frequently cited in the public press and legal journals. She has spoken at various conferences and appeared as a guest on CNBC addressing the topic of securities case settlements. She has also published in academic journals, including research focusing on the intersection of accounting and litigation. Dr. Simmons was previously an accounting faculty member at the Mason School of Business at the College of William & Mary. From 1986 to 1991, she was an accountant with Price Waterhouse.

The authors gratefully acknowledge the research efforts and significant contributions of their colleagues at Cornerstone Research in the writing and preparation of this annual update.

Many publications quote, cite, or reproduce data, charts, or tables from Cornerstone Research reports. The authors request that you reference Cornerstone Research in any reprint, quotation, or citation of the charts, tables, or data reported in this study.

Please direct any questions and requests for additional information to the settlement database administrator at settlementdatabase@cornerstone.com.

**Boston**
617.927.3000

**Chicago**
312.345.7300

**London**
+44.20.3655.0900

**Los Angeles**
213.553.2500

**New York**
212.605.5000

**San Francisco**
415.229.8100

**Silicon Valley**
650.853.1660

**Washington**
202.912.8900

www.cornerstone.com

© 2022 by Cornerstone Research.
All rights reserved. Cornerstone Research is a registered service mark of Cornerstone Research, Inc.
C and design is a registered trademark of Cornerstone Research, Inc.