UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| ————————————————— x | |
| MARK A. RODRIGUEZ, Individually and on Behalf of All Others Similarly Situated, | Civil Action No. 1:20-cv-00982 |
| | CLASS ACTION |
| Plaintiff, | |
| vs. | |
| CPI AEROSTRUCTURES, INC., DOUGLAS McCROSSON and VINCENT PALAZZOLO, CANACCORD GENUITY LLC and B. RILEY FBR, | |
| Defendants. | |
| ————————————————— x | |
| RUSSELL GARRETT, Individually and on Behalf of All Others Similarly Situated, | Civil Action No. 1:20-cv-01026 |
| | CLASS ACTION |
| Plaintiff, | |
| vs. | |
| CPI AEROSTRUCTURES, INC., DOUGLAS McCROSSON and VINCENT PALAZZOLO, CANACCORD GENUITY LLC and B. RILEY FBR, | |
| Defendants. | |
| ————————————————— x | |

MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR AN AWARD OF
ATTORNEYS' FEES AND EXPENSES

4894-1808-1580.v1

**TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION ..............................................................................................1

II.     HISTORY AND BACKGROUND OF THE LITIGATION..............................................2

III.    ARGUMENT....................................................................................................3

    A.      Lead Counsel Are Entitled to an Award of Attorneys' Fees and Expenses from the Common Fund.................................................................3

    B.      The Court Should Award a Reasonable Percentage of the Common Fund.............4

    C.      The Requested Attorneys' Fees Are Reasonable Under the Percentage-of-the-Fund Method.................................................................................6

    D.      The Fee Request Is Reasonable When a Lodestar Cross-Check Is Applied............8

    E.      The Relevant Factors Confirm that the Requested Fee Is Reasonable ...................11

        1.      The Time and Labor Expended by Counsel ...............................................11

        2.      The Risks of the Litigation ........................................................................12

        3.      The Magnitude and Complexity of the Litigation .....................................15

        4.      The Quality of Representation Supports the Requested Fee .....................16

        5.      Public Policy Considerations ....................................................................17

        6.      The Class's Reaction to the Fee Request to Date Supports the Requested Fee ............................................................................................17

IV.     LEAD COUNSEL'S EXPENSES ARE REASONABLE AND WERE NECESSARY TO THE PROSECUTION OF THIS ACTION .......................................18

V.      CONCLUSION................................................................................................19

4894-1808-1580.v1

## TABLE OF AUTHORITIES

**Page**

### CASES

*Anixter v. Home-Stake Prod. Co.*,
  77 F.3d 1215 (10th Cir. 1996) ..................................................................................14

*Aponte v. Comprehensive Health Mgmt., Inc.*,
  2013 WL 1364147 (S.D.N.Y. Apr. 2, 2013)...............................................................12

*Bateman Eichler, Hill Richards, Inc. v. Berner*,
  472 U.S. 299 (1985)......................................................................................................3

*Bellifemine v. Sanofi-Adventis U.S. LLC*,
  2010 WL 3119374 (S.D.N.Y. Aug. 6, 2010)................................................................9

*Blum v. Stenson*,
  465 U.S. 886 (1984)..................................................................................................5, 6

*Boeing Co. v. Van Gemert*,
  444 U.S. 472 (1980)......................................................................................................3

*Brown v. Phillips Petroleum Co.*,
  838 F.2d 451 (10th Cir. 1988) .....................................................................................5

*Chatelain v. Prudential-Bache Sec. Inc.*,
  805 F. Supp. 209 (S.D.N.Y. 1992) .............................................................................15

*Christine Asia Co., Ltd. v. Yun Ma*,
  2019 WL 5257534 (S.D.N.Y. Oct. 16, 2019).........................................................9, 15

*City of Providence v. Aeropostale, Inc.*,
  2014 WL 1883494 (S.D.N.Y. May 9, 2014),
  *aff'd sub nom. Arbuthnot v. Pierson*,
  607 F. App'x 73 (2d Cir. 2015) ....................................................................3, 5, 8, 16

*Davis v. J.P. Morgan Chase & Co.*,
  827 F. Supp. 2d 172 (W.D.N.Y. 2011) .........................................................................5

*Detroit v. Grinnell Corp.*,
  495 F.2d 448 (2d Cir. 1974)........................................................................................12

*Ellenburg III v. JA Solar Holdings Co., Ltd.*,
  No. 1:08-cv-10475-JGK, slip op.
  (S.D.N.Y. June 30, 2011)............................................................................................10

4894-1808-1580.v1

**Page**

*Faught v. Am. Home Shield Corp.*,
  668 F.3d 1233 (11th Cir. 2011) ......................................................................5

*Fleming v. Impax Laboratories Inc.*,
  2022 WL 2789496 (N.D. Cal. July 15, 2022)...................................................8

*Fresno Cnty. Emps.' Ret. Ass'n. v. Isaacson/Weaver Family Tr.*,
  925 F.3d 63 (2d Cir. 2019),
  *cert denied*, __U.S.__, 140 S. Ct. 385 (2019)........................................3, 4

*Goldberger v. Integrated Res., Inc.*,
  209 F.3d 43 (2d Cir. 2000)........................................................... *passim*

*Harman v. Lyphomed, Inc.*,
  945 F.2d 969 (7th Cir. 1991) ..........................................................................5

*Hawaii Structural Ironworkers Pension Tr. Fund v.*
  *AMC Ent. Holdings, Inc.*,
  No. 1:18-cv-00299-AJN-SLC, slip op.
  (S.D.N.Y. Feb. 14, 2022) .................................................................................7

*Hayes v. Harmony Gold Mining Co., Ltd.*,
  509 F. App'x 21 (2d Cir. 2013) ......................................................................4

*Hicks v. Morgan Stanley*,
  2005 WL 2757792 (S.D.N.Y. Oct. 24, 2005).................................................4

*Hubbard v. BankAtlantic Bancorp, Inc.*,
  688 F.3d 713 (11th Cir. 2012) .......................................................................14

*In re Am. Bank Note Holographics, Inc.*,
  127 F. Supp. 2d 418 (S.D.N.Y. 2001).......................................................6, 12

*In re AOL Time Warner, Inc. Sec. & ERISA Litig.*,
  2006 WL 903236 (S.D.N.Y. Apr. 6, 2006).....................................................15

*In re Bayer AG Sec. Litig.*,
  2008 WL 5336691 (S.D.N.Y. Dec. 15, 2008) ...............................................15

*In re Bear Stearns Cos., Inc. Sec., Derivative & ERISA Litig.*,
  909 F. Supp. 2d 259 (S.D.N.Y. 2012).............................................................10

*In re BHP Billiton Ltd. Sec. Litig.*,
  2019 WL 1577313 (S.D.N.Y. Apr. 10, 2019)...................................................9

*In re Bisys Sec. Litig.*,
  2007 WL 2049726 (S.D.N.Y. July 16, 2007) .................................................16

4894-1808-1580.v1

**Page**

*In re China Sunergy Sec. Litig.*,
   2011 WL 1899715 (S.D.N.Y. May 13, 2011) ........................................................................18

*In re Colgate-Palmolive Co. ERISA Litig.*,
   36 F. Supp. 3d 344 (S.D.N.Y. 2014).................................................................................6, 8

*In re Comverse Tech., Inc. Sec. Litig.*,
   2010 WL 2653354 (E.D.N.Y. June 24, 2010) ..................................................................9, 12

*In re Cont'l Ill. Sec. Litig.*,
   962 F.2d 566 (7th Cir. 1992) ...............................................................................................13

*In re Facebook, Inc. IPO Sec. & Derivative Litig.*,
   2015 WL 6971424 (S.D.N.Y. Nov. 9, 2015),
   *aff'd*, 674 F. App'x 37 (2d Cir. 2016)...................................................................................7

*In re FLAG Telecom Holdings, Ltd. Sec. Litig.*,
   2010 WL 4537550 (S.D.N.Y. Nov. 8, 2010)............................................................... *passim*

*In re Glob. Crossing Sec. & ERISA Litig.*,
   225 F.R.D. 436 (S.D.N.Y. 2004) .....................................................................................6, 18

*In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.*,
   55 F.3d 768 (3d Cir. 1995)......................................................................................................5

*In re Ikon Office Sols., Inc. Sec. Litig.*,
   194 F.R.D. 166 (E.D. Pa. 2000).....................................................................................10, 15

*In re Indep. Energy Holdings PLC Sec. Litig.*,
   302 F. Supp. 2d 180 (S.D.N.Y. 2003)..................................................................................18

*In re Interpublic Sec. Litig.*,
   2004 WL 2397190 (S.D.N.Y. Oct. 26, 2004) .........................................................................4

*In re J.P. Morgan Stable Value Fund ERISA Litig.*,
   2019 WL 4734396 (S.D.N.Y. Sept. 23, 2019)........................................................................7

*In re JDS Uniphase Corp. Sec. Litig.*,
   2007 WL 4788556 (N.D. Cal. Nov. 27, 2007) .....................................................................14

*In re Lithium Ion Batteries Antitrust Litig.*,
   2019 WL 3856413 (N.D. Cal. Aug. 16, 2019) .....................................................................10

*In re Marsh ERISA Litig.*,
   265 F.R.D. 128 (S.D.N.Y. 2010) ...................................................................................14, 16

- iv -

**Page**

*In re Oracle Corp. Sec. Litig.*,
   2009 WL 1709050 (N.D. Cal. June 19, 2009),
   *aff'd*, 627 F.3d 376 (9th Cir. 2010) ................................................................14

*In re PPDAI Grp. Inc. Sec. Litig.*,
   2022 WL 198491 (E.D.N.Y. Jan. 21, 2022) ...............................................7

*In re Parking Heaters*,
   2019 WL8137325 (E.D.N.Y. Aug. 15, 2019).................................................5

*In re Patriot Nat'l, Inc. Sec. Litig.*,
   2019 WL 5882171 (S.D.N.Y. Nov. 6, 2019) ...............................................7

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
   991 F. Supp. 2d 437 (E.D.N.Y. 2014) ......................................................4

*In re Prudential Sec. Inc. Ltd. P'ships Litig.*,
   985 F. Supp. 410 (S.D.N.Y. 1997) ...........................................................13

*In re Rite Aid Corp. Sec. Litig.*,
   396 F.3d 294 (3d Cir. 2005)......................................................................18

*In re Sadia S.A. Sec. Litig.*,
   2011 WL 6825235 (S.D.N.Y. Dec. 28, 2011) .........................................13

*In re Telik, Inc. Sec. Litig.*,
   576 F. Supp. 2d 570 (S.D.N.Y. 2008).............................................3, 9, 12

*In re Thirteen Appeals Arising out of the San Juan
   Dupont Plaza Hotel Fire Litig.*,
   56 F.3d 295 (1st Cir. 1995)........................................................................5

*In re Veeco Instruments Inc. Sec. Litig.*,
   2007 WL 4115808 (S.D.N.Y. Nov. 7, 2007)...........................................3, 6, 16

*J. I. Case Co. v. Borak*,
   377 U.S. 426 (1964)....................................................................................3

*Johnston v. Comerica Mortg. Corp.*,
   83 F.3d 241 (8th Cir. 1996) ........................................................................5

*Lopez v. Fashion Nova*,
   2021 WL 4896288 (S.D.N.Y. Oct. 19, 2021) ............................................9

*Machniewicz v. Uxin Ltd., et al.*,
   No. 1:19-cv-0822-MKB-VMS, slip op.
   (E.D.N.Y. Sept. 8, 2021)............................................................................7

4894-1808-1580.v1

**Page**

*Maley v. Del Glob. Techs. Corp.*,
   186 F. Supp. 2d 358 (S.D.N.Y. 2002) ................................................................6, 17

*Missouri v. Jenkins*,
   491 U.S. 274 (1989) ...........................................................................................6, 9

*Nichols v. Noom, Inc.*,
   2022 WL 2705354 (S.D.N.Y. July 12, 2022) .........................................................6

*Powers v. Eichen*,
   229 F.3d 1249 (9th Cir. 2000) .................................................................................5

*Rawlings v. Prudential-Bache Props., Inc.*,
   9 F.3d 513 (6th Cir. 1993) .......................................................................................5

*Robbins v. Koger Props., Inc.*,
   116 F.3d 1441 (11th Cir. 1997) .............................................................................14

*Savoie v. Merchs. Bank*,
   166 F.3d 456 (2d Cir. 1999) ....................................................................................5

*Strougo v. Barclays PLC, et al.*,
   No. 1:14-cv-05797-VM-DCF, slip op.
   (S.D.N.Y. June 3, 2019) ...........................................................................................7

*Swedish Hosp. Corp. v. Shalala*,
   1 F.3d 1261 (D.C. Cir. 1993) ...................................................................................5

*Teachers' Ret. Sys. of La. v. A.C.L.N., Ltd.*,
   2004 WL 1087261 (S.D.N.Y. May 14, 2004) .................................................12, 16

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007) .................................................................................................3

*Union Asset Mgmt. Holding A.G. v. Dell, Inc.*,
   669 F.3d 632 (5th Cir. 2012) ...................................................................................5

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
   396 F.3d 96 (2d Cir. 2005) ...............................................................................4, 5, 9

*Woburn Ret. Sys. v. Salix Pharms., Ltd.*,
   2017 WL 3579892 (S.D.N.Y. Aug. 18, 2017) .......................................................17

**STATUTES, RULES AND REGULATIONS**

15 U.S.C.
   §77z-1(a)(6) .............................................................................................................6

4894-1808-1580.v1

## I.    INTRODUCTION

Lead Counsel have secured a $3,600,000 settlement for the benefit of the Class.  This is a very good result given the serious obstacles to recovery, the credible defenses to liability and damages that Defendants have articulated, the fact that the Court might have accepted those arguments in ruling on the pending motion to dismiss or at summary judgment, and the recovery relative to the amount of maximum estimated recoverable damages suffered by the Class.[1]  In recognition of these risks and the excellent result obtained, Lead Counsel now respectfully move this Court for an award of attorneys' fees of 20% of the Settlement Amount and $20,042.03 in expenses that were reasonably and necessarily incurred in prosecuting and resolving the Action, plus interest on both amounts.[2]

As set forth below, the relevant factors articulated in the Second Circuit's *Goldberger* decision strongly support the requested award.  *See Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 50 (2d Cir. 2000).  Significantly, following an extensive Court-ordered notice program in which over 10,300 copies of the Notice were mailed to potential Class Members and nominees, to date not a

---

[1]    Capitalized terms used herein are defined and have the meanings contained in the Stipulation of Settlement (ECF 54-2) (the "Stipulation"), the accompanying Declaration of Alan I. Ellman in Support of Motions for Final Approval of Class Action Settlement and Approval of Plan of Allocation and an Award of Attorneys' Fees and Expenses ("Ellman Decl."), and in the Memorandum of Law in Support of Motion for Final Approval of Class Action Settlement and Approval of Plan of Allocation ("Settlement Memorandum"), submitted concurrently herewith. Internal citations are omitted and emphasis is added throughout unless otherwise noted.

[2]    Lead Counsel means Robbins Geller Rudman & Dowd LLP and Robbins LLP.  *See* Declaration of Alan I. Ellman on Behalf of Robbins Geller Rudman & Dowd LLP in Support of Application for Award of Attorneys' Fees and Expenses ("Robbins Geller Decl."); and Declaration of Stephen J. Oddo Filed on Behalf of Robbins LLP in Support of Application for Award of Attorneys' Fees and Expenses ("Robbins Decl."), submitted herewith.

4894-1808-1580.v1

single Class Member has objected to the requested fees or the expenses (not to exceed $50,000, as set forth in the Notice).[3]

As detailed below, in the Ellman Declaration, and in the Settlement Memorandum, the Settlement achieved here against determined adversaries represents an excellent result for Lead Plaintiff and the Class, particularly when judged in the context of the significant litigation risks in this Action. The $3.6 million Settlement that Lead Counsel and Lead Plaintiff obtained provides the Class with an immediate and certain recovery in a case that faced significant risks to establishing falsity and damages. Ellman Decl., ¶¶27-28. In achieving this result, Lead Counsel worked 1,771 hours over the course of this complex litigation, all on a contingency basis, with no guarantee of ever being paid.

Lead Counsel believe that an attorney fee award of 20%, together with payment of litigation expenses, properly reflects the many significant risks taken by Lead Counsel in prosecuting the Action, as well as the result achieved. When examined under either of this Circuit's methods of contingency fee determination (*i.e.*, percentage of the fund or lodestar), it is abundantly clear that an award of fees of 20% is reasonable, and well within the range of attorneys' fees awarded in similar complex, contingency cases.

## II.   HISTORY AND BACKGROUND OF THE LITIGATION

A detailed description of Lead Plaintiff's claims and Lead Counsel's efforts on behalf of the Class are set forth in the accompanying Ellman Declaration. For the sake of brevity, the Court is respectfully referred to that declaration.

---

[3]   As of the date of this fee memorandum, which is before the August 19, 2022 deadline for filing objections, Lead Counsel have not received any objection to the fee and expense request. If any timely objections are received from Class Members, Lead Counsel will address them in their reply brief, which will be filed with the Court no later than September 2, 2022.

- 2 -

### III.    ARGUMENT

#### A.    Lead Counsel Are Entitled to an Award of Attorneys' Fees and Expenses from the Common Fund

The Supreme Court has long recognized that "a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole." *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980); *see also Goldberger*, 209 F.3d at 47; *Fresno Cnty. Emps.' Ret. Ass'n. v. Isaacson/Weaver Family Tr.*, 925 F.3d 63, 68 (2d Cir. 2019), *cert denied*, __U.S.__, 140 S. Ct. 385 (2019). The purpose of the common fund doctrine is to fairly and adequately compensate class counsel for services rendered and to ensure that all class members contribute equally toward the costs associated with litigation pursued on their behalf. *See Goldberger*, 209 F.3d at 47; *In re Veeco Instruments Inc. Sec. Litig.*, 2007 WL 4115808, at *2 (S.D.N.Y. Nov. 7, 2007).

Courts have recognized that in addition to providing just compensation, awards of fair attorneys' fees from a common fund also serve to encourage skilled counsel to represent those who seek redress for damages inflicted on entire classes of persons, and to discourage future alleged misconduct of a similar nature. *See City of Providence v. Aeropostale, Inc.*, 2014 WL 1883494, at *10-*11 (S.D.N.Y. May 9, 2014), *aff'd sub nom. Arbuthnot v. Pierson*, 607 F. App'x 73 (2d Cir. 2015); *In re Telik, Inc. Sec. Litig.*, 576 F. Supp. 2d 570, 585 (S.D.N.Y. 2008); *Veeco*, 2007 WL 4115808, at *2. Indeed, the Supreme Court has emphasized that private securities actions, such as this one, provide "'a most effective weapon in the enforcement' of the securities laws and are 'a necessary supplement to [SEC] action.'" *Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 310 (1985) (quoting *J. I. Case Co. v. Borak*, 377 U.S. 426, 432 (1964)); *accord Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007).

- 3 -

Courts in this Circuit have consistently adhered to this precedent.  *See In re Interpublic Sec. Litig.*, 2004 WL 2397190, at \*10 (S.D.N.Y. Oct. 26, 2004) ("It is well established that where an attorney creates a common fund from which members of a class are compensated for a common injury, the attorneys who created the fund are entitled to 'a reasonable fee – set by the court – to be taken from the fund.'"); *Fresno Cnty.*, 925 F.3d at 68.  Fairly compensating Lead Counsel for the risks they took in bringing this Action is essential because "[s]uch actions could not be sustained if plaintiffs' counsel were not to receive remuneration from the settlement fund for their efforts on behalf of the class."  *Hicks v. Morgan Stanley*, 2005 WL 2757792, at \*9 (S.D.N.Y. Oct. 24, 2005).

**B.      The Court Should Award a Reasonable Percentage of the Common Fund**

Lead Counsel respectfully submit that the Court should award a fee based on a percentage of the common fund obtained.  Courts routinely find that the percentage-of-the-fund method, under which counsel is awarded a percentage of the fund that it creates, is the preferred means to determine a fee because it "'directly aligns the interests of the class and its counsel and provides a powerful incentive for the efficient prosecution and early resolution of litigation.'"  *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 121 (2d Cir. 2005); *see also Hayes v. Harmony Gold Mining Co., Ltd.*, 509 F. App'x 21, 24 (2d Cir. 2013) ("[A]s the district court recognized, the prospect of a percentage fee award from a common settlement fund, as here, aligns the interests of class counsel with those of the class.").  The percentage approach also recognizes that the quality of counsel's services is measured best by the results achieved and is most consistent with the system typically used in the marketplace to compensate attorneys in non-class contingency cases.[4]

---

[4]      *See, e.g.*, *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 991 F. Supp. 2d 437, 440 (E.D.N.Y. 2014) ("The percentage method better aligns the incentives of plaintiffs' counsel with those of the class members because it bases the attorneys' fees on the results they achieve for their clients, rather than on the number of motions they file, documents they review, or hours they work. . . . The percentage method also accords with the overwhelming prevalence of

- 4 -

The Supreme Court has indicated that attorneys' fees in common-fund cases generally should be based on a percentage of the fund. *See Blum v. Stenson*, 465 U.S. 886, 900 n.16 (1984) ("[U]nder the 'common fund doctrine,' . . . a reasonable fee is based on a percentage of the fund bestowed on the class."). The Second Circuit has expressly approved the percentage method, recognizing that "the lodestar method proved vexing" and had resulted in "an inevitable waste of judicial resources." *Goldberger*, 209 F.3d at 48-49 (holding that the percentage-of-the-fund method may be used to determine appropriate attorneys' fees, although the lodestar method may also be used); *Savoie v. Merchs. Bank*, 166 F.3d 456, 460 (2d Cir. 1999) (stating that the "percentage-of-the-fund method has been deemed a solution to certain problems that may arise when the lodestar method is used in common fund cases"). Indeed, the Second Circuit has acknowledged that the "trend in this Circuit is toward the percentage method." *Wal-Mart*, 396 F.3d at 121; *see also City of Providence*, 2014 WL 1883494, at *11-*12.[5] The percentage method "'directly aligns the interests of the class and its counsel and provides a powerful incentive for the efficient prosecution and early resolution of litigation.'" *In re Parking Heaters*, 2019 WL8137325, at *7 (E.D.N.Y. Aug. 15, 2019).

contingency fees in the market for plaintiffs' counsel . . . ."); *Davis v. J.P. Morgan Chase & Co.*, 827 F. Supp. 2d 172, 184 (W.D.N.Y. 2011) (The "advantages of the percentage method . . . are that it provides an incentive to attorneys to resolve the case efficiently and to create the largest common fund out of which payments to the class can be made, and that it is consistent with the system typically used by individual clients to compensate their attorneys.").

[5]     All federal Courts of Appeal to consider the matter have approved the percentage method, with two circuits requiring its use in common-fund cases. *See In re Thirteen Appeals Arising out of the San Juan Dupont Plaza Hotel Fire Litig.*, 56 F.3d 295, 305 (1st Cir. 1995); *In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 821-22 (3d Cir. 1995); *Union Asset Mgmt. Holding A.G. v. Dell, Inc.*, 669 F.3d 632, 644 (5th Cir. 2012); *Rawlings v. Prudential-Bache Props., Inc.*, 9 F.3d 513, 515-16 (6th Cir. 1993); *Harman v. Lyphomed, Inc.*, 945 F.2d 969, 975 (7th Cir. 1991); *Johnston v. Comerica Mortg. Corp.*, 83 F.3d 241, 246 (8th Cir. 1996); *Powers v. Eichen*, 229 F.3d 1249, 1256 (9th Cir. 2000); *Brown v. Phillips Petroleum Co.*, 838 F.2d 451, 454-56 (10th Cir. 1988); *Faught v. Am. Home Shield Corp.*, 668 F.3d 1233, 1242 (11th Cir. 2011); *Swedish Hosp. Corp. v. Shalala*, 1 F.3d 1261, 1269-71 (D.C. Cir. 1993). The Eleventh and District of Columbia Circuits require the use of the percentage method in common-fund cases. *See Faught*, 668 F.3d at 1242; *Swedish Hosp.*, 1 F.3d at 1271.

4894-1808-1580.v1

The determination of attorneys' fees using the percentage-of-the-fund method is also supported by the PSLRA, which provides that "[t]otal attorneys' fees and expenses awarded by the court to counsel for the plaintiff class shall not exceed a ***reasonable percentage*** of the amount" recovered for the class. 15 U.S.C. §77z-1(a)(6). Courts have concluded that, by drafting the PSLRA in such a manner, Congress expressed a preference for the percentage, as opposed to the lodestar, method of determining attorneys' fees in securities class actions. *See Veeco*, 2007 WL 4115808, at *3; *Maley v. Del Glob. Techs. Corp.*, 186 F. Supp. 2d 358, 370 (S.D.N.Y. 2002); *In re Am. Bank Note Holographics, Inc.*, 127 F. Supp. 2d 418, 430 (S.D.N.Y. 2001); *In re Glob. Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 465-66 (S.D.N.Y. 2004).

Given the Supreme Court's indication that the percentage method is proper in this type of case, the Second Circuit's explicit approval of the percentage method in *Goldberger* and *Fresno*, as well as the trend among the district courts in this Circuit and the language of the PSLRA, the Court should award attorneys' fees based on a percentage of the fund.

### C.    The Requested Attorneys' Fees Are Reasonable Under the Percentage-of-the-Fund Method

The Supreme Court has recognized that an appropriate court-awarded fee is intended to approximate what counsel would receive if they were bargaining for their services in the marketplace. *See Missouri v. Jenkins*, 491 U.S. 274, 285-86 (1989). An "'ideal proxy' for the award should reflect the fees upon which common fund plaintiffs negotiating in an efficient market for legal services would agree." *In re Colgate-Palmolive Co. ERISA Litig.*, 36 F. Supp. 3d 344, 352 (S.D.N.Y. 2014). If this were a non-class action, the customary fee arrangement would be contingent and in the range of 33% of the recovery. *See Blum*, 465 U.S. at 903 ("'In tort suits, an attorney might receive one-third of whatever amount the plaintiff recovers. In those cases, therefore, the fee is directly proportional to the recovery.'") (Brennan, J., concurring); *see also Nichols v.*

4894-1808-1580.v1

*Noom, Inc.*, 2022 WL 2705354, at *10 (S.D.N.Y. July 12, 2022) ("A fee equal to one-third of a settlement fund is routinely approved in this Circuit.").

Lead Counsel's efforts have resulted in a $3.6 million settlement. This recovery of over 22.5% of Lead Plaintiff's estimated maximum recoverable damages (Ellman Decl., ¶5) is a very good result in a pre-trial settlement in a PSLRA case. The percentage of the Settlement Fund that Lead Counsel requests to be paid is fair and reasonable in light of the substantial benefit Lead Counsel's work has conferred on the Class.

The requested 20% fee is within, if not below, the range of percentage fees awarded by courts within the Second Circuit in other comparable securities cases. *See, e.g.*, *Hawaii Structural Ironworkers Pension Tr. Fund v. AMC Ent. Holdings, Inc.*, No. 1:18-cv-00299-AJN-SLC, slip op., ECF 60 (S.D.N.Y. Feb. 14, 2022) (awarding 33-1/3% of $18 million settlement); *Machniewicz v. Uxin Ltd., et al.*, No. 1:19-cv-0822-MKB-VMS, slip op., ECF 61 (E.D.N.Y. Sept. 8, 2021) (awarding 33.33% of settlement); *In re PPDAI Grp. Inc. Sec. Litig.*, 2022 WL 198491, at *17 (E.D.N.Y. Jan. 21, 2022) (approving plaintiffs' counsel's request for attorneys' fees in the amount of one-third of the settlement fund); *Strougo v. Barclays PLC, et al.*, No. 1:14-cv-05797-VM-DCF, slip op., ECF 146 (S.D.N.Y. June 3, 2019) (awarding 33% of $27 million settlement); *In re Facebook, Inc. IPO Sec. & Derivative Litig.*, 2015 WL 6971424, at *9 (S.D.N.Y. Nov. 9, 2015) (awarding 33% of $26.5 settlement), *aff'd*, 674 F. App'x 37 (2d Cir. 2016); *In re Patriot Nat'l, Inc. Sec. Litig.*, 2019 WL 5882171, at *1 (S.D.N.Y. Nov. 6, 2019) (awarding 33% fee plus expenses); *In re J.P. Morgan Stable Value Fund ERISA Litig.*, 2019 WL 4734396, at *6 (S.D.N.Y. Sept. 23, 2019) (awarding one-third of $75 million recovery).

4894-1808-1580.v1

**D.    The Fee Request Is Reasonable When a Lodestar Cross-Check Is Applied**

When using the percentage-of-the-fund method, courts can also look to "hours as a 'cross check' on the reasonableness of the requested percentage," *Goldberger*, 209 F.3d at 50, "to ensure that an otherwise reasonable percentage fee would not lead to a windfall." *Colgate-Palmolive*, 36 F. Supp. 3d at 353. When used as a "mere cross-check, the hours documented by counsel need not be exhaustively scrutinized by the district court." *Goldberger*, 209 F.3d at 50.

The lodestar method requires a two-part analysis: "first, to determine the lodestar, the court multiplies the number of hours each attorney spent on the case by each attorney's reasonable hourly rate; and second, the court adjusts that lodestar figure (by applying a multiplier) to reflect such factors as the risk and contingent nature of the litigation, the result obtained, and the quality of the attorney's work." *City of Providence*, 2014 WL 1883494, at *13. Performing the lodestar calculation here confirms that the fee requested by Lead Counsel is reasonable and should be approved.

Lead Counsel and their paraprofessionals spent 1,771 hours prosecuting this case, producing a total lodestar amount of $1,227,933.25 when multiplied by counsel's billing rates. *See* Robbins Geller Decl. ¶4; Robbins Decl., ¶4.[6] The attorneys' fees requested by Lead Counsel herein, $720,000, represents 0.58 of Lead Counsel's lodestar.[7]

---

[6]    In determining whether the rates are reasonable, the Court should take into account the attorneys' professional reputation, experience, and status. Here, the lawyers and paraprofessionals of Lead Counsel are experienced securities practitioners with track records of success, and among the most prominent and well-regarded securities practitioners in the nation. Lead Counsel's billing rates are reasonable and have recently been judicially approved. *See Fleming v. Impax Laboratories Inc.*, 2022 WL 2789496, at *9 (N.D. Cal. July 15, 2022); ("The Court finds [Robbins Geller's] billing rates in line with prevailing rates in this district for personnel of comparable experience, skill, and reputation."); *Email exchanges with Kevin Lavelle, Joseph Tull and Lea Bays regarding scheduling call to discuss ESI protocol and protective order edits from defense counsel.* Hr'g Tr. at 160:22-24, *In re Am. Realty Cap. Props., Inc. Litig.*, No. 15-MC-40(AKH) (S.D.N.Y. Jan. 23, 2019) ("I find your lodestar reasonable, the rates appropriate and, in relationship to the work that you did,

- 8 -

In cases of this nature, fees representing multiples above lodestar are regularly awarded to reflect the contingency-fee risk and other relevant factors. *See In re FLAG Telecom Holdings, Ltd. Sec. Litig.*, 2010 WL 4537550, at *26 (S.D.N.Y. Nov. 8, 2010) ("'a positive multiplier is typically applied to the lodestar in recognition of the risk of the litigation, the complexity of the issues, the contingent nature of the engagement, the skill of the attorneys, and other factors'"); *In re Comverse Tech., Inc. Sec. Litig.*, 2010 WL 2653354, at *5 (E.D.N.Y. June 24, 2010) ("Where, as here, counsel has litigated a complex case under a contingency fee arrangement, they are entitled to a fee in excess of the lodestar.").

Accordingly, in complex contingent litigation, lodestar multipliers of between 2 and 5 or more have been commonly awarded. *See Lopez v. Fashion Nova*, 2021 WL 4896288, at *3 (S.D.N.Y. Oct. 19, 2021) ("In this Circuit, 'courts regularly award lodestar multipliers of up to eight times the lodestar, and in some cases, even higher multipliers.'"); *Wal-Mart*, 396 F.3d at 123 (upholding multiplier of 3.5); *Christine Asia Co., Ltd. v. Yun Ma*, 2019 WL 5257534, at *19 (S.D.N.Y. Oct. 16, 2019) (awarding fee representing a 2.15 multiplier, which court found to be "well within the range commonly awarded in securities class actions of this complexity and magnitude"); *In re BHP Billiton Ltd. Sec. Litig.*, 2019 WL 1577313, at *1-*2 (S.D.N.Y. Apr. 10, 2019) (awarding fee representing 2.7 multiplier); *Telik*, 576 F. Supp. 2d at 590 ("In contingent litigation, lodestar multiples of over 4 are routinely awarded by courts, including this Court."); *see also Bellifemine v. Sanofi-Adventis U.S. LLC*, 2010 WL 3119374, at *6 (S.D.N.Y. Aug. 6, 2010) (multiple of 2.05);

---

reasonable.") (Ex. A hereto); Hr'g Tr. at 25:12-16, *Kaess v. Deutsche Bank AG*, No. 09-cv-01714 (GHW)(RWL) (S.D.N.Y. June 11, 2020) ("I find that these billable rates [for Robbins Geller] based on the timekeeper's title, specific years of experience, and market rates for similar professionals in their fields . . . to be reasonable in this context.") (Ex. B hereto).

[7]    The Supreme Court and other courts have held that the use of current rates is proper since such rates compensate for inflation and the loss of use of funds. *See Jenkins*, 491 U.S. at 283-84.

- 9 -

4894-1808-1580.v1

*Ellenburg III v. JA Solar Holdings Co., Ltd.*, No. 1:08-cv-10475-JGK, slip op., ECF 88 (S.D.N.Y. June 30, 2011) (multiplier of 2.10).

The fact that the requested fee is substantially less than the lodestar strongly supports its reasonableness. *See In re Lithium Ion Batteries Antitrust Litig.*, 2019 WL 3856413, at *8 (N.D. Cal. Aug. 16, 2019) (finding requested fee "particularly appropriate where the lodestar cross-check results in negative multiplier"); *In re Bear Stearns Cos., Inc. Sec., Derivative & ERISA Litig.*, 909 F. Supp. 2d 259, 271 (S.D.N.Y. 2012) (negative multiplier was a "strong indication of the reasonableness of the [requested] fee").

Here, while shouldering the risk of non-recovery, Lead Counsel litigated this case on a contingency basis for more than two years, working 1,771 hours for the benefit of the Class. Accordingly, the negative multiplier supports the requested fee.

The lodestar/multiplier is to be used merely as a cross-check on reasonableness. To find otherwise undermines the principles supporting the percentage approach and encourages needless lodestar building litigation. *See also In re Ikon Office Sols., Inc. Sec. Litig.*, 194 F.R.D. 166, 196 (E.D. Pa. 2000) ("The court will not reduce the requested award simply for the sake of doing so when every other factor ordinarily considered weighs in favor of approving class counsel's request of thirty percent."). Lead Counsel invested substantial time and effort prosecuting this Action against Defendants to a successful completion.

As detailed in the Ellman Declaration, based on their efforts in litigating this case and producing an excellent result, Lead Counsel believe the requested fee, whether calculated as a percentage of the fund or in relation to counsel's lodestar, is manifestly reasonable. Moreover, as discussed below, each of the factors cited by the Second Circuit in *Goldberger* also strongly supports a finding that the requested fee is reasonable.

- 10 -

4894-1808-1580.v1

**E.      The Relevant Factors Confirm that the Requested Fee Is Reasonable**

In *Goldberger*, the Second Circuit explained that whether the court uses the percentage-of-the-fund method or the lodestar approach, it should continue to consider the traditional criteria that reflect a reasonable fee in common fund cases, including:

- the time and labor expended by counsel;

- the risks of the litigation;

- the magnitude and complexity of the litigation;

- the requested fee in relation to the settlement;

- the quality of representation; and

- public policy considerations.

*Goldberger*, 209 F.3d at 50.  Consideration of these factors demonstrates that the requested fee is fair and reasonable.

**1.      The Time and Labor Expended by Counsel**

Lead Counsel expended substantial time and effort pursuing the Action on behalf of the Class.  Since the Litigation began in February 2020, Lead Counsel and their paraprofessionals devoted 1,771 hours to prosecuting the Class's claims.  As detailed in the Ellman Declaration, submitted herewith, counsel, among other things:

- conducted an extensive investigation into the underlying facts;

- researched the law relevant to the claims asserted and Defendants' potential defenses thereto, and drafted a detailed amended complaint;

- opposed Defendants' motion to dismiss the complaint for failure to state a claim;

- prepared for and participated in mediation with John R. Van Winkle, Esq.;

- conducted post-mediation settlement negotiations; and

- negotiated and drafted the Stipulation and exhibits thereto, as well as the motion for preliminary approval of the Settlement.

- 11 -

*See generally* Ellman Decl.

Moreover, Lead Counsel, with the assistance of their damages consultant, prepared the proposed Plan of Allocation. Throughout the Action, Lead Counsel staffed the matter efficiently and avoided any unnecessary duplication of effort. Moreover, additional hours and resources will necessarily be expended assisting Class Members with the completion and submission of their Proof of Claim and Release forms, shepherding the claims process, and responding to Class Member inquiries. *See Aponte v. Comprehensive Health Mgmt., Inc.*, 2013 WL 1364147, at *6 (S.D.N.Y. Apr. 2, 2013). The significant amount of time and effort devoted to this case by Lead Counsel to obtain a $3.6 million recovery – work that will not end with the Court's approval of the Settlement – confirms that the 20% fee request is reasonable.

### 2. The Risks of the Litigation

#### a. The Contingent Nature of Lead Counsel's Representation Supports the Requested Fee

The risk undertaken in the litigation is often considered the most important *Goldberger* factor. *Goldberger*, 209 F.3d at 54; *Comverse*, 2010 WL 2653354, at *5; *Telik*, 576 F. Supp. 2d at 592. The Second Circuit has recognized that the risk associated with a case undertaken on a contingent fee is an important factor in determining an appropriate fee award:

> No one expects a lawyer whose compensation is contingent upon his success to charge, when successful, as little as he would charge a client who in advance had agreed to pay for his services, regardless of success. Nor, particularly in complicated cases producing large recoveries, is it just to make a fee depend solely on the reasonable amount of time expended.

*Detroit v. Grinnell Corp.*, 495 F.2d 448, 470 (2d Cir. 1974). "Little about litigation is risk-free, and class actions confront even more substantial risks than other forms of litigation." *Teachers' Ret. Sys. of La. v. A.C.L.N., Ltd.*, 2004 WL 1087261, at *3 (S.D.N.Y. May 14, 2004); *Am. Bank Note*, 127 F. Supp. 2d at 433 (concluding it is "appropriate to take this [contingent fee] risk into account in

- 12 -

4894-1808-1580.v1

determining the appropriate fee to award"); *In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 985 F. Supp. 410, 417 (S.D.N.Y. 1997) ("Numerous courts have recognized that the attorney's contingent fee risk is an important factor in determining the fee award."). This risk encompasses not just the risk of no payment, but also the risk of underpayment. *See In re Cont'l Ill. Sec. Litig.*, 962 F.2d 566, 569-70 (7th Cir. 1992) (reversing district court's fee award where court failed to account for, among other things, risk of underpayment to counsel). When considering the reasonableness of attorneys' fees in a contingency action, the court should consider the risks of the litigation at the time the suit was brought. *See Goldberger*, 209 F.3d at 55; *In re Sadia S.A. Sec. Litig.*, 2011 WL 6825235, at *3 (S.D.N.Y. Dec. 28, 2011).

Lead Counsel undertook this Action on a wholly contingent-fee basis, investing a substantial amount of time and money to prosecute a risky action with no guarantee of compensation or even the recovery of expenses. Unlike Defendants' Counsel, who are paid substantial hourly rates and reimbursed for their expenses on a regular basis, Lead Counsel have not been compensated for any time or expenses since this case began in early 2020, and would have received no compensation or payment of their expenses had this case not been resolved successfully.

From the outset, Lead Counsel understood that they were embarking on a complex, expensive, and lengthy litigation with no guarantee of ever being compensated for investing the time and money the case would require. In undertaking that responsibility, Lead Counsel were obligated to assure that sufficient attorney and paraprofessional resources were dedicated to prosecuting the Action and that funds were available to compensate staff and to pay for the considerable costs that a case such as this entails. Under these circumstances, the financial burden on contingent-fee counsel is far greater than on a firm that is paid on an ongoing basis.

4894-1808-1580.v1

In addition to advancing litigation expenses, Lead Counsel faced the possibility that they would receive no attorneys' fees at all.  Indeed, it is possible that, if not for this Settlement, the entire case may have been disposed of at the pleading stage or summary judgment.[8]

Losses in contingent-fee litigations, especially those brought under the PSLRA, are exceedingly expensive.  Lead Counsel's assumption of the contingency-fee risk strongly supports the reasonableness of the requested fee.  *See Flag Telecom*, 2010 WL 4537550, at *27 ("Courts in the Second Circuit have recognized that the risk associated with a case undertaken on a contingent fee basis is an important factor in determining an appropriate fee award."); *In re Marsh ERISA Litig.*, 265 F.R.D. 128, 148 (S.D.N.Y. 2010) ("There was significant risk of non-payment in this case, and Plaintiffs' Counsel should be rewarded for having borne and successfully overcome that risk.").

### b.    Risks of Establishing Liability and Damages

While Lead Plaintiff remains confident in his claims, his ability to ultimately prove liability was far from certain.  As detailed in the Ellman Declaration and in the Settlement Memorandum, Defendants raised numerous challenges to Lead Plaintiff's allegations of materiality, scienter, and damages.  Even assuming *arguendo* that Lead Plaintiff was able to overcome Defendants' pending

---

[8]    Moreover, it is wrong to presume that a law firm handling complex contingent litigation always wins.  There are numerous class actions in which lead counsel expended thousands of hours and yet received no remuneration, despite their diligence and expertise.  *See, e.g.*, *Hubbard v. BankAtlantic Bancorp, Inc.*, 688 F.3d 713, 725 (11th Cir. 2012) (affirming judgment as a matter of law following jury verdict partially in plaintiff's favor); *In re Oracle Corp. Sec. Litig.*, 2009 WL 1709050 (N.D. Cal. June 19, 2009), *aff'd*, 627 F.3d 376 (9th Cir. 2010) (court granted summary judgment for defendants after eight years of litigation, after lead counsel incurred over $7 million in expenses, and worked over 100,000 hours, representing a lodestar of approximately $40 million); *In re JDS Uniphase Corp. Sec. Litig.*, 2007 WL 4788556, at *1 (N.D. Cal. Nov. 27, 2007) (jury verdict for defendants); *Robbins v. Koger Props., Inc.*, 116 F.3d 1441, 1449 (11th Cir. 1997) (jury verdict of $81 million for plaintiffs against an accounting firm reversed on appeal on loss-causation grounds and judgment entered for defendant); *Anixter v. Home-Stake Prod. Co.*, 77 F.3d 1215, 1233 (10th Cir. 1996) (Tenth Circuit overturned securities-fraud class-action jury verdict for plaintiffs in case filed in 1973 and tried in 1988 on basis of 1994 Supreme Court opinion).

4894-1808-1580.v1

motion to dismiss and their likely summary judgment and *Daubert* motions, these arguments would no doubt be raised again prior to and at trial. Therefore, whether Lead Plaintiff ultimately would prove liability was far from assured.

Moreover, there is no way to know how a jury would decide these issues. The damage assessments of the parties' respective trial experts would become a "battle of experts." The outcome of such battles is never predictable, and there existed the very real possibility that a jury could be swayed by experts for Defendants to minimize the Class's losses or to show that the losses were attributable to factors other than the alleged misstatements and omissions. Thus, even if Lead Plaintiff prevailed as to liability at trial, the judgment obtained might well be only a fraction of the damages claimed.

### 3. The Magnitude and Complexity of the Litigation

The complexity of the litigation is another factor examined by courts evaluating the reasonableness of attorneys' fees requested by class counsel. *See Chatelain v. Prudential-Bache Sec. Inc.*, 805 F. Supp. 209, 216 (S.D.N.Y. 1992). It is widely recognized that "shareholder actions are notoriously complex and difficult to prove." *In re Bayer AG Sec. Litig.*, 2008 WL 5336691, at *5 (S.D.N.Y. Dec. 15, 2008); *see also Christine Asia*, 2019 WL 5257534, at *18 ("Securities class actions in particular are 'notably difficult and notoriously uncertain.'"). "[S]ecurities actions have become more difficult from a plaintiff's perspective in the wake of the PSLRA." *Ikon*, 194 F.R.D. at 194; *see also In re AOL Time Warner, Inc. Sec. & ERISA Litig.*, 2006 WL 903236, at *9 (S.D.N.Y. Apr. 6, 2006) ("[T]he legal requirements for recovery under the securities laws present considerable challenges, particularly with respect to loss causation and the calculation of damages. These challenges are exacerbated . . . where a number of controlling decisions have recently shed new light on the standard for loss causation."). This case was no exception. As described in the Ellman

- 15 -

4894-1808-1580.v1

Declaration, this Action involved a number of difficult and complex questions concerning liability, scienter, and damages in a case that would have required extensive additional efforts by Lead Counsel to ultimately prepare for trial.

The trial of liability issues alone would have involved substantial attorney and expert time, the introduction of voluminous documentary and deposition evidence, vigorously contested motions, and the considerable expenditures of judicial resources. Because this case revolved around "difficult, complex, hotly disputed, and expert-intensive issues," this factor favors awarding a 20% fee. *City of Providence*, 2014 WL 1883494, at *16.

### 4. The Quality of Representation Supports the Requested Fee

The quality of the representation by Lead Counsel is another important factor that supports the reasonableness of the requested fee. Lead Counsel submit that the quality of the representation here is best evidenced by the quality of the result achieved. *See generally* Settlement Memorandum; *see also Flag Telecom*, 2010 WL 4537550, at *28; *In re Bisys Sec. Litig.*, 2007 WL 2049726, at *3 (S.D.N.Y. July 16, 2007). Lead Counsel demonstrated a great deal of skill to achieve a settlement at this level in this particular case. Lead Counsel are experienced securities class action and complex litigation practitioners. *See* Robbins Geller Decl., Ex. D; Robbins Decl., Ex. E. This Settlement is attributable to the diligence, determination, hard work, and reputation of counsel, who developed, litigated, and successfully negotiated the Settlement of this Action and a substantial cash recovery in a very difficult case, without the risk of trial. *See Teachers' Ret. Sys.*, 2004 WL 1087261, at *6.

Finally, courts repeatedly recognize that the quality of the opposition faced by Lead Counsel should also be taken into consideration in assessing the quality of counsel's performance. *See, e.g.*, *Marsh ERISA*, 265 F.R.D. at 148 ("The high quality of defense counsel opposing Plaintiffs' efforts further proves the caliber of representation that was necessary to achieve the Settlement."); *Veeco*,

- 16 -

2007 WL 4115808, at *7 (among the factors supporting award of attorneys' fees was that defendants were represented by "one of the country's largest law firms").  Here, Defendants are represented by lawyers from Wilmer Cutler Pickering Hale and Dorr LLP and Shearman & Sterling LLP, who presented skilled defenses and spared no effort in representing their clients.  Notwithstanding this formidable opposition, Lead Counsel's ability to present a strong case and to demonstrate their willingness to continue to vigorously prosecute the Action through trial and then inevitable appeals enabled Lead Counsel to achieve a very favorable Settlement for the benefit of the Class.

### 5.    Public Policy Considerations

A strong public policy concern exists for rewarding firms for bringing successful securities litigation.  *See Woburn Ret. Sys. v. Salix Pharms., Ltd.*, 2017 WL 3579892, at *7 (S.D.N.Y. Aug. 18, 2017) (fee award was "appropriate, and not excessive, to encourage future securities class actions"); *Flag Telecom*, 2010 WL 4537550, at *29 (if the "important public policy [of enforcing the securities laws] is to be carried out, the courts should award fees which will adequately compensate Lead Counsel for the value of their efforts, taking into account the enormous risks they undertook"); *Maley*, 186 F. Supp. 2d at 373 ("In considering an award of attorney's fees, the public policy of vigorously enforcing the federal securities laws must be considered.").  Accordingly, public policy favors granting Lead Counsel's fee and expense application here.

### 6.    The Class's Reaction to the Fee Request to Date Supports the Requested Fee

To date, the Claims Administrator has sent more than 10,300 copies of the Notice to potential Class Members and nominees informing them, *inter alia*, that Lead Counsel intended to apply to the Court for an award of attorneys' fees in an amount not to exceed 20% of the Settlement Amount,

4894-1808-1580.v1

plus expenses not to exceed $50,000, plus interest on both amounts.[9]  The time to object to the fee request expires on August 19, 2022.  To date, however, not a single objection to the fee and expense amounts set forth in the Notice has been received.  Such a "low level of objection is a 'rare phenomenon.'"  *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 305 (3d Cir. 2005).  The fact that no objections have been received to date supports the fairness of the fee request.

## IV.    LEAD COUNSEL'S EXPENSES ARE REASONABLE AND WERE NECESSARY TO THE PROSECUTION OF THIS ACTION

Lead Counsel also respectfully request an award of $20,042.03 in expenses incurred while prosecuting the Action.  Submitted herewith are declarations regarding these expenses, which are properly recovered by counsel.  *See* Robbins Geller Decl., ¶¶5-6; Robbins Decl., ¶¶5-6.  *See, e.g.*, *In re China Sunergy Sec. Litig.*, 2011 WL 1899715, at *6 (S.D.N.Y. May 13, 2011) (in a class action, attorneys should be compensated "'for reasonable out-of-pocket expenses incurred and customarily charged to their clients, as long as they were "incidental and necessary to the representation"'"); *Flag Telecom*, 2010 WL 4537550, at *30 ("It is well accepted that counsel who create a common fund are entitled to the reimbursement of expenses that they advanced to a class."); *In re Indep. Energy Holdings PLC Sec. Litig.*, 302 F. Supp. 2d 180, 183 n.3 (S.D.N.Y. 2003) (court may compensate class counsel for reasonable expenses necessary to the representation of the class).

Lead Counsel's modest expenses include, for example, filing and Business Wire fees, the costs of mediating the Class's claims, and computerized research.  A complete breakdown by category of the expenses incurred is set forth in the accompanying Robbins Geller and Robbins LLP declarations.  These expenses were critical to Lead Counsel's success in achieving the Settlement.  *See Glob. Crossing*, 225 F.R.D. at 468 ("The expenses incurred – which include investigative and

---

[9]    *See* accompanying Declaration of Jack Ewashko Regarding Mailing of Notice and Publication of Summary Notice, Ex. A (Notice) at 3.

expert witnesses, filing fees, service of process, travel, legal research and document production and review – are the type for which 'the paying, arms' length market' reimburses attorneys.  For this reason, they are properly chargeable to the Settlement fund.").  So far, not a single objection to the expense amount set forth in the Notice has been received.  Accordingly, Lead Counsel respectfully request payment for these expenses, plus interest earned on such amount at the same rate as that earned by the Settlement Fund.

## V.    CONCLUSION

Lead Counsel's efforts have resulted in a very good result for the Class.  Based on the foregoing, and the entire record herein, Lead Counsel respectfully request that the Court award attorneys' fees of 20% of the Settlement Amount, plus expenses in the amount of $20,042.03, plus interest on both amounts.

DATED:  August 5, 2022

Respectfully submitted,

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
ALAN I. ELLMAN
AVITAL O. MALINA

*s/ Alan I. Ellman*
ALAN I. ELLMAN

58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
aellman@rgrdlaw.com
amalina@rgrdlaw.com

- 19 -

4894-1808-1580.v1

ROBBINS GELLER RUDMAN
& DOWD LLP
ELLEN GUSIKOFF STEWART
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
elleng@rgrdlaw.com

ROBBINS LLP
BRIAN J. ROBBINS
STEPHEN J. ODDO
ERIC M. CARRINO
5040 Shoreham Place
San Diego, CA  92122
Telephone:  619/525-3990
619/525-3991 (fax)
brobbins@robbinsllp.com
soddo@robbinsllp.com
ecarrino@robbinsllp.com

Lead Counsel for Lead Plaintiff

- 20 -

4894-1808-1580.v1

# EXHIBIT A

K1NAARCHps

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

In Re:
                                    15-MC-40 (AKH)


AMERICAN REALTY CAPITAL
PROPERTIES, INC. LITIGATION,

                                    Fairness Hearing


------------------------------x

                                    New York, N.Y.
                                    January 23, 2019
                                    10:15 a.m.


Before:

                 HON. ALVIN K. HELLERSTEIN

                                    District Judge


                      APPEARANCES

ROBBINS GELLER RUDMAN & DOWD LLP
     Attorneys for TIAA and Class Plaintiffs
BY:  DEBRA J. WYMAN, ESQ.
     MICHAEL J. DOWD, ESQ.
     ROBERT M. ROTHMAN, ESQ.
     ELLEN GUSIKOFF-STEWART, ESQ.

GLANCY PRONGAY & MURRAY LLP
     Attorneys for the Witchko Derivative
BY:  MATTHEW M. HOUSTON, ESQ.


MILBANK LLP
     Attorneys for Defendant ARCP
BY:  SCOTT A. EDELMAN, ESQ.

THE COURT:  Who is going to do the application for Robbins Geller?

MR. DOWD:  I will, your Honor.  Michael Dowd.

THE COURT:  Good morning, Mr. Dowd.

MR. DOWD:  Good morning, your Honor.

THE COURT:  I've read your extensive declaration, that is, the declaration of Ms. Wyman.

I want to take up just your fees, your activities. The first to file the class action lawsuit were four firms, who don't seem to be involved: Pomerantz LLP, Wolf Popper LLP, Wolf Haldenstein LLP, and the Rosen Law Firm.  Is it clear that they are making no claim?

MR. DOWD:  They are making no claim, your Honor.

THE COURT:  OK.  Did they do anything in the lawsuit?

MR. DOWD:  No, your Honor.  I mean, I'm sure they filed complaints early on.  But the Court, when it appointed us lead plaintiff, told us to work with other firms and form a working group, a global working group.  And there were a group of firms, I believe it was nine firms, that agreed to be part of that working group and to work on the case.  And we've submitted their time with our time.  And those are the only attorneys that would be entitled to fees in this casement.

THE COURT:  The second thing, I did not appreciate how many counsel there were.  My impression was that there were three or four at the time that I said what you said.

MR. DOWD:  Pardon me, your Honor?

THE COURT:  I didn't know there were nine other law firms involved.

MR. DOWD:  There were, your Honor.  The Court --

THE COURT:  I didn't know that, I said.  When I asked you to coordinate services and organize the plaintiffs' group, I thought there were just two or three law firms.

MR. DOWD:  No, they were not.  And they each had clients in the case, except I believe there was one firm that did not.  But they each had clients.  They were all class reps. They were all either on our "may call" or "will call" witness list.  And so they provided valuable service.  And they did a lot of work in the case.  We've limited it and tried to give them discrete projects or dealing with just their plaintiffs, you know, because that's what we thought the Court wanted with the working group, and we did do that.  Their time is about 10 percent of our time.  And I think that's fair considering what they did in the case.

THE COURT:  You have a rather detailed description of the various things you were doing.

MR. DOWD:  Yes, your Honor.  That would be in Ms. Wyman's, the longer declaration.

THE COURT:  The declaration in support of application for award of attorney's fees and expenses is what I'm looking at.  I have the larger one as well.

K1NAARCHps

Ms. Wyman's affidavit identifies the lawyers -- all your firm?

MR. DOWD:  Yes.  They're all our firm.

THE COURT:  Why so many lawyers?

MR. DOWD:  Well, your Honor, there are different people that helped with different tasks.  When I looked at it, this is what struck me.  We had a working group that I really thought were the people that were going to be responsible for trying this case.  That group was about 15 people, 13 lawyers and the two forensic accountants that were involved in it from beginning to end.  Those 15 people account for about 72 percent of our lodestar, $47 million, just those 15 people.  They were all people that the Court would probably be familiar with or would have seen their names.  Certainly most of us have been here in court.

And then if you add in the four people at our office, three of our internal staff attorneys and another associate, that were primarily responsible for the document review, so that would be another four people, bringing it to 19.  I think those people together would account for about 82 percent of our entire lodestar.

So it may look like a lot of people because there were timekeepers that did individual things or who were on the case for a given period of time.  But if you look at those people that really drove the case, you're talking about the 15 main

K1NAARCHps

people that did everything.  That's 72 percent of the time.
And if you take in those other four that were responsible for a
lot of the document work, that's, I think, about 82 percent of
the lodestar.

THE COURT:  12 people billed more than a thousand
hours.

MR. DOWD:  Yes, your Honor.

THE COURT:  How many people were involved in your
firm, Mr. Edelman?  Roughly.

MR. EDELMAN:  Your Honor, I would bet a comparable
number.  This was complicated litigation in a big case.

THE COURT:  I understand.

MR. EDELMAN:  That doesn't sound at all outlandish to
me.  Their the core team.

THE COURT:  OK.  Then I pass that observation.

MR. DOWD:  That's just Mr. Edelman's firm.  There were
also Grant Thornton's lawyers.

THE COURT:  They had a separate job to do.

MR. DOWD:  Well, and we had to do the job on the other
side of them as well.

THE COURT:  That's true.

MR. DOWD:  They had, at summary judgment --

THE COURT:  Mr. Dowd, I withdraw that implied
criticism.

The hourly rates, for example, what did Jason Forge

K1NAARCHps

do?

MR. DOWD: Jason Forge, your Honor? Jason Forge was a critical part of this team. He worked on the case primarily towards the end at summary judgment, when he got ready for trial. He did fantastic work with their damages experts. He was a former assistant U.S. attorney. He was an AUSA who did huge cases in LA and San Diego before I talked him into coming over to our firm. He's a great lawyer, your Honor. He's been in front of you. I don't think he argued in this case. He was certainly in the courtroom. He's argued in other cases that I've been on with him in front of this Court. So you've met him.

THE COURT: Now, the top billing rate of $1,150 of Samuel Rudman, $1,250, he only had 29 hours.

MR. DOWD: It's really, it's probably Mr. Coughlin, myself, and Mr. Robbins.

THE COURT: Several billing more than a thousand dollars. Those seem like New York rates rather than San Diego rates.

MR. DOWD: Well, Mr. Rudman is in New York. But I think you should look at the rates for lawyers that do this type of litigation. If you look, the *National Law Journal* said over a thousand dollars an hour is common now for partners. If you look at some of the firms on the other side of this case --

THE COURT: I wouldn't try.

K1NAARCHps

MR. DOWD:  We submitted a declaration showing that Weil Gotshal -- and they were on the other side of this case, good lawyers -- we showed that they filed an application in the Sears bankruptcy earlier last year, and they had nine lawyers, at $1500 an hour, and dozens at over a thousand dollars an hour.  So higher than us.

THE COURT:  The bankruptcy rates are out of sight, and that's often because the allowances are heavily discounted.

Tell me now how the other firms worked.

MR. DOWD:  How did the other firms work?  What did they do, your Honor?

THE COURT:  What did they do, yes.

MR. DOWD:  Well, I can tell you that, for example, if you just go down the list, if you start with Lowey Dannenberg, for example.  They represented Corsair.  And Corsair was a shareholder and class member for the Cole shares and also the May 2014 common stock offering.  Corsair produced, I believe, 145,000 pages of documents, all of which had to be reviewed for privilege.  They were on our "will call" witness list.  They are on, I believe, also a "may call" witness list.  Their client was deposed.  They also assisted with the summary judgment briefing on the discrete project that Ms. Wyman gave them.

THE COURT:  What project was that?

MR. DOWD:  Do you remember which briefing it was?

K1NAARCHps                                                      154

MS. WYMAN:  Your Honor, we needed some assistance with the research of some tricky issues, and we asked them to help us with that, and they prepared --

THE COURT:  You what?

MS. WYMAN:  We asked them to help us with some research and prepared an insert to one of the briefs.

MR. DOWD:  So you're looking at, your Honor, document review, analysis of the claims, data collection, motion to dismiss, negotiation of discovery disputes.  Ms. Wyman would have had to coordinate with them for what their --

THE COURT:  You're taking it out of their declaration, what you just said.

MR. DOWD:  Pardon me?

THE COURT:  What you just read, is that from their declaration?

MR. DOWD:  It's from their declaration, yes, your Honor, that was submitted.

THE COURT:  Now, Motley Rice makes no description in its declaration.  What did they do?

MR. DOWD:  Motley Rice, your Honor, they had two clients in the case.  They had the national sheet metal workers union.  And they were on both the Cole and the May 2014 offering.  They were on our "will call" witness list, Mr. Myers.  They had also Union Asset Management, which was a German entity that was on the July and December 2013 bond

K1NAARCHps

claims.  They had two witnesses that they produced, Mr. Riechwald and Mr. Fischer, who came over from Germany, as I recall, to have their depositions taken.  Similarly, Sheet Metal Workers had Mr. Myers, so they had three days of deposition testimony.  And all three of those witnesses were on our "will call" witness list.  They are coming.

They also assisted us, as I recall, with the motion to dismiss briefing that related, I think, to the Exxon exchange.  They attended the first mediation.  And they would have spent a lot of time on depo prep and the depositions.  And they also would have interacted, I'm sure, with Ms. Wyman in terms of document production and disputes with the defendants, so that, you know, their views would be expressed to the defendants as well.

THE COURT:  Johnson Fistel.

MR. DOWD:  Johnson Fistel, your Honor, represented their client in the case.  There was a class rep.  It was Paul Matten.  He was an ARCT IV shareholder.  He was on our "may call" witness list, I believe.  They also assisted, they gave us an associate who came to our office, I believe, in New York, and assisted with document review of the defendants' documents.  They also produced documents for their client.  And I believe Mr. Matten was also interviewed by the Department of Justice when they were insistent that they wanted one of our class reps, or a couple of our class reps, to be interviewed about

K1NAARCHps

their case.

THE COURT:  Cohen Milstein.

MR. DOWD:  Cohen Milstein, your Honor, represented the New York City funds.  They were in the July 2013 offering, the Cole offering, the May 2014 offering.  They produced two witnesses on behalf of the New York City funds, Horan and Jeter.  They were both deposed.  They were both on our "will call" witness list.  They had, your Honor, as I recall, produced 190,000 pages of documents, which had to be reviewed. And they would have been involved, I'm sure, in checking class cert issues.  And I believe they assisted also with the motion to dismiss briefing as well, your Honor.  So they provided a valuable service.  A lot of their work was related to New York City funds.  Obviously, if we were trying a case in front of your Honor, in front of a New York jury, it would certainly be helpful to have New York City funds here.

THE COURT:  What would they testify on?

MR. DOWD:  They would have testified about their purchases in all the different offerings as class reps.

THE COURT:  Those would have come in by stipulation.

MR. DOWD:  Your Honor, they don't come in by stipulation.

THE COURT:  Well, it's a matter of record what they bought and when they bought.

MR. DOWD:  Yes.  And no one says, we're going to

K1NAARCHps

stipulate to it, your Honor.  I've tried a couple of these cases.

THE COURT:  There would have been stipulations.

MR. DOWD:  Well, I've tried cases, and there weren't stipulations.

THE COURT:  You would not need any witnesses on this, and I don't know that the witnesses would have contributed anything.

I'm reacting because a million dollars for each of these law firms, given the $65 million of lodestar that you put into the case, seems excessive.

MR. DOWD:  I don't think it was, your Honor.  I think what they did, in terms of their clients and document production, producing the documents, defending them at depositions -- we didn't take their depositions.  The defendants deposed them.

THE COURT:  I understand.  But the knowledge of a class member is derivative and really irrelevant.  The knowledge is derivative of what the lawyer finds and irrelevant because it doesn't prove any proposition against the defendants.  I understand that these depositions are taken as a matter of course by defendants, and they have to be, the clients have to be represented and there's a certain time of preparation, but over a million dollars for each, without time records showing anything, I haven't seen any time records for

K1NAARCHps

them.

MR. DOWD:  Well, your Honor, again, we started out from a different premise.  We seek a percentage of the fee, a percentage of the fund, as our fee.  And that's the trend in the Second Circuit.  I know I've argued with your Honor about this in the past.  But that's how we seek a fee.  When my firm is working on a case --

THE COURT:  I just don't do that, Mr. Dowd.  I told you in the past, I believe that people who just do it on a basis of percentage do not want to go through the rigor of review and time.  I'll award lodestar.  And I'll be candid with you right now; you will get an award for your lodestar as well, not as much as you asked for, but you'll get an award.  I'm not sure about those other firms.  I don't know what they contributed.  I don't have a justification of their time.  I don't know what activities took up their time.  I don't know how they distributed their work between partners and associates.  I don't understand the substantial expense factors that they put into this case.  It's hard questions.

MR. DOWD:  They did break down their time by who the timekeepers were.  And they also broke down their expenses.  Those are attached to their declarations that they each submitted.

But, again, your Honor, when my firm goes into a case, we negotiated with TIAA.  We negotiated for a percentage fee.

K1NAARCHps

And we're not sitting there thinking, let's bring in 50 for attorneys to sit in a room reviewing documents so we can build up our lodestar. And that's the problem with the lodestar analysis. I'm just being honest with your Honor. It encourages lawyers to hire for people that do nothing to add value to the case. And we don't do that.

THE COURT: You don't do that.

MR. DOWD: No, we don't. We work for a percentage. That's what we asked for. If we put people on an assignment, it's because we needed it done. You know, at summary judgment the defendants had like 60 people in the courtroom.

THE COURT: You had expenses paid outside bankruptcy counsel, $171,000, so that they can file a motion in the bankruptcy court to get permission so that they could litigate in this court.

MR. DOWD: That's correct, your Honor.

THE COURT: That's a lot of money.

MR. DOWD: I understand that, your Honor. And when the Court ordered us to go protect those claims and get the stay lifted, we had to hire bankruptcy counsel. It's not like --

THE COURT: Did you pay them, or are they waiting to get paid?

MR. DOWD: No, we paid them.

THE COURT: You are out of pocket.

K1NAARCHps

MR. DOWD:  That's out of pocket for us.

And, again, you know, there was a court order saying, you know, go defend the thing in bankruptcy.  I'm not a bankruptcy lawyer.

THE COURT:  That's right.  It is a large amount.

MR. DOWD:  I understand.

THE COURT:  One is a simple motion, to lift stay, which is ordinarily granted in relationship to a large case like this.

MR. DOWD:  And then I think they also had to keep monitoring it, and I think they probably made other appearances.  I'm not positive -- I know they did.  Right?

THE COURT:  It's too high a fee.

MR. DOWD:  I understand, your Honor.  And we paid out of pocket.  We're not trying to give money away.  I mean, if you cut it, it just cuts my money.  I don't think they're going to give it back.

THE COURT:  Why weren't they required to make an application?

MR. DOWD:  Because we didn't consider them part of a contingent fee.  They wanted to get paid hourly, and that's what we paid.

THE COURT:  You paid over a million dollars to Crowninshield Financial Research, Inc.

MR. DOWD:  We absolutely did, your Honor.

K1NAARCHps

THE COURT:  And you have people on in your firm who do the same work.  No?

MR. DOWD:  They do similar work.  And frankly a lot of the partners at our firm know a lot about damages.  I mean, that million dollars, your Honor, was, we had to spend it.  I cannot tell you how much work they did.

THE COURT:  Were they going to be witnesses?

MR. DOWD:  Pardon me?

THE COURT:  Were they going to be --

MR. DOWD:  Yes.  It's Dr. Feinstein.  He also testified in front of you on class cert.  He was going to testify again at trial, your Honor.

THE COURT:  Was his deposition taken?

MR. DOWD:  His deposition was taken four times, your Honor.

THE COURT:  So this million dollars reflects that activity.

MR. DOWD:  Absolutely.  And the defendant has six experts, on just loss causation.  And you throw in truth on the market, they had 12.  And I guarantee you, because I've worked with some of them, they paid a lot more than a million dollars for their 12 guys or six people, whatever you want to call them.

THE COURT:  They're not asking me to give them any allowances to have a law firm relationship with a client who

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1NAARCHps

will or will not pay, I think, in advance.  I will not give you that.  You paid William H. Purcell Consulting over $350,000 --

MR. DOWD:  We did.

THE COURT:  -- for testimony concerning due diligence issues.  I remarked that I did not see the due diligence issues as having experts.  It was really a fact and a law issue.

MR. DOWD:  Yes.  And then defendants --

THE COURT:  I understand that, given defendants' insistence to have experts of that like, and a certain degree of uncertainty whether they will or will not be able to use them, you need to have your own.

MR. DOWD:  Correct.  And they had three.

THE COURT:  What about Harvey Pitt?

MR. DOWD:  Harvey Pitt, your Honor --

THE COURT:  $200,000 to Harvey Pitt --

MR. DOWD:  Like 198,000.

THE COURT:  -- to trace securities.

MR. DOWD:  Well, and he was also going to testify about the SEC regulatory framework.

THE COURT:  I told you I wasn't going to allow that.

MR. DOWD:  No, I think you said I could award for that.  In fact, I'm pretty sure you awarded that --

THE COURT:  No.  When I commented, you said that he was going to trace shares, a job that an accountant could do.

MR. DOWD:  I think you also said he could testify

about the SEC regulatory framework as well.

THE COURT:  No, I did not.

MR. DOWD:  I think you did, your Honor.

And, you know, your Honor, a lot of Mr. Pitt's bill is because the defendant showed up with between 15 and 20 lawyers in Washington, D.C., to take his deposition for two days.  At the end of the first day, I walked out, because I said, this is a waste of time.  And then defendants filed a letter brief complaining that I had walked out.  And we had to go back for a second day.

I didn't want to have Harvey Pitt get deposed twice to talk about stuff that, you know, frankly I thought was not that remarkable.

THE COURT:  You have almost $50,000 paid to John Barron and $384,000 to the firm that Barron went to.

MR. DOWD:  Correct.  Barron.

THE COURT:  Barron.

MR. DOWD:  We could have had several experts on accounting.  And we found a REIT auditor and accountant who was going to testify to both, as to the company and as to Grant Thornton.  I think his expenses are very reasonable.

THE COURT:  I find your lodestar reasonable, the rates appropriate and, in relationship to the work that you did, reasonable.  I'll go into lodestar a bit later.

The next firm I want to hear from is Lowey Dannenberg.

K1NAARCHps

MR. SKELTON:  Good morning, your Honor.  Thomas Skelton of Lowey Dannenberg.  Ms. Hart sends her apologies. She had a client meeting in California with a client who was in hospice care and may pass at any time and felt that she needed to keep that appointment.

THE COURT:  Thank you.

MR. SKELTON:  Your Honor, my firm represents the Corsair group of funds.  They had a $19 million loss and were the second largest shareholder at the lead plaintiff stage.  We were obviously not appointed lead counsel.  Throughout the course of the case, we took our direction from Robbins Geller. We worked on numerous aspects of the case, including, as set forth in Ms. Hart's declaration, motions to dismiss, motions for class certification, motions for summary judgment.

THE COURT:  What did you do on the motion to dismiss?

MR. SKELTON:  We did discrete projects and we reviewed motion papers at the direction of lead counsel, particularly in any issues that might have related to Corsair.  And they would apply throughout the case.  Much of our work was specifically directed to issues that related to Corsair.  For example, one of the issues that went throughout the case was the issue of tracing, as Mr. Dowd alluded to.  We were able to find documents through our document platform that showed, in connection with the May 2014 offering, that Corsair purchased shares at the offering price on the date of the offering from

K1NAARCHps

one of the underwriters at a price that was outside of the trading price on that given day.

THE COURT:  That's an accountant's work for Corsair. Why was it your work?

MR. SKELTON:  Corsair retained to us perform these services and to represent them in the case.  And the issue was whether we could trace the shares to the offering.  And our work, we did the work analyzing the documents and providing the information to --

THE COURT:  But normally that work would be done internally within a company.  Corsair is what, a management company?

MR. SKELTON:  It's an investment manager, yes.

THE COURT:  Investment manager.

MR. SKELTON:  Yes.

THE COURT:  An investment manager knows what he bought, what he sold, when he bought it, how much he paid.

MR. SKELTON:  An investment manager would have had to find all the documents and analyze them.  We analyzed them in the context of the arguments that the defendants were making regarding tracing.  They argued that we couldn't trace the shares to the offering because shares are fungible and they're held electronically and therefore we couldn't recover on the Section 11 claims.  And the client, this is --

THE COURT:  You bought these shares on the offerings,

K1NAARCHps

did you not?

MR. SKELTON:  Corsair brought the shares on the offering, yes.

THE COURT:  Which offering did you buy on?

MR. SKELTON:  The May 2014 offering, as well as Cole merger shares.  But the offering at issue was the May 2014 offering.

THE COURT:  Did you buy from the underwriters?

MR. SKELTON:  Yes.

THE COURT:  So what was the big problem?

MR. SKELTON:  The problem was that the defendants were arguing in the in limine motions and in summary judgment that we couldn't trace the shares to the offering because shares are fungible and, because we couldn't say that these particular shares did not exist before the offering, we couldn't recover on the Section 11 claim.

THE COURT:  That's a legal issue.

MR. SKELTON:  Yes.  And we needed to argue that legal issue with supporting documents.  And the documents we were able to find showed that Corsair purchased, on the date of the offering, at the offering price, from one of the underwriters.  And we compared that to publicly available information that showed that the lowest trading price of the day was above the price at which Corsair purchased, so therefore they must have purchased on the offering.  This is not a routine analysis that

K1NAARCHps

Corsair would do. They didn't understand the nuances of Section 11, of the 1933 Act. We did. They retained us to do this, and that was part of what we did. And we were able to establish, through documentary evidence, that the shares were purchased on the offering. And ultimately, your Honor ruled in favor of the plaintiffs on that issue.

Other matters that we dealt with --

THE COURT: What was your contribution to the result?

MR. SKELTON: Corsair was a certified class representative. They purchased the shares on the open market. They purchased shares in the Cole offering. They purchased shares in the May secondary offering. All of our work, your Honor, was done either at the direction of lead counsel or in consultation with lead counsel, and consult --

THE COURT: Did you take any depositions of the defendants?

MR. SKELTON: We did not, your Honor. We were not asked to do that.

THE COURT: So all you did was represent your client.

MR. SKELTON: Well, we represented our client, who had issues relating to the various -- the offering and the merger and common shares. We were asked to perform tasks on the summary judgment motion, on class certification.

THE COURT: In relationship to your client.

MR. SKELTON: Well, generally, in relation -- in

K1NAARCHps

relation to our client and other tasks that Ms. Wyman called me and asked me if we could do certain research projects related to omissions and related to the admissibility of the financial restatement, which was an earlier issue that came up during the case. Our client produced 145,000 pages of documents. We reviewed the documents for responsiveness and privilege. We dealt with issues relating to the ESI and follow-up questions from the defendants regarding the documents that were produced. Mr. Mishaan of Corsair was deposed. Mr. Rothman from Robbins Geller attended the prep sessions, worked with us to get ready for the deposition. He attended the deposition. And the deposition went very well, and Corsair was certified as a class representative by your Honor.

THE COURT: What did the interview with the Department of Justice and the Securities and Exchange Commission have to do with this lawsuit?

MR. SKELTON: Well, it involved parallel proceedings that the SEC and the U.S. Attorney's Office were contemplating bringing. They wanted to interview Corsair as a witness, and we prepared our client -- and he was the same person who was ultimately deposed.

THE COURT: So why should the class pay for that?

MR. SKELTON: Well, that was time that was spent learning facts that the government had, and they presented hypotheticals to us that helped us to understand some of the

K1NAARCHps

issues that they were considering.  And we recognized that the government has different burdens of proof and different elements, but the underlying facts and the approach that the government was taking helped to us understand better the underlying facts in this case.

THE COURT:  Why shouldn't that be a fee chargeable to your client, rather than to the class?

MR. SKELTON:  Well, the information that we learned and that the client provided to the government was very similar to the information that was being argued in the case.  The adjusted funds from operations was one of the issues that was discussed at that meeting.  And we believed that that helped sharpen our focus.  And Mr. Mishaan, who was the witness at the SEC and DOJ meeting, was also the deponent that Corsair proffered for his deposition.

THE COURT:  These interviews with the Department of Justice and with the SEC were not on the record, were they?

MR. SKELTON:  No, your Honor.

THE COURT:  They couldn't be used in the lawsuit.

MR. SKELTON:  No, they could not be used to be submitted as evidence.  But it was helpful to us in understanding the government's approach and learning facts about the case that helped us proceed.

Just to put a finer point on it, your Honor, the interview was a short interview.  It lasted a couple hours.  We

K1NAARCHps

had a prep session the day before.  It was not a lengthy period of time.  But we do believe that the information that we learned during that process was helpful.

THE COURT:  How much of your fees went into that?

MR. SKELTON:  I could find it in our time sheets and submit this, your Honor, but it was probably six to eight hours of my time and a couple of hours of Ms. Hart's time.

MR. DOWD:  Your Honor, could I just mention one thing?  This happens in our cases sometimes, and it did here, where DOJ reaches out and says, we want a victim witness, and since you already have a lawsuit, we want your victim witness.  And the first thing I say to them and I'm sure is what we said in this case -- I think Mr. Forge dealt with it -- is, get out of here, go find your own witnesses.  And then they say, well, you know, if we want, we can subpoena your witnesses.

And so I think at times, you get stuck in this position with the U.S. Attorney's Office.  And I say, you got to go in there and protect them because I don't know what they're going to write down, that your witness may or may not have said, and turn over in Jencks Act discovery before their trial.

And so you have to protect your witness.  And it's not our fault, your Honor.  We always tell them just go away, find your own witnesses, OK, you do your job, we'll do ours.  It's not like they are going to help us.

K1NAARCHps

And I say that with all due respect.  I used to be an assistant U.S. attorney, so --

THE COURT:  One last question.  If I were to give a lesser bonus to your and to the other firms than I give to Robbins Geller, would that it be unjust?

MR. SKELTON:  Well, as I understand it, your Honor, Robbins Geller as lead counsel has the discretion, unless your Honor orders otherwise, to distribute the fees in accordance with its discretion as to the contributions that were made by the firms.  We believe that our contribution was valid and meritorious, but of course Robbins Geller, they did the lion's share of the work, they took the depositions, they did a phenomenal job and they got a phenomenal result.

THE COURT:  My thought was that I would make awards to each of your firms so that Robbins Geller would not have the burden of redistribution.

MR. SKELTON:  That is certainly within your discretion, your Honor, to do that and to award what you think our firms' contribution was.  We do believe we contributed to the success of the case.  I believe that Robbins Geller agrees with that.  Obviously Robbins Geller did the lion's share of the work.  They took the depositions.  And they created a tremendous result.  So I'm not going to sit here and tell you that your Honor has to award me the same multiplier that Robbins Geller gets.  They were lead counsel.  But we do

K1NAARCHps

believe that our contribution was meritorious and that our time was valid and that our application should be granted.

THE COURT:  Thank you.

MR. SKELTON:  Thank you, your Honor.

THE COURT:  Tell me your name again?

MR. SKELTON:  Thomas Skelton from Lowey Dannenberg.

THE COURT:  I'll hear Motley Rice next.

MR. DOWD:  Your Honor, I'm not sure that all the co-counsel came.  I mean, we were here to present for them, just like everything else in this case.  We tried to keep a tight rein on everybody just so that there wouldn't be waste of time.  And I'm pretty sure Cohen Milstein was here on Tuesday and they may have sent a different person today because they couldn't be here again today.  But most of the people, we told them, we submitted your time and we'll argue for you.  And that's typically the way we did things in this case.  We didn't want ten firms showing up.  I mean, the Court's order said, "As reported in yesterday's status conference, lead plaintiff's counsel, Robbins Geller, will work with and lead a working group of all interested plaintiff's counsel."  And that's what we did.

THE COURT:  I understand, Mr. Dowd.  But I have to examine the reasonableness of all the constituent parts of your fee, of your fee request, notwithstanding that you're requesting for everybody.

K1NAARCHps

I'm looking at Mr. Levin's declaration, Mr. Levin being a member of Motley Rice. That firm does not have offices in New York, does it?

MR. DOWD: I don't know whether they have an office in New York.

They do. Mr. Rothman says they do.

THE COURT: But the lawyers that worked on the case, were they from the New York office or another office?

MR. ROTHMAN: There was one lawyer who was either from Westchester or Kentucky, maybe from Connecticut, and the rest, Mr. Levin is in the South Carolina office.

THE COURT: It doesn't seem to be right to charge for transportation. I will disallow that charge.

I don't know what they did. What did they do in the case?

MR. DOWD: Well, I talked to you about that already, your Honor. They had the sheet metal workers. They produced Mr. Myers for his deposition. They also had Union Asset Management.

THE COURT: Tell me what they did to contribute to the victory.

MR. DOWD: Well, that does contribute to the victory, your Honor. You're producing deponents and witnesses who bought different offerings that contribute to the victory. I mean, they flew these guys over, as I understand it, from

K1NAARCHps

Germany to have their depositions taken, which is probably part of the travel expenses in this case. They assisted with the motion to dismiss briefing on the Exxon exchange. They attended the first mediation. They did all that depo prep and depo work. They produced respectively about, between them, the two plaintiffs, over 26,000 pages of documents, your Honor.

THE COURT: Johnson Fistel.

MR. DOWD: Johnson Fistel we talked about as well. That was Paul Matten. He was one of the ARCT IV witnesses. They also assisted with the document review. They lent us an associate to assist with document review.

They also produced about 1100 pages of documents on behalf of Mr. Matten. I believe their client was also interviewed by the DOJ.

THE COURT: The Weiss law firm, are they here? Is Weiss here?

MR. DOWD: I don't believe so, your Honor. Again, we kept tight reins on everybody to try to keep the numbers down.

THE COURT: This is an interest in their fee, not a matter of -- they're not getting paid for coming here today. They just have an interest in getting paid.

What about the Weiss law firm? What did they do?

MR. DOWD: Their client was Simon Abadi. He was, I believe, in the Cole offering. And they produced documents for their client. Their client was deposed in the case. He was on

K1NAARCHps

one of the "may call" witness lists.  And so they did do work that related to their client in the case.

THE COURT:  Stull Stull & Brody.

MR. DOWD:  Stull Stull & Brody represented Dr. Esposito and another gentleman named Noah Bender.  Esposito was one of the witnesses that really gave a standing on ARCT IV.  He was together with Mr. Matten.  But Dr. Esposito was deposed, and he was on our "will call" witness list because he gave a standing on the ARCT IV issue.  And so they would have represented Dr. Esposito at his deposition and assisted with anything related to Dr. Esposito's briefing.

THE COURT:  Gardy & Notis.

MR. DOWD:  Gardy & Notis, your Honor, they had a client who was not named as a class rep in this case named Shenker.  I think that he sought lead plaintiff appointment. However, because they were on the Cole exchange, they went down to Maryland because there had been a securities case against Cole, and they tried to make sure, their primary role was to make sure that our claims, our claims asserted in this case, didn't get cut out in the release in the Maryland Cole case. Not only did they argue below in this case, in the district court, but then I believe they also argued it on appeal as well, your Honor.  And so that was their main role in the case, was objections and appeals in the Cole case to protect our clients to make sure their claims didn't get released in

K1NAARCHps

Maryland, in sort of an end-around.  And so that was the work we gave them to do, and they did it, and they did it well.

THE COURT:  The Polaszek Law Firm.

MR. DOWD:  The Polaszek Law Firm represented the City of Tampa funds.  They were on the May 2014 offering.  They produced their client, who was one of the class reps, was Ernest Carrera, on behalf of Tampa, obviously, and he was on our "may call" witness list at the end of the day.  They produced documents.  Their client was deposed.

Frequently, when I looked at their lodestar, I was thinking I would have thought it would have been higher.  But that was just my view.

THE COURT:  Cohen Milstein.

MR. DOWD:  Cohen Milstein we discussed.  They represented the New York City funds.  They were on a host of offerings, I think three different offerings.  They produced two witnesses, Mr. Horan and Mr. Jeter.  They were both deposed.  They were both on our "will call" witness list.  They did significant work in the case.  They produced 190,000 pages of documents that had to be reviewed for privilege and responsiveness.  And they also assisted with the motion to dismiss briefing in the case, as I recall.  And so I think that their work was very good, and they did a good job, and helped us with the case.

MR. LOMETTI:  Your Honor, I'm sorry.  It's Chris

K1NAARCHps

Lometti from Cohen Milstein.  Julie Reiser was here on Tuesday, is in court in California, had a mediation, actually, in California today.  She couldn't be here.  I'm here if you have any additional questions.

But I think there may have been four offerings that the New York City funds were involved with.

THE COURT:  Did you take part in any depositions against defendants?

MR. LOMETTI:  No, your Honor.

THE COURT:  Or any motions?

MR. LOMETTI:  I think the firm worked on the motion to dismiss, on class cert issues, and I believe -- Michael, correct me if I'm wrong -- but there was some work that the firm did in relation to the investment managers in general.  New York City funds had five investment managers, and there was a time where the defendants were possibly wanting to depose some or all of them and we had to fight that, and which we did successfully.  And we may have been involved with other investment manager-type issues as well in the case, your Honor.

MR. DOWD:  That's correct, your Honor.

THE COURT:  Thank you.

And Levi & Korsinsky.

MR. DOWD:  They had clients Mitchell and Bonnie Ellis.  They were on the ARCT IV offering.  They were on our "may call" witness list.  They produced documents.  The defendants did not

K1NAARCHps

take their depositions.  I noted that their expenses were zero, which was consistent with that.  But that would have been their primary role: protecting their client, producing documents, reviewing them, and responding to issues on motion to dismiss that dealt with their clients.

THE COURT:  If I were to give you whatever I give you, as a fee for everyone, what would be the methodology of distribution?

MR. DOWD:  What would be our process?  I think we would have to --

THE COURT:  Your theory of distribution.

MR. DOWD:  We would have to look at what everyone did and then figure out how to divide it.  A large part of it would be based on what the Court ordered and how much we got, and we would have to think that through and then talk to the firms and make a decision.  That's what would happen.  It's not like there's some mathematical equation that we use.

THE COURT:  I feel I want to reward your law firm more than the others proportionally.

MR. DOWD:  Your Honor, I will say this.  In this case, we kept those co-counsel to 10 percent of our lodestar, basically.  And they did work on the case.  And they did good work, with everything they had to do.  And they cooperated with us.  And they worked with their witnesses.  And it added value to the case.  I don't think it's fair --

K1NAARCHps

THE COURT:  I'm sure they did.  But the driving force in this case --

MR. DOWD:  Absolutely.

THE COURT:  -- and the reason that the result is uncommon, was the work of your firm.

MR. DOWD:  I understand, your Honor.  But I can't stand here and denigrate these other firms that I feel made a legitimate contribution to this case.  And I won't do it.

THE COURT:  OK.  I'll take a short break and then I'll --

MR. DOWD:  Your Honor, I would like to address some other issues too for the Court's consideration.

THE COURT:  Go ahead.

MR. DOWD:  Is that all right?

THE COURT:  Yes, go ahead.

MR. DOWD:  Because I know the Court goes with the lodestar approach.  I understand.  But, you know, in this case, TIAA, the lead plaintiff, did a great job.  And the Court actually said they did an excellent job in this case.  They held our feet to the fire.  We had an ex ante negotiated fee agreement with them, before we were appointed lead plaintiff, calling for 12.4 percent of the fee.

THE COURT:  How much?

MR. DOWD:  12.4 percent.  You have to do some math on it.  But that's what it comes out to.  That's where the 127

K1NAARCHps

million comes from, your Honor.

TIAA is one of the largest retirement systems in the world, your Honor. They have almost a trillion dollars in assets.

THE COURT: I'm familiar with that.

MR. DOWD: All I'm saying is, they're used to dealing with lawyers, and they drove a good bargain on behalf of themselves and the class at 12.4 percent. If you look at the Second Circuit law, it says an ex ante negotiated fee agreement, the Second Circuit has said, should be given serious consideration by the court. Other judges in this court have said it's entitled to a presumption of reasonableness or correctness, starting with Judge Lynch, back in the *Global Crossing* case, probably almost 15 years ago.

THE COURT: From the point of view of a client wanting to litigate, there's a choice of paying as you go on a time basis, but the model for defendants is, the client takes each bill that comes and looks at it and says, well, I don't need this service or that service or you billed me too much on that, and you make adjustments. And at the end of the day, when you have a recovery, if the client has been paying you on a time basis and you want a bonus, the client will often say, well, I hired you because you're good, and I hired you because I'm willing to pay the high rates that you charge. So why should I also pay a bonus?

K1NAARCHps

You're getting a percentage from TIAA in lieu of pay as you go. Therefore you've had to wait. And therefore, from the perspective of TIAA, which is one of the beneficiaries of many in this lawsuit, it's not really arm's-length bargaining.

MR. DOWD: It is, though, your Honor.

THE COURT: It's an indication.

MR. DOWD: I understand.

THE COURT: I accept it as an indication.

MR. DOWD: I'll telling you just what some other courts have said.

THE COURT: I understand.

MR. DOWD: That 12.4 --

THE COURT: I understand some give lodestar and some give percentages.

MR. DOWD: Right.

THE COURT: I give lodestar. I don't give percentages.

MR. DOWD: But the negotiated fee agreement is given a presumption of reasonableness in courts. And that 12.4 percent, your Honor, it's lower, lower than what a lot of people get. It is a contingent fee. We're not getting paid by the hour. It's contingent-fee litigation. And people do it on a percentage basis. That's how it works. And in this courthouse last year somebody got 25 percent on 250 million. The Second Circuit in November affirmed 13 percent on 2.3

K1NAARCHps

billion, your Honor, in a case.

THE COURT:  The Court of Appeals does not want to substitute itself for my judgment in the case.  It's tough work.  There are very few legal principles involved.

MR. DOWD:  Your Honor, can I just ask you to consider two other issues?

The defendants, in connection with the audit committee investigation and, you know, our suit, as well as other issues, totaled $264 million that they spent.  Now, that's not just our case.

THE COURT:  Say that again.

MR. DOWD:  264 million.

THE COURT:  Who?

MR. DOWD:  The defendants.  That's what ARCP paid for everything that resulted from the audit committee investigation, a lot of which we had to duplicate and a lot of which was probably directly on our case.  They spent $69 1/2 million just in the first three quarters of 2019.  In the first three quarters of 2019 I know the lion's share of that money had to be defending our case.  69 1/2 million, that's more than my lodestar, just for three quarters last year.

I would ask the Court to consider that.  These numbers are not crazy.

When you look at what happened in this case, your Honor, I mean, the quality of the representation, I can tell

K1NAARCHps

you, your Honor --

THE COURT: I'm not going to cut your lodestar, if that's what you're worrying about.

MR. DOWD: No, no, I'm not worried about that. I'm worried about trying to get more than my lodestar.

THE COURT: You'll get more.

MR. DOWD: I would like to get as much as I could.

THE COURT: I could give you all 12.2 percent, but I'm not going to give you that much.

MR. DOWD: All right, your Honor. Just consider this. Bloomberg News, 2017, had an analyst that said this case would settled for between 33 and 117 million dollars. We got 1.052 billion. Last summer, JPMorgan said, based on what they paid the opt-out litigants in this case, which were huge funds, huge funds -- Vanguard, PIMCO, BlackRock -- they said that we get 450. And we got 1.025 billion, your Honor.

I just, I can't sit down before I tell you that. I mean, we did a remarkable job. And we should benefit from that -- for not taking the 450 and coming in and getting the same lodestar award, for saying, no, we're going to roll the dice on summary judgment and make this case worth more for the class, your Honor. And that's what we did. And we should be rewarded for taking that risk.

That's all I ask the Court to consider. I know the Court wants to rule, and I don't want to belabor it, but I ask

K1NAARCHps

you to consider that.

THE COURT:  What did you perceive to be the risk, the probability, of my granting summary judgment to the defendant?

MR. DOWD:  I don't know.  To be honest, your Honor, I thought that we could very possibly get thrown out on Grant Thornton, who ended up paying 50 million --

THE COURT:  What did you think that?

MR. DOWD:  I don't know.  Because I think that auditors get out of these cases an awful lot.  I think they did a study and only like 2 percent --

THE COURT:  They were not responsible for the AFFO --

MR. DOWD:  Exactly.

THE COURT:  But they were responsible to know how their numbers were being used.

MR. DOWD:  No, I understand that.

THE COURT:  And their numbers were being used in a way that you considered and you were likely to prove to be false and misleading.

MR. DOWD:  But it was a risk.  And you look at some of these other people that filed opt-out cases, they weren't taking that risk.

THE COURT:  I don't mean to denigrate what you did. Because I think what you did was very good.  A 50 percent discount of proveable damage is a much lower figure than that, because the number of over $2 billion ascribable to the overall

K1NAARCHps

damage is subject to many, many pitfalls, failures of claims and the like.  So your achieving over a billion dollars is highly significant.

MR. DOWD:  Thank you.

THE COURT:  And I don't want to take away from it.  I think you did outstanding work.  I think you have to be rewarded for your persistence and your stubbornness and for your leadership in the case.  You stood up to the most powerful law firms in the City of New York and were their equal.

MR. DOWD:  Thank you, your Honor.

THE COURT:  However, your lodestar rates for partners are pretty high.

MR. DOWD:  They're also lower than the rates of the firms on the other side.

THE COURT:  Yes.  But they had to get it on a pay-as-you-go basis, and you're getting it from me.

MR. DOWD:  Well, that's even better, your Honor.

THE COURT:  You have a significantly lower expense.

MR. DOWD:  They're $1500 an hour, your Honor.

THE COURT:  I know.

MR. DOWD:  They got it in 2014 and 2015, some of these firms.  That money is worth 50 percent more now, because they got it then and they had higher rates than us.  You know, I mean, it's not -- our rates are not high, you know what.  I mean --

K1NAARCHps

THE COURT:  We have an imperfect world.

MR. DOWD:  I understand that.  But, you know, my world isn't much different from theirs when it comes to, you know, meeting salary obligations and funding expenses and everything else.  I don't get paid on the 30th day of every month like they do.

THE COURT:  Is the transportation from San Diego -- you're in San Diego, right?

MR. DOWD:  Yes, your Honor.

THE COURT:  And Ms. Wyman is in San Diego.

MR. DOWD:  Yes.

THE COURT:  Are your transportation costs chargeable as an expense?

MR. DOWD:  Yes, it is an expense.

THE COURT:  You're taking advantage of a lower cost structure in San Diego, significantly lower structure. Charging the transportation cost and asking to be paid New York rates, that's significant.

MR. DOWD:  Your Honor, our transportation costs were significantly higher because we cut out a lot of the airline fees.  So out of pocket I'm losing about 130 grand on that, your Honor.

THE COURT:  I'll take a short recess.

(Recess)

THE COURT:  I've considered the arguments, read the

fee justifications and the expense itemizations.  I find the lodestars of each of the firms reasonable and appropriate and the expenses reasonable as well.

My award for all of the counsel who will be sharing this fee is $100 million, plus allowance of expenses of $5,164,539.91.

It comes out to a multiplier of 1.376, but regardless of the accuracy of my arithmetic, the number is $100 million of fee and $5,164,539.91.

I believe that, in this case, as I said before, the services delivered by the Robbins Geller firm were outstanding, that Ms. Wyman, Mr. Dowd, and your colleagues, Mr. Rothman, did outstanding work.  I think in the fees of some of the other firms it was hard for me to see the same amount of productivity, in terms of obtaining the result, and in some cases whether or not all the fees that were presented were fees that should be allowed.  But it's very hard to pierce through this, as Mr. Dowd has suggested that everything went into the final result, and so I determined that each of the firms would be considered as having had a full lodestar, and that the add-on, the bonus, would be done in the aggregate for all firms.

How the fees are ultimately allocated is something, I guess, the firms are going to have to work out for themselves. As I understand it, I have no continuing jurisdiction, should

K1NAARCHps

there be any dispute.

There's no interest to be awarded on this amount. It will be paid, how did you say, about third, Mr. Dowd, one third on when?

MR. DOWD: Yes, your Honor. There's a third now, a third in 90 days, and a third on the initial distribution, the big distribution.

THE COURT: OK. And it will be payable by the funds that have already been paid by the defendants.

MR. DOWD: Yes, your Honor. The money, we got the money in October, your Honor.

THE COURT: All the money.

MR. DOWD: Yes. And that actually, if we had awaited the final approval like a lot of firms do -- they don't fight for that. We've made the class about $4 million on that alone, just by standing, holding out for that.

THE COURT: That's not unusual. Payment on the agreement.

MR. DOWD: A lot of people won't fight for it anymore, your Honor.

THE COURT: OK. That's my award. And I congratulate all of you. Thank you very much.

MR. DOWD: Thank you, your Honor.

MS. WYMAN: Thank you, your Honor.

MS. GUSIKOFF STEWART: Thank you, your Honor.

K1NAARCHps

MR. HOUSTON:  Your Honor --

THE COURT:  Two minutes.

MR. DOWD:  Your Honor, we have an order that we adjusted, I think we filed it yesterday, to reflect a third, a third, a third.  And I think our expenses went down about $9,000.

THE COURT:  Hand it up.  Then I'll talk to Mr. Houston.

MR. DOWD:  Oh, it has a percentage in it.  So if you want us to just submit one later?

THE COURT:  Yes.

MR. DOWD:  Or I can write it in now, whichever you prefer.

THE COURT:  You can write it in now.

Meanwhile, I'll hear from Mr. Houston.

MR. HOUSTON:  Your Honor, very briefly.  We had a couple issues with process on the submissions in the derivative matter.  We have asked for, with counsel for VEREIT, that we be given the opportunity to file a reply statement once they have gone through our time records and identified their issues.  We think this will create the greatest and clearest record.

THE COURT:  I think this is what you do.  Without giving me anything, give Mr. Edelman what you propose. Mr. Edelman will then give you his objections.  You will negotiate to whatever extent you feel appropriate.  And then

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K1NAARCHps

there will be a filing on a joint basis, just the way you do with a 2(e) letter, so I don't get separate filings. So just give me the outside date by which you can accomplish all that. Discuss it with Mr. Edelman. And then we'll issue an order.

MR. HOUSTON: Your Honor, that was the second issue. We have discussed some dates. We had asked for a month to put together the records in accordance with your Honor's directive on Tuesday.

THE COURT: How much time do you want?

MR. HOUSTON: OK. So we'll take that month. Mr. Edelman, how long do you want? Do you want your two weeks that you suggested, or longer than that, to review what we are submitting?

MR. EDELMAN: Your Honor, so as I understand it, you want us to do a joint letter.

THE COURT: At the end.

MR. EDELMAN: At the end?

THE COURT: Outlining the positions.

MR. EDELMAN: And do you want us to be limited to the page limits? Because as I understand it, Mr. Houston is planning on now submitting a different set of time records.

THE COURT: What do you propose?

MR. EDELMAN: I would propose that Mr. Houston submit whatever he wants to submit. To the extent that there was stuff in the time records that shouldn't have been in there,

K1NAARCHps

take them out, put them in a letter responding to our position.

We put in a letter responding to that.  And then your Honor is

in a position to decide.  And we do it as quickly as we can.

We've already had extensive briefing and argument on this.

MR. HOUSTON:  The only problem with that is that we

never did get the chance to respond to the initial issues.  And

Mr. Edelman has already said that, on review of the next

submission of records, there may be additional issues.

THE COURT:  Mr. Houston, February 21, you file with

the Court your submission, backed up by whatever supporting

data you think is appropriate.

Mr. Edelman, on March 13, you respond.

MR. EDELMAN:  Thank you, your Honor.

THE COURT:  And Mr. Houston, another week, March 20,

to reply.  And I'll endeavor to decide on the papers or, if I

need to see you, I'll do that as well.

OK?  Are those dates satisfactory?

MR. EDELMAN:  Thank you, your Honor.

MR. HOUSTON:  Yes.  Thank you, your Honor.

THE COURT:  All right.

Anything further?

MR. EDELMAN:  Yes.  Your Honor, on behalf of VEREIT

and, I think, all the counsel, we want to thank you for all

your work and your attention and your good humor throughout

what was a very contentious fight.  Thank you.

K1NAARCHps

MR. DOWD:  Thank you, your Honor.  And I would also thank your staff as well.  They were fabulous too.

THE COURT:  Yes.  The staff is fantastic and they make people look good, to the extent I look good.  Metaphorically speaking.

It's been a pleasure to have you.  It's not common to have a case this well argued, this well presented.  There were lots of discovery issues throughout.  Your ability to cooperate in this procedure that I have facilitated my work enormously, and where I couldn't resolve it, we had hearings on a short basis.  My goal in this, which I don't suppose was accomplished, was to reduce transaction costs as much as possible and move the case along as much as I could.  You'll judge me whether I succeeded or not, but that was my goal.  And I think it was facilitated by the way you cooperated with each other, while at the same time representing your respective clients most zealously.  So I thank you.

MR. DOWD:  Thank you.

MR. EDELMAN:  Thank you, your Honor.

MS. WYMAN:  Thank you, your Honor.

THE COURT:  When is finality, Mr. Dowd?

MR. DOWD:  Well, there's no objection, so it should be 30 days from judgment, which I believe the Court entered yesterday.

THE COURT:  What about my not giving a fee award yet?

K1NAARCHps

I've done everything in the class action.

MR. DOWD:  Oh, no, they are separate cases.  They weren't even consolidated ever.  They were coordinated for discovery but not consolidated, so my case is down right now, and it will be final in 30 days because there are no objections.

MR. EDELMAN:  Also, it's our understanding that the derivative judgment makes that case final and the fee issue is separate.

THE COURT:  Will be supplementary to the judgment.

MR. HOUSTON:  Yes.  That's right, your Honor.

THE COURT:  OK.  Thank you.

MR. DOWD:  Thank you.

MR. EDELMAN:  Thank you again, your Honor.

(Adjourned)

# EXHIBIT B

K6BKDEUC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

NORBERT G. KAESS, et al,

                Plaintiffs,

          v.                          09 CV 1714 (GHW)(RWL)
                                      Telephone Conference
DEUTSCHE BANK AG, et al.,

                Defendants.

------------------------------x
                                      New York, N.Y.
                                      June 11, 2020
                                      4:30 p.m.

Before:

                    HON. GREGORY H. WOODS,

                                      District Judge

                         APPEARANCES

GLANCY PRONGAY & MURRAY LLP
     Attorneys for Plaintiffs
BY:  BRIAN P. MURRAY
     -and-
ROBBINS GELLER RUDMAN & DOWD LLP
BY:  THEODORE J. PINTAR
     ERIC NIEHAUS
     KEVIN LAVELLE

CAHILL GORDON & REINDEL LLP
     Attorneys for Deutsche Bank Defendants
BY:  DAVID JANUSZEWSKI
     SAMUEL MANN

SKADDEN ARPS SLATE MEAGHER & FLOM LLP
     Attorneys for Underwriter Defendants
BY:  WILLIAM J. O'BRIEN
     ANDREW BEATTY

                SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

K6BKDEUC

(The Court and all parties appearing telephonically)

THE COURT:  This is Judge Woods.

Is there a court reporter on the line?

(Pause)

THE COURT:  Let me just say a few words at the outset of today's conference.

First, you should conceive of this conference as if it was happening in the courtroom.  As you know, the dial-in information for this call is publicly available; members of the public and the press are welcome to dial in.

Second, let me ask you to all keep your phones on mute at all times when you're not speaking on the phone.  I can hear some background noise right now, shuffling some paper.  We should not hear any background noise during the course of the conference.  Please keep your phones on mute at all times when you are not speaking during the conference.  That will help us to keep a clear record of what we say today.

Third, I'd like to ask each of the people who will speak during this conference to please identify themselves each time that they speak during this conference.  So, if you speak during this conference, you should say your name each time that you speak.  You should do that regardless of whether or not you've spoken previously during the conference.  That will help us to keep a clear record of today's conference.

Last, as you've heard, there is a court reporter on

K6BKDEUC

the line.  You should not be surprised if he chimes in at any point.  If he does, and if he asks you to do something to help him to hear or understand what you're saying, please do what he asks.  That will help us to, again, keep a clear record of the conference today.

Because there is a court reporter on the line transcribing the conference, I'm ordering that there be no recordings or rebroadcasts of any portion of the conference.

So, with those introductory remarks in hand, let me turn to the parties.

I'd like to ask for counsel for each side to identify counsel who are on the line for each of the parties and any representatives for each of the parties.  What I'm going to ask is that, if you can, that one person from each side identify herself and the members of her team; that way, we won't have to hear many people chiming in at a time.

So let me begin with counsel for plaintiffs.

Who's on the line for plaintiffs?

MR. PINTAR:  Good afternoon, your Honor.  It's Ted Pintar, and I'm here with Eric Niehaus and Kevin Lavelle, from Robbins Geller Rudman & Dowd, for plaintiffs.

THE COURT:  Good.  Thank you very much.

Who is on the line for defendants?

MR. MURRAY:  Excuse me.  I hate to interrupt, but this is also for plaintiffs, Brian Murray, from Glancy Prongay &

K6BKDEUC

Murray. Sorry to interrupt you.

Now the defendants.

THE COURT: Fine.

Counsel for defendants?

MR. JANUSZEWSKI: Good afternoon, your Honor. This is David Januszewski, and I have my colleague, Samuel Mann. We are both from Cahill Gordon & Reindel, representing Deutsche Bank and the Deutsche Bank defendants. And on the line, we also have, from Deutsche Bank, Stella Tipi, in-house counsel at Deutsche Bank.

THE COURT: Good. Thank you very much.

So, counsel --

MR. O'BRIEN: I'm sorry. Good afternoon, your Honor. I just wanted to introduce myself and my colleagues. William J. O'Brien and Andrew Beatty, from the firm of Skadden Arps Slate Meagher & Flom, on behalf of the underwriter defendants.

THE COURT: Good. Thank you very much.

So, counsel, first, let me thank you all for being on the call. I scheduled this conference as a settlement hearing or approval hearing with respect to the proposed resolution of this case. I have reviewed all of the materials that have been submitted on the docket to date in connection with this matter. I'd like to hear, however, from each of the parties, to hear, in particular, if there's anything that any of you would like to add to any of your written submissions in connection with

K6BKDEUC

the proposed resolution of the case.

Let me begin with counsel for plaintiffs.

Counsel?

MR. PINTAR:  Again, good afternoon, your Honor.  Ted Pintar, for plaintiffs.

I had a number of things I wanted to mention just at the outset.  Obviously, we're here on the final approval of an $18.5 million settlement.  We are very proud of that result. As we have indicated, and I won't repeat all of what's in the papers, but it represents a very significant percentage of reasonably recoverable damages.

On February 27, 2020, this Court entered its preliminary approval order.  Pursuant to that order, notice was disseminated.  The claims administrator mailed over 112,000 notice packages, published the summary notice in the Wall Street Journal and Business Wire, and set up a settlement website where the notice and other settlement-related documents were posted.

And, as a result, there was one objection.  It's not clear to me whether that has been withdrawn.  I won't attempt to characterize Mr. Agay's email.  We submitted it to the Court.  He indicates, however, that he would not be participating today.  There were only four opt-outs.  And I do have some information on claims to date.  Over 11,000 claims have been submitted, and they are still processing claims --

K6BKDEUC

the mailed claims, so that number is likely to rise even from there.

So, we believe that not only is it a good settlement, that the class has reacted very positively to it, and, as you know, today we're asking the Court to enter three orders: The final judgment, the order approving plan of allocation, and the order awarding attorneys' fees and expenses and award to class plaintiffs. Other than that, your Honor, I certainly don't have anything to add to our papers. I'm happy to address any questions the Court may have, though.

THE COURT: Good. Thank you very much, counsel.

Let me hear from each of the groups of defendants.

First, counsel for the Deutsche defendants.

MR. JANUSZEWSKI: Yes, your Honor. Again, this is David Januszewski, from Cahill Gordon.

We have nothing to add to what was submitted, which was designed to address the objection that my friend just addressed. We have nothing to add to that.

THE COURT: Good. Thank you very much.

Counsel for the remaining defendants, anything that you'd like to add to your written submissions?

MR. O'BRIEN: Yes. William O'Brien, from the firm of Skadden Arps Slate Meagher & Flom, on behalf of the underwriter defendants.

And like Mr. Januszewski, we have nothing further to

K6BKDEUC

add.

THE COURT:  Good.  Thank you very much.

Is there anyone else on the line who wishes to be heard?

So, hearing none, counsel, I'm going to approve the proposed resolution of this action, or series of actions.  What I'd like to do is to ask you to place your phones, again, on mute, if you would, please.  I'd like to review the reasoning for my decision.  I'm going to do so now orally.  At the end, I'll take up the two orders and judgment that the parties have proposed.  Let me begin with, first, an overview.

So, I. Overview:

Plaintiffs brought this securities class action in February 2009 on behalf of all persons who purchased the 7.35 percent Noncumulative Trust Preferred Securities of Deutsche Bank Capital Funding Trust X and/or the 7.60 percent Trust Preferred Securities of Deutsche Bank Contingent Capital Trust III securities from Deutsche Bank AG pursuant to public offerings from November 6, 2007, to February 14, 2008. Plaintiffs allege that defendants violated Sections 11, 12(a)(2), and 15 of the Securities Act (the "Securities Act") and (15, U.S.C., Section 77k, 771(a)(2), and 77o) by omitting material facts from the offering documents.  See declaration of Eric I. Niehaus ("Niehaus dec."), Docket No. 308, paragraph 3.

Since then, plaintiffs have extensively litigated this

K6BKDEUC

case.  The parties have engaged in significant motion practice, and have completed fact discovery.  Niehaus declaration paragraphs 3-4.  Now, plaintiffs seek final approval of the class action settlement and approval of their plan for allocating the net proceeds of the settlement.  Plaintiffs' counsel also seek an award of attorneys' fees and litigation costs, and the lead plaintiffs seek an award for expenses incurred while representing the class.

Judge Batts presided over this case for almost the entire time that it has been pending in this court.  The case was reassigned to me on February 20, 2020, after Judge Batts' untimely death.

II. Class Certification:

On October 2, 2018, pursuant to Rule 23 of the Federal Rules of Civil Procedure, Judge Batts granted plaintiffs' motion to certify a class defined as:  All persons or entities who purchased or otherwise acquired the 7.35 percent Noncumulative Trust Preferred Securities of Deutsche Bank Capital Funding Trust X ("7.35 percent Preferred Securities"), and/or the 7.60 percent Trust Preferred Securities of Deutsche Bank Contingent Capital Trust III ("7.60 percent Preferred Securities"), pursuant or traceable to the public offerings that commenced on or about November 6, 2007, and February 14, 2008.  Excluded from the class are defendants, the officers and directors of Deutsche Bank, and the underwriter defendants at

K6BKDEUC

all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns and any entity in which defendants have or had a controlling interest.  Docket No. 224 at 10.

III.  Approval of the Settlement Agreement:

Rule 23(e) requires court approval for a class action settlement to ensure that it is procedurally and substantively fair, reasonable, and adequate.  Federal Rule of Civil Procedure 23(e).  To determine procedural fairness, courts examine the negotiating process leading to the settlement. Wal-Mart Stores, Inc. v. Visa USA, Inc., 396 F.3d 96, 116 (2d Cir. 2005).  To determine substantive fairness, courts analyze whether the settlement's terms are fair, adequate, and reasonable according to the factors set forth in City of Detroit v. Grinnell Corp., 495 F.2d 448 (2d Cir. 1974).

The court examines procedural and substantive fairness in light of the "strong judicial policy favoring settlements" of class action suits.  Wal-Mart Stores, 396 F.3d at 116.  A "presumption of fairness, adequacy, and reasonableness may attach to a class action settlement reached in arm's-length negotiations between experienced capable counsel after meaningful discovery."  Id.  "Absent fraud or collusion, [courts] should be hesitant to substitute [their] judgment for that of the parties who negotiated the settlement."  In re EVCI Career Colls. Holding Corp. Sec. Litig., 2007 WL 2230177, at *4

K6BKDEUC

(S.D.N.Y. July 27, 2007).

A. Procedural Fairness:

The settlement is procedurally fair, reasonable, adequate and not a product of collusion.  The settlement was reached after the parties had conducted a thorough investigation and evaluated the claims and defenses; the agreement in principle was reached after sessions with the Honorable Judge Layn R. Phillips, a former United States District Judge and an experienced mediator of securities class actions and other complex litigation.  Niehaus declaration paragraph 6, 129.  In advance of the mediation, the parties exchanged detailed mediation statements addressing both liability and damages.  Id.  The parties reached a final resolution on September 12, 2019, with the assistance of Judge Phillips, after formal mediation.  Id.

B. Substantive Fairness:

The settlement is also substantively fair.  The factors set forth in Grinnell provide the analytical framework for evaluating the substantive fairness of a class action settlement.  The Grinnell factors are:  (1) the complexity, expense, and likely duration of the litigation; (2) the reaction of the class; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the

K6BKDEUC

ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund to a recovery in light of all of the attendant risks of litigation.  Grinnell 295 F.2d at 463. Litigation here through trial will be complex, expensive, and long.  It has been complex, expensive, and long.  Thus, the first Grinnell factor weighs in favor of final approval.  See In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig., 330 F.R.D. 11, 36 (E.D.N.Y 2019) ("Settlement is favored if settlement results in substantial and tangible present recovery, without the attendant risk and delay of trial.").

With respect to the second factor, the class members' reaction to the settlement has been overwhelmingly positive. Of the 112,397 notice packets mailed to potential members of the settlement class, four exclusion requests were received. Supplemental declaration of Ross D. Murray (Supplemental Murray Dec.") Docket No. 324, Paragraphs 4, 6.  Only one class member, Mr. Richard Agay, objected.  See Richard Agay letter ("Agay letter") Docket No. 320-21.

That objection did not challenge the settlement, the resolution of this case, the reasons for the settlement, the manner in which class plaintiffs and lead counsel prosecuted the litigation, the work lead counsel performed, or lead

K6BKDEUC

counsel's fee and expense application.  Instead, the objection asserted only that Mr. Agay received his copy of the notice late, and that he was confused by certain aspects of the submission, and that the claims administrator did not sufficiently respond to Mr. Agay's telephonic inquiry.  On June 5, 2020, Mr. Agay emailed lead counsel in an email that I construe as him withdrawing his objections, perhaps because he recognized that he was apparently persuaded by the response of the parties showing that he was not entitled to recovery in the suit.  See Docket No. 329.  While Mr. Agay received his notice later than expected, he received it with enough time to submit objections, and the delay was caused by a failure at his broker.  His objection does not suggest that the overall distribution or notice program was ineffective in design or execution.

The absence of objections, with the exception of one retail investor, who literally withdrew his objection, coupled with the minimal number of requests for exclusion, strongly supports the finding that the settlement plan of allocation and fee and expense requests are fair, reasonable, and adequate. See In re Citigroup, Inc. Sec. Litig., 965 F. Supp. 2d 369, 382 (S.D.N.Y. 2013); In re Bisys Sec. Litig., 2007 WL 2049726, at *1 (S.D.N.Y. July 16, 2007); In re Veeco instruments Inc. Sec. Litig., 2007 U.S. Dist. LEXIS 85629, at *40.

In sum, the overall favorable response demonstrates

K6BKDEUC

that the class approves of the settlement and supports final approval.

The plaintiffs completed fact discovery, so counsel "had an adequate appreciation of the merits of the case before negotiating."  Beckman v. KeyBank, N.A., 293 F.R.D. 467, 475 (S.D.N.Y. 2013)(quoting In re Warfarin Sodium Antitrust Litig., 391 F.3d 516, 537 (3rd Cir. 2004); see also Niehaus declaration paragraph 5.  Lead plaintiffs spent significant time and resources analyzing and litigating the legal and factual issues of this case, including an extensive factual and legal investigation into the settlement class's claims and engaging in the detailed formal mediation process.  Niehaus declaration paragraph 5.

Turning to the fourth and fifth factors, the risk of establishing liability and damages further weighs in favorable of final approval.  "Litigation inherently involves risks."  In re PaineWebber Ltd. Partnerships Litig., 171 F.R.D. 104, 126 (S.D.N.Y. 1997).  Indeed, the primary purpose of settlement is to avoid the uncertainty of a trial on the merits.  See Velez v. Majik Cleaning Serv., Inc., 2007 WL 7232783, at *6 (S.D.N.Y. June 25, 2007).  Here, plaintiffs face significant risks as to both liability and damages; defendants challenged the premise that the allegedly omitted information was material and the notion that plaintiffs could prove that the drop in price was related to the allegedly omitted information.  See Niehaus

K6BKDEUC

declaration paragraphs 106, 115 to 17.  The proposed settlement eliminates these uncertainties.  These factors, therefore, weigh in favor of final approval.

The risk of obtaining class certification is nonexistent here.  Therefore, the sixth Grinnell factor weighs in favor of final approval.  Settlement generally eliminates the risk, expense, and delay inherent in the litigation process as a whole.

Turning to the seventh factor, there is nothing to suggest that Deutsche Bank or the underwriter defendants would be unable to withstand a greater judgment than the settlement amount.  "But a defendant is not required to empty its coffers before a settlement can be found adequate."  Shapiro v. JP Morgan & Co., 2014 WL 1224666, at *11 (S.D.N.Y. Mar. 24, 2014)(quotation omitted).

Deutsche Bank's financial circumstances -- or I should say the defendants' financial circumstances do not ameliorate the force of the other Grinnell factors, which lead to the conclusion that the settlement is fair, reasonable, and adequate.

Finally, the amount of the settlement, in light of the best possible recovery and the attendant risks of litigation, weighs in favor of final approval.  The determination of whether a settlement amount is reasonable "is not susceptible of a mathematical equation yielding a particularized sum."  In

K6BKDEUC

re Austrian & German Bank Holocaust Litig., 80 F.Supp. 2d 164, 178 (S.D.N.Y. 2000).  Instead, "There is a range of reasonableness with respect to a settlement – a range which recognizes the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion."  Newman v. Stein, 464 F.2d 689, 693 (2d Cir. 1972).

Here, lead plaintiffs assert that the settlement would constitute 47 percent of the estimated recoverable damages. Niehaus declaration paragraph 19.  This is a reasonable result when compared to the median ratio of settlement to investor losses of 2.1 percent for securities class action settlements in 2019.  Id.  Therefore, the amount of this immediate recovery is reasonable, and this factor weighs in favor of final approval.

Weighing the Grinnell factors, I find that the settlement is substantively fair and weigh in favor of final approval.

IV.  Plan of Allocation:

"To warrant approval, the plan of allocation must also meet the standards by which the settlement was scrutinized – namely, it must be fair and adequate...an allocation formula need only have a reasonable, rational basis, particularly if recommended by experienced and competent class counsel."  In Re WorldCom, Inc. Sec. Litig., 388 F. Supp. 2d

K6BKDEUC

319, 344 (S.D.N.Y. 2005)(citation and quotation omitted). "A plan of allocation need not be perfect," in re EVCI Career Colleges Holding Corp. Sec. Litig., 2007 WL 2230177, at *11 (S.D.N.Y. July 27, 2007)(collecting cases), or "tailored to the rights of each plaintiff with mathematical precision," PaineWebber, 171 F.R.D. at 133; see also RMed International, Inc. v. Sloan's Supermarkets, Inc., 2000 WL 420548, at *2 (S.D.N.Y. April 18, 2000) (recognizing that "aggregate damages in securities fraud cases are generally incapable of mathematical precision"). Thus, "In determining whether a plan of allocation is fair, courts look primarily to the opinion of counsel." In re EVCI Career Colleges Holding Corp. Sec. Litig., 2007 WL 2230177, at *11.

Lead counsel, who are experienced and competent in complex class actions, prepared the plan of allocation in connection with plaintiffs' damages expert. Niehaus declaration paragraphs 100, 134. The settlement fund, minus attorneys' fees and expenses, will be allocated on a pro rata basis according to the relative size of class members' "Recognized claims." Id. at paragraphs 9, 10. The expert has calculated an estimated individual class members' claim based on (i) allegations when the alleged concealed facts and trends became known (i.e., realization events); (ii) an event study that estimates price changes in the securities as a result of realization events; and (iii) the statutory formula used to

K6BKDEUC

calculate recoverable damages during the settlement class period.  Declaration of Steven P. Feinstein ("Feinstein dec"), Docket No. 177-1, paragraphs 29-42.

Because the plan of allocation has a clear rational basis, equitably treats the class members, and was devised by experienced and estimable class counsel, the Court finds it fair and adequate.  See In re Telik, Inc. Sec. Litig., 576 F.Supp. 2d, 570, 581 (S.D.N.Y. 2008).

V.   Dissemination of Notice:

On February 27, 2020, the Court entered an order granting preliminary approval of the settlement as "fair, reasonable and adequate" to class members.  In accordance with that order, lead counsel retained Gilardi & Co. LLC ("Gilardi") as claims administrator to supervise and administer the notice procedure in connection with the settlement and to process all claims.  Declaration of Ross D. Murray ("Murray dec"), Docket No. 310, paragraph 2.

Gilardi sent a copy of the notice to potential members of the settlement class.  First, Gilardi mailed, by first class mail, the notice packet to 283 nominees - banks, brokerage companies, and other institutions - that Gilardi had in its proprietary database.  Id. at paragraph 5.

Next, Gilardi mailed the notice packet to 4,643 additional institutions or entities on the U.S. Securities and Exchange Commission's ("SEC") list of active brokers and

K6BKDEUC

dealers.  Id. paragraph 5.

Gilardi also delivered electronic copies of the notice packet to 381 registered electronic filers, primarily institutions and third-party filers, and to the depository trust company ("DTC") on the DTC legal notice system ("LENS"), which enables bank and broker nominees to contact Gilardi for copies of the notice for their beneficial holders.  Id. paragraph 7.  Gilardi received multiple responses and additional names of potential settlement class members from individuals or other nominees, with requests for over 64,000 notice packets to be forwarded directly to nominees' customers.  Id. paragraph 9.  Gilardi also published the summary notice in the Wall Street Journal and transmitted it over Business Wire.  Id. paragraph 11.  Gilardi also posted the date and time of the hearing on the settlement website.  Id. paragraph 12.

Gilardi ultimately mailed a total of 112,397 notice packets, including mailing notice packets to persons a second time when the first set were returned as undeliverable.  Supplemental Murray declaration paragraph 4.

These notices apprised settlement class members, among other things, of: (i) the amount of the settlement; (ii) the reasons why the parties are proposing the settlement; (iii) the maximum amount of attorneys' fees and expenses that will be sought; (iv) the identity and contact information for representatives of lead counsel available to answer questions

K6BKDEUC

concerning the settlement; (v) the right of settlement class members to object to the settlement; (vi) the right to request exclusion from the settlement class; (vii) the binding effect of a judgment on settlement class members; (viii) the dates and deadlines for certain settlement-related events; and (ix) the way to obtain additional information about the action and the settlement by contacting lead counsel and the settlement administrator.  See Federal Rule of Civil Procedure 23(c)(2)(B).

I find that these efforts fairly and adequately advised class members of the terms of the settlement, as well as the right of Rule 23 class members to opt out of, or to object to the settlement, and to appear at the final fairness hearing today.  I find that the notice and its distribution comported with all constitutional requirements, including those of due process.

VI.  Attorneys' Fees, Costs and Expenses:

Lead counsel requests attorneys' fees in the amount of what the Court calculates to be $6,166,666.67 plus interest earned at the same rate as the settlement fund.  This amounts to one-third of the settlement fund, or 33.3 percent of the settlement fund.  Lead counsel also seeks reimbursement of: (i) $1,203,502.39 in litigation expenses in total, with Robbins Geller Rudman & Dowd LLP ("Robbins Geller") seeking $1,170,981.31, Glancy Prongay & Murray seeking $28,740.22, and

K6BKDEUC

Murray Frank LLP seeking $3,780.86; and (ii) to approve the award to the lead plaintiffs, or class plaintiffs, of "20,000 in the aggregate pursuant to 15, U.S.C., Section 77Z-1(a)(4) in connection with their representation of the class."  Niehaus declaration paragraph 17.

Now, the trend in the Second Circuit is to use the percentage of the fund method to compensate attorneys in common fund cases, although the Court has discretion to award attorneys' fees based on the lodestar method or the percentage of recovery method.  See Fresno County Employees' Ret. Association v. Isaacson/Weaver Family Trust, 925 F.3d 63, 68 (2d Cir. 2019).

The notice provided to class members advised that class counsel would apply for attorneys' fees for up to 33.3 percent of the settlement fund, in addition to litigation costs not to exceed 1.3 million.  See Gilardi declaration Exhibit A Notice at 2.  No class member objected to the request.

A. Goldberger Factors:

Reasonableness is the touchstone when determining whether to award attorneys' fees.  In Goldberger v. Integrated Resources, Inc., 209 F.3d 43 (2d Cir. 2000), the Second Circuit set forth the following six factors to determine the reasonableness of a fee application:  (1) the time and labor expended by counsel; (2) the magnitude and complexities of the

K6BKDEUC

litigation; (3) the risk of the litigation; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations.  Id at 50.

1.  Class Counsel's Time and Labor:

Plaintiffs' counsel have expended more than 26,000 hours of attorney time in total over the course of this action, the vast majority of which was time expended by of counsel at Robbins Geller.  Declaration of Eric Niehaus in support of lead counsel's motion for an award of attorneys' fees ("Niehaus fee declaration"), Docket No. 311 paragraph 5.  Niehaus declaration paragraph 135.

2.  Magnitude and Complexity of the Litigation:

The size and difficulty of the issues in a case are significant factors to be considered in making a fee award.  In re Prudential Sec, Inc. Ltd. Partnership Litig., 912 F. Supp. 97, 100 (S.D.N.Y. 1996).  "In evaluating the settlement of a securities class action, federal courts, including this Court, have long recognized that such litigation is notably difficult and notoriously uncertain."  In re Flag Telecom Holdings Ltd. Sec. Litig., 2010 WL 4537550, at *15 (S.D.N.Y. Nov. 8, 2010) (quotation omitted).  This case is one of substantial magnitude.  In addition to all of the complications that are attendant to any large securities class action, this matter involved events that happened over ten years ago, extensive discovery, and litigation.  The amount sought by plaintiffs'

K6BKDEUC

counsel is commensurate with the magnitude and complexity of this litigation.

3.    The Risk of Litigation:

As discussed, lead counsel faced significant risk in prosecuting this action and proving the merits of the claims. All of the fact-finding has concluded.  Given the complexity of the case, the risk at summary judgment and trial is significant.  Defendants adamantly denied any wrongdoing, and, in the event that litigation had continued, would have continued to aggressively litigate their defenses through summary judgment, Daubert motions, trial, and any appeals.

4.    Quality of Representation:

Lead counsel has considerable expertise in securities litigation.  See Robbins Geller resume, Niehaus fee declaration, Exhibit G; see also declaration of Brian P. Murray filed on behalf of Glancy Prongay & Murray LLP in support of application for award of attorneys' fees and expenses ("Murphy fee declaration").  Robbins Geller attorneys are currently "lead or [are] named counsel in hundreds of securities class action or large institutional-investor cases" and are "responsible for the largest securities class action in history."  Niehaus fee declaration, Exhibit G.  RiskMetrics Group has recognized Glancy Prongay & Murray as one of the top plaintiffs' law firms in the United States in its securities class action services report for every year since the inception

K6BKDEUC

of the report in 2003.  See Murphy fee declaration, Exhibit I.

The high quality of defense counsel opposing plaintiffs' efforts further proves the caliber of representation that was necessary to achieve the settlement. Cahill Gordon & Reindel and Skadden Arps Slate Meagher & Flom are two prominent defense firms, and "the ability of plaintiffs' counsel to obtain a favorable settlement for the class in the face of such formidable opposition confirms the quality of their representation of the class."  In re Marsh ERISA Litig., 265 F.R.D. 128, 148 (S.D.N.Y. 2010).

Accordingly, the Court finds that this Goldberger factor weighs in favor of the requested fee award.

5.  The Requested Fee in Relation to the Settlement:

Generally, courts consider the size of a settlement to ensure that the percentage awarded does not constitute a windfall.  In this case, the requested fee is 33.3 of the settlement, within the range of reasonableness, in light of other class action settlements in this circuit.  See Mohney v. Shelly's Prime Steak, Stone Crab & Oyster Bar, 2009 WL 5851465, at *5 (S.D.N.Y. Mar. 31, 2009)("Class counsel's request for 33 percent of the settlement fund is typical in class action settlements in the Second Circuit.").

6.  Public Policy Considerations:

When determining whether a fee award is reasonable, courts consider the social and economic value of the class

action "and the need to encourage experienced and able counsel to undertake such litigation."  In re Sumitomo Copper Litig., 74 F. Supp. 2d 393, 399 (S.D.N.Y. 1999).  "Courts have, as a generic matter, frequently observed that the public policy of vigorously enforcing the federal securities laws must be considered in calculating an award."  In re BioScrip, Inc. Sec. Litig., 273 F.Supp. 3d 474, 502 (S.D.N.Y. 2017)(quotation omitted) affirmed sub nom.  Fresno County Employees Retirement Association v. Isaacson/Weaver Family Trust, 925 F.3d 63 (2d Cir. 2019).

Vigorous, private enforcement of the federal securities laws can only occur if private investors can obtain some parity in representation with that available to large corporate defendants.  Accordingly, public policy favors granting lead plaintiffs' fee request.

After considering all of the Goldberger factors, the requested fee award appears to be reasonable.

B.  Lodestar "Cross Check":

In Goldberger, the Second Circuit "encouraged the practice of requiring documentation of hours as a 'cross check' on the reasonableness of the requested percentage."  Goldberger, 209 F.3d at 50.  "Of course, where used as a mere cross-check, the hours documented by counsel need not be exhaustively scrutinized by the district court."  Id.

As of April 17, 2020, plaintiffs' counsel have

SOUTHERN DISTRICT REPORTERS, P.C.

K6BKDEUC

expended over 26,000 hours in total in this case, resulting in a total lodestar of $16,069,646.  Niehaus fee declaration paragraph 4, Exhibit A; Murphy fee declaration, Exhibit A. Robbins Geller expended 17,356.85 hours with a lodestar of $12,021,477, Glancy Prongay & Murray LLP expended 8,097.8 hours with a lodestar of $3,639,826.50, the Frank Murray LLP expended 562.2 hours with a lodestar of $355,902.50.  Id.  Plaintiffs' counsel submitted declarations and time reports in support of their motion for attorneys' fees.  Id.  Counsel submitted a summary time records detailing the billable rate and hours worked by each attorney and professional support staff in this case.  I find that these billable rates based on the timekeeper's title, specific years of experience, and market rates for similar professionals in their fields nationwide and in New York, where Robbins Geller LLP is based, to be reasonable in this context.

Based on plaintiffs' counsel's requested fee - one-third of the settlement, or by the Court's calculation, $6,166,666.67 - the lodestar yields a negative "cross-check" multiplier of about 0.38; therefore, the fee is well below the typically awarded multipliers in this circuit. "Courts regularly award lodestar multipliers from 2 to 6 times lodestar in this circuit."  Fleisher v. Phoenix Life Insurance Company, 2015 WL 10847814, at *18 (S.D.N.Y. Sept. 9, 2020)(quotation omitted)(collecting cases).  Thus, the lodestar

K6BKDEUC

"cross-check" confirmation that plaintiffs' counsel requested fee is reasonable.

The Court therefore finds that, based on the Goldberger factors and the lodestar "cross-check," that plaintiffs' counsel's requested fees are reasonable.

C.   Litigation Expenses:

Plaintiffs' counsel requests $1,203,502.39 total in litigation expenses, including filing fees, process service, mailing expenses, document management and hosting services, investigative and expert witnesses, legal research, travel and mediation.  See Niehaus fee declaration paragraph 5, Exhibit B. Robbins Geller seeks $1,170,981.31, Glancy Prongay & Murray seeks $28,740.22, and Murray Frank LLP seeks $3,780.86.  The largest component of plaintiffs' counsel's expenses was the cost of experts and consultants, amounting to $750,458, or approximately 62 percent of total expenses.  Niehaus fee declaration paragraph 6.  The next largest components of plaintiffs' counsel's expenses were for transportation, hotels, and meals ($227,852.66), court transcripts and deposition materials ($68,030.54), and mediation ($27,210).  See Niehaus fee declaration, Exhibit B.  The notice disclosed that lead counsel would seek up to $1,300,000 in litigation expenses.  No objection to these expenses was received.

"It is well-established that counsel who create a common fund are entitled to the reimbursement of expenses that

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

they advance to a class."  In re Giant Interactive Group, Inc., 279 F.R.D. 151, 165 (S.D.N.Y. 2011); see also In re Indep. Energy Holdings, 302 F.Supp. 2d 180, 183 Note 3 (S.D.N.Y. 2003).  "Attorneys may be compensated for reasonable out-of-pocket expenses incurred and customarily charged to their clients as long as they were 'incidental and necessary to the representation of those clients.'" (quotation omitted).  The expenses for which lead counsel seeks payment are the type of expenses that courts typically approve.  See In re Global Crossing Sec. & ERISA Litig., 225 F.R.D. 436, 468 (S.D.N.Y. 2004).  Therefore, the Court finds that the requested litigation expenses are reasonable and necessary to the representation of the class and are appropriately reimbursed to class counsel.

          D.  Lead Plaintiffs' Expenses:

          Lead plaintiffs seek an award of $20,000 for both of them in recognition of the time and expense that they incurred on behalf of the class.  Motion in support, Docket No. 307, at 31; see also Niehaus declaration paragraph 17.  15, U.S.C., Section 77Z-1(a)(4) allows "the award of reasonable costs and expenses (including lost wages) directly relating to the representation of the class to any representative party serving on behalf of a class."

          As set forth in their declaration, lead plaintiffs dedicated a significant amount of time to the successful

K6BKDEUC

prosecution of this action, including by reviewing pleadings and motions, discussing strengths and risks of the case, and consulting with lead counsel regarding settlement.  Kaess and Farrugio declaration paragraphs 2 through 12.  These are the kinds of activities which regularly are found to support awards to class representatives.

As set forth in their declaration, lead plaintiffs assert that the value of their time and resources invested in this case is substantially in excess of the $20,000 award that they seek here.  Id.  And the application here is consistent with the notice, which disclosed that "Class plaintiffs may seek an award pursuant to 15, U.S.C., Section 77z-1(a)(4) in connection with their representation of the class in an amount not to exceed $20,000 in the aggregate."  Murphy fee declaration, Exhibit A notice.

Thus, I find that the requested award of $20,000 to lead plaintiffs is reasonable.

VII.  Conclusion:

In conclusion, I approve the class action settlement for $18,500,000 and approve the plan for allocating the net proceeds of the settlement.  I also award plaintiffs' counsel attorneys' fees in the amount of what the Court calculates to be $6,166,666.67, plus interest earned at the same rate as the settlement fund.  This amounts to one-third of the settlement fund, or 33.3 percent of the settlement fund.  I am also

K6BKDEUC

awarding $1,203,502.39 in litigation expenses to be divided as outlined by lead counsel.  Finally, I award lead plaintiffs $20,000 in the aggregate for time and expenses incurred while representing the class.

So, counsel, thank you very much for your patience as I got through the reasoning for my decision to approve the settlement here.

I received the proposed orders and judgment, and I expect to act on those promptly after today's conference.

Is there anything else that we should take up now, before we adjourn?

First, counsel for plaintiffs?

MR. PINTAR:  Not for plaintiffs, your Honor.  Again, Ted Pintar.  Thank you very much.

THE COURT:  Thank you.

Counsel for the Deutsche Bank defendants?

MR. JANUSZEWSKI:  Your Honor, David Januszewski.

Nothing else from us.

THE COURT:  Good.  Thank you.

Counsel for the underwriter defendants?

MR. O'BRIEN:  Yes.  William O'Brien, from Skadden Arps Slate Meagher & Flom LLP.

Nothing further from us as well.

THE COURT:  Good.  Thank you, all.

COUNSEL:  Thank you.   * * *