UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| MARK A. RODRIGUEZ, Individually and on Behalf of All Others Similarly Situated, | : : : | Civil Action No. 1:20-cv-00982 <br><br> CLASS ACTION |
| Plaintiff, | : : : | |
| vs. | : : : | |
| CPI AEROSTRUCTURES, INC., DOUGLAS McCROSSON and VINCENT PALAZZOLO, CANACCORD GENUITY LLC and B. RILEY FBR, | : : : : | |
| Defendants. | : : | |
| RUSSELL GARRETT, Individually and on Behalf of All Others Similarly Situated, | : : : | Civil Action No. 1:20-cv-01026 <br><br> CLASS ACTION |
| Plaintiff, | : : : | |
| vs. | : : : | |
| CPI AEROSTRUCTURES, INC., DOUGLAS McCROSSON and VINCENT PALAZZOLO, CANACCORD GENUITY LLC and B. RILEY FBR, | : : : : | |
| Defendants. | : : | |

**DECLARATION OF ALAN I. ELLMAN IN SUPPORT OF MOTIONS FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND APPROVAL OF PLAN OF ALLOCATION AND AN AWARD OF ATTORNEYS' FEES AND EXPENSES**

4895-1294-9799.v1

I, ALAN I. ELLMAN, hereby declare under the penalty of perjury as follows:

1.      I am an attorney duly licensed to practice law in the State of New York and am admitted to practice in this Court.  I am a member of the law firm of Robbins Geller Rudman & Dowd LLP ("Robbins Geller"), co-Lead Counsel for the Court-appointed lead plaintiff, Jeffrey L. Feinberg, individually and as trustee and beneficiary of the Jeffrey L. Feinberg Personal Trust ("Lead Plaintiff").  I have been actively involved in the prosecution and resolution of the above-captioned actions ("Action" or "Litigation"), am familiar with its proceedings, and have knowledge of the matters set forth herein based upon my active participation in the Action and the supervision of, or communications with, other individuals who helped prosecute this Action.[1]

2.      I respectfully submit this declaration pursuant to Rule 23 of the Federal Rules of Civil Procedure, in support of: (a) Lead Plaintiff's request for final approval of the all-cash settlement of $3,600,000 (the "Settlement"); (b) Lead Plaintiff's request for approval of the proposed Plan of Allocation; and (c) Lead Counsel's application for an award of attorneys' fees and expenses.

## I.      INTRODUCTION AND OVERVIEW

3.      Lead Plaintiff has achieved a very good settlement for the Class.  The Settlement provides for the payment of $3,600,000 in cash for the benefit of the Class in exchange for a release of the Released Claims (as defined in the Stipulation) against the Defendants.  As described herein, the Settlement is the product of Lead Plaintiff's and Lead Counsel's careful analysis and vigorous litigation of the claims and defenses.  Specifically, and as further detailed below, Lead Counsel conducted a comprehensive investigation of the factual basis for the operative complaint, opposed Defendants' motion to dismiss, and participated in a mediation session with Defendants that was

---

[1]      Capitalized terms not otherwise defined herein have the same meanings as that ascribed to them in the Stipulation of Settlement (ECF 54-2) (the "Stipulation").

4895-1294-9799.v1

overseen by John R. Van Winkle, a nationally recognized mediator experienced in class actions (the "Mediator"). With the assistance of the Mediator, the parties reached an agreement to settle this Action on May 20, 2021.

4. As explained below and in the accompanying Memorandum of Law, this Settlement takes into consideration the significant risks specific to this Litigation. While Lead Plaintiff and Lead Counsel believe that Lead Plaintiff's claims have merit, there was a significant chance that one or more of Defendants' arguments in defense of liability may have ultimately proved insurmountable and the Class may have ended up with little or no recovery. If the Litigation were to proceed rather than settle at this juncture, Lead Plaintiff would be subject to the risk that Defendants' motion to dismiss would be granted, Lead Plaintiff's prospective class certification motion would be denied, or that Defendants would prevail at summary judgment. Even if Lead Plaintiff were to overcome these hurdles, the eventual trial in this Action would last several weeks, would be very complicated for jurors as it involves complex accounting issues, expensive for the Class, and Lead Plaintiff would be subject to the risk of losing at trial. Even if Lead Plaintiff were to prevail at trial, a jury verdict would be subject to appeal. This protracted process would have caused the Class to incur additional expenses, regardless of the outcome.

5. Lead Counsel believe that the Settlement is in the best interests of the Class, especially considering its size and the significant risks involved in the case. Rather than proceed with this Litigation for years and risk obtaining little or nothing from Defendants, the Settlement provides the Class with a substantial cash recovery now. The Settlement Amount represents a recovery of approximately 22.5% of reasonable recoverable damages of approximately $16 million (Defendants estimated reasonable recoverable damages at a significantly lower amount). This is a very good result, especially as compared to the median percentage recovery in securities class

actions alleging both Rule 10b-5 and §§11 and/or 12(a)(2) claims from 2012 through 2021 of 6.1% of damages. *See* Laarni T. Bulan and Laura E. Simmons, *Securities Class Action Settlements: 2021 Review and Analysis*, at 7, Fig. 6 (Cornerstone Research 2022). In sum, the Settlement provides for a substantial monetary benefit to the Class now and is a very good result for the Class in light of the potential recovery and substantial risks involved in continued litigation. Lead Plaintiff and Lead Counsel believe the Settlement to be fair, reasonable, and adequate, in the best interests of the Class, and should be approved by this Court.

6.      Lead Counsel seek an award of attorneys' fees of 20% of the Settlement Amount (or $720,000) plus litigation expenses in an amount of $20,042.03, with interest on such fees and expenses earned at the same rate as earned by the Class on the Settlement Fund. As discussed below, Lead Counsel's requested fee amounts to a modest 0.58 multiplier of Lead Counsel's "lodestar" (*i.e.*, Lead Counsel's hourly rates multiplied by the hours spent on prosecuting and settling this Action).

7.      Pursuant to the Court's Order Granting Preliminary Approval Pursuant to Fed. R. Civ. P. 23(e)(1) and Permitting Notice to the Class dated June 7, 2022 (ECF 61) (the "Preliminary Approval Order"), the Notice of Pendency and Proposed Settlement of Class Action (the "Notice") and the Proof of Claim and Release form ("Proof of Claim," together with the Notice, the "Notice Package") were mailed to all Class Members who could be identified with reasonable effort; the Notice Package was posted on the Settlement website, www.CPIAeroStructuresSecuritiesSettlement.com; and the Summary Notice was published once in the national edition of *Investor's Business Daily* and once over a national newswire service. *See* accompanying Declaration of Jack Ewashko Regarding Mailing of Notice and Publication of Summary Notice ("Ewashko Declaration"), submitted herewith.

8.      The Notice advised all recipients of, among other things: (i) the definition of the Class; (ii) their right to exclude themselves from the Class; (iii) their right to object to any aspect of the Settlement, including the Plan of Allocation and Lead Counsel's request for attorneys' fees and expenses; and (iv) the procedures and deadline for submitting a Proof of Claim in order to be eligible for a payment from the proceeds of the Settlement.

9.      Lead Counsel have been advised by A.B. Data, Ltd. ("A.B. Data"), whose retention as Claims Administrator was authorized by the Preliminary Approval Order, that as of July 31, 2022, a total of 10,327 copies of the Notice Package have been mailed to potential Class Members and their nominees.  Ewashko Declaration, ¶¶2-8.

10.     The Court-ordered deadline for filing objections to the Settlement or requesting to "opt out" of the Class is August 19, 2022.  ECF 61 at ¶¶19, 21.  To date, no objections to any aspect of the Settlement have been filed by Class Members, and no requests for exclusion have been received.

## II.    THE NATURE AND HISTORY OF THE LITIGATION

### A.    The Commencement of the Action and Appointment of Lead Plaintiff and Lead Counsel

11.     On February 24, 2020, plaintiff Mark A. Rodriguez filed the initial complaint in this putative class action in the United States District Court for the Eastern District of New York against the following Defendants: (i) CPI Aerostructures, Inc. ("CPI" or the "Company"); (ii) Douglas McCrosson, CPI's President and Chief Executive Officer during the relevant period; and (iii) Vincent Palazzolo, CPI's Chief Financial Officer during the relevant period.  ECF 1.

12.     On April 24, 2020, Jeffrey L. Feinberg, individually and as trustee and beneficiary of the Jeffrey L. Feinberg Personal Trust ("Feinberg" or "Lead Plaintiff"), filed a motion to be appointed lead plaintiff.  ECF 18.  On May 5, 2020, the Court appointed Feinberg as lead plaintiff

- 4 -

and approved Feinberg's selection of Robbins Geller Rudman & Dowd LLP and Robbins LLP as Lead Counsel.  ECF 24.

**B.    The Amended Complaint and a Summary of the Allegations**

13.    Lead Counsel conducted a comprehensive investigation of the claims against CPI. This investigation included, *inter alia*, reviewing and analyzing publicly available information regarding CPI, including U.S. Securities and Exchange Commission ("SEC") filings, other regulatory filings and reports, publicly available annual reports, press releases, news articles and other media reports, and reports of securities analysts.  Lead Counsel also conducted interviews with former CPI employees.

14.    On September 24, 2020, Lead Plaintiff filed the Consolidated Amended Complaint for Violations of the Federal Securities Laws (the "Amended Complaint"), which asserted claims under Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 ("Securities Act Claims") and Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act Claims").  ECF 35. The Amended Complaint was filed on behalf of: (i) purchasers of CPI common stock issued pursuant to and/or traceable to the Company's offering conducted on or about October 17, 2018; and (ii) purchasers of CPI common stock between March 22, 2018 and February 14, 2020, inclusive (the "Class Period").  *Id.* at ¶1.  The Amended Complaint also named Canaccord Genuity LLC ("Canaccord") and B. Riley F.B.R. ("F.B.R.") as underwriter defendants.  *Id.* at ¶¶22-23.

15.    CPI describes itself as a U.S. supplier of aircraft parts for fixed-wing aircraft in both the commercial and defense markets.  *Id.* at ¶32.  The Amended Complaint alleged that, throughout the Class Period, Defendants misrepresented that: (i) CPI's financial statements were presented in accordance with Generally Accepted Accounting Principles ("GAAP") and governing SEC rules and regulations; (ii) CPI had implemented Accounting Standards, Codification Topic 606 *Revenue From*

*Contracts With Customers* ("ASC 606"), effective January 1, 2018; (iii) the adoption of ASC 606 did not materially change CPI's recognition of revenue under its contracts; (iv) the adoption of ASC 606 had "no impact" on CPI's consolidated financial statements; and (v) the Company's system of internal controls over financial reporting and disclosure controls were effective. *See id* at ¶3.

16.     As alleged in the Amended Complaint, on February 14, 2020, CPI announced that (i) it did not follow the dictates of ASC 606; (ii) the Company's financial statements for the 2018 annual period and the 2018 and 2019 interim periods required restatements; and (iii) its internal controls over financial reporting and its disclosure controls for those periods were ineffective. *Id.* at ¶4.  The Restatement also revealed that throughout the Class Period, CPI's "[m]anagement lacked sufficient technical proficiency and training" to ensure compliance with financial reporting requirements, and failed to "execute a strategy to hire and retain a sufficient complement of personnel with an appropriate level of knowledge, experience, and training in certain areas important to financial reporting." *Id.* at ¶7.

17.     The market reacted strongly to these revelations and CPI's share price fell 37% on February 18, 2020. *Id.* at ¶4.  On August 25, 2020, the Company issued restated financial statements for its interim and annual 2018 periods and its 2019 interim periods (the "Restatement"), which quantified the impact of CPI's failure to apply ASC 606.  *Id.* at ¶5.  CPI explained that, during the Class Period, the Company prematurely recognized revenue by utilizing "manufacturing program" rather than performance obligations as the unit of accounting for its customer contracts.  *Id.*  The Amended Complaint also alleges that CPI disclosed that the SEC's Division of Enforcement (the "Division") was conducting an investigation into CPI's financial reporting for violations of the federal securities laws. *Id.* at ¶11.  As part of the investigation, the Division issued a subpoena to the Company seeking documents and information relating to, among other things, the Offering,

4895-1294-9799.v1

previously disclosed errors in, and restatement of, the Company's financial statements, and the departure of the Company's CFOs.  *Id.*

C.    **The Motion to Dismiss the Amended Complaint**

18.    On February 19, 2021, Defendants moved to dismiss the Amended Complaint for failure to state a claim under Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure and under the Private Securities Litigation Reform Act of 1995, 15 U.S.C. §78u-4(b)(2).  In support of their motion, Defendants asserted several arguments, any of which could have resulted in the dismissal of the Litigation.  With respect to Lead Plaintiff's Exchange Act Claims, Defendants argued that their allegedly false and misleading statements were not made with scienter.  Defendants noted that Lead Plaintiff's pleadings did not include allegations of insider trading, accounts from confidential witnesses, or internal documents establishing when (or how) the Individual Defendants learned of CPI's improper accounting.  According to Defendants' motion to dismiss, Lead Plaintiff's allegations hinged on after-the-fact disclosures about CPI's accounting errors.  In sum, Defendants argued that the most compelling inference to be drawn from the allegations of the Amended Complaint was the non-fraudulent one – that CPI and the Individual Defendants misapplied a new accounting standard, ASC 606, in reliance on the advice of the Company's outside auditor.

19.    With respect to Lead Plaintiff's Securities Act Claims, Defendants argued that certain allegedly false and misleading statements were subjective opinions that were not actionable.  Those challenged opinion statements include Defendants': (i) SOX certifications; (ii) statements concerning the sufficiency of CPI's internal controls; and (iii) statements regarding the potential impact of ASC 606 on CPI.  According to Defendants, under the Supreme Court's decision in *Omnicare, Inc. v. Laborers District. Council Construction Industry Pension Fund,* 575 U.S. 175 (2015) ("*Omnicare*"), these were hindsight allegations and failed to plead that Defendants' opinions

- 7 -

did not disclose important facts either about the scope of Defendants' inquiry or about inconsistent knowledge Defendants possessed.

20.    On April 23, 2021, Lead Plaintiff opposed Defendants' motion to dismiss.  Lead Plaintiff set forth a detailed description of the relevant facts and asserted various arguments supporting Defendants' scienter in making the false and misleading statements alleged in the Amended Complaint.  Lead Plaintiff's opposition highlighted that CPI admitted that during the Class Period, the Company prematurely recognized revenue in contravention of ASC 606 by utilizing the "manufacturing program" unit, rather than the required "performance obligations," as the basis for accounting for its customer contracts.  Lead Plaintiff also underscored Defendants' powerful motive to inflate CPI's stock price during the Class Period – *i.e.*, the Company's need for capital from its Offering.  Lead Plaintiff argued that a holistic analysis of all the relevant factors – including the nature of the systemic deficiencies in CPI's internal controls, which included defendant Palazzolo's and CPI management's lack of technical proficiency and training – demonstrated that Defendants had no reasonable basis for their belief that their application of ASC 606 was proper.  Lead Plaintiff emphasized that the scope of the Restatement was staggering and Defendants dramatically misstated the Company's financial performance.  Finally, Lead Plaintiff noted that although Defendants used the certification of their auditor as a defense to scienter, as disclosed in the Restatement, the outside auditor issued a scathing adverse opinion regarding CPI's internal controls over financial reporting.

21.    With respect to Defendants' challenges to the Securities Act Claims, Lead Plaintiff argued that statements concerning the impact of ASC 606's implementation on CPI's historical practices and the SOX certifications were not "subjective opinion statements" but rather statements of fact.  Moreover, Lead Plaintiff contended that many of Defendants' false and misleading statements were actionable even if viewed as opinions because they lacked the meaningful inquiry

- 8 -

that investors would assume was undertaken as required by *Omnicare*. Indeed, by CPI's own admission in the Restatement, the Company's management – defendant Palazzolo – lacked sufficient technical and accounting expertise.

22.     While the motion to dismiss was *sub judice* but before the parties agreed to a settlement in principle, the SEC notified CPI that it did not intend to recommend an enforcement action against the Company. This development presented a significant roadblock to Lead Plaintiff's prospects for prevailing in this Action. Indeed, it is likely that the fact that the SEC investigation was closed would be used by Defendants to argue that CPI's misstatements regarding the application of ASC 606 were innocuous errors rather than fraudulent activity.

## III.    THE NEGOTIATION OF THE SETTLEMENT

### A.    Lead Plaintiff and Lead Counsel Had an Extensive Understanding of the Facts Relevant to This Action Before Entering into the Settlement

23.     By the time the Amended Complaint was filed, Lead Counsel had conducted an extensive investigation and analysis of the facts and legal issues in this case. This process included, among other things, a review of CPI's SEC filings, news reports, and other publicly available information regarding CPI. In addition, Lead Counsel consulted with a forensic accountant to gain an in-depth understanding of the requirements of companies implementing ASC 606. Lead Counsel also retained a consulting expert concerning damages.

24.     As detailed herein, Lead Plaintiff's and Lead Counsel's analysis of the claims and defenses also involved extensive legal research and analysis in connection with opposing Defendants' motion to dismiss.

25.     On May 13, 2021, the Settling Parties participated in a confidential mediation with John R. Van Winkle, Esq., an experienced mediator. The mediation was preceded by the submission and exchange of mediation statements on May 6, 2021. The parties did not resolve the Litigation on

- 9 -

May 13, but continued their arm's-length negotiations thereafter with the assistance of the Mediator. On May 20, 2021, with the benefit of substantial briefing as well as a developed factual record, the Mediator made, and the Settling Parties accepted, a proposal to resolve the case for $3,600,000 for the benefit of the Class, subject to the negotiation of the terms of the Stipulation of Settlement and approval by the Court. The Stipulation (together with the Exhibits thereto) reflects the final and binding agreement and a compromise of all matters that are in dispute between the Settling Parties.

26.    All of these efforts have enabled Lead Plaintiff and Lead Counsel to endorse the Settlement. Indeed, as a result of the extensive legal and factual research and analysis conducted by Lead Counsel, Lead Plaintiff and Lead Counsel had a thorough understanding of the strengths and weaknesses of the claims and the defenses at the time the agreement to settle the Action was reached. In light of the substantial benefit to the Class, the significant costs and risks of protracted litigation – and in recognition of the fact that the proposed Settlement is the result of arm's-length negotiations by experienced counsel overseen by a well-respected mediator – Lead Plaintiff respectfully submits that the proposed Settlement warrants final approval. Lead Plaintiff further submits that the Court should, for the purposes of settlement only, certify the Class, appoint Lead Plaintiff as Class Representative, and appoint Lead Counsel as Class Counsel.

**B.    The Settlement Eliminates the Risks Lead Plaintiff and the Class Faced**

27.    In deciding to settle the Litigation, Lead Plaintiff and Lead Counsel considered, among other things: (i) the substantial immediate cash benefit to Class Members under the terms of the Stipulation; (ii) the possibility of the dismissal of Lead Plaintiff's claims; (iii) the possibility of the Class not being certified; (iv) the expense involved in preparing for and briefing summary judgment and any future appeals; (v) the possibility of the Court granting summary judgment in Defendants' favor; (vi) the likelihood of a "battle of the experts" with respect to the issue of falsity,

- 10 -

4895-1294-9799.v1

materiality, and damages; (vii) the possibility of losing at trial; (viii) the probability that, even if Lead Plaintiff won at trial, Defendants would file post-verdict motions and appeals resulting in additional risk to, and even more delay in obtaining, any recovery for the Class; and (ix) the risk that Defendants may ultimately be unable to satisfy a judgment after trial.

28.     While Lead Counsel believe that all of the claims asserted against Defendants have merit, there were serious risks as to whether Lead Plaintiff would ultimately prevail on the merits and, even if completely successful, equally serious risks as to the amount of time it would take to collect on any judgment.  Importantly, while Defendants' motion to dismiss was pending, the SEC notified CPI that it did not intend to recommend an enforcement action against the Company.  This development had the potential to hinder Lead Plaintiff's ability to sustain his claim at the dismissal stage and prove his claims at summary judgment and trial following extensive fact and expert discovery.

## IV.     THE PLAN OF ALLOCATION

29.     The Net Settlement Fund will be distributed to Class Members in accordance with the Plan of Allocation set forth in the Notice and approved by the Court.  The Plan of Allocation provides that Class Members will only be eligible to participate in the distribution of the Net Settlement Fund if they have an overall net loss on their transactions in CPI common stock during the Class Period.

30.     The Plan of Allocation was prepared with the assistance of one of Lead Counsel's in-house damages consultants and estimates the amount of alleged artificial inflation in the price of CPI common stock during the Class Period.  A.B. Data, the Claims Administrator selected by Lead Counsel and appointed by the Court, will process claims, allow claimants an opportunity to cure any deficiencies in their claims or request that the Court review denial of their claims, and will distribute

4895-1294-9799.v1

the Net Settlement Fund pursuant to the Court-approved Plan of Allocation. In the unlikely event there are sufficient funds in the Net Settlement Fund, each Authorized Claimant will receive an amount equal to the Authorized Claimant's claim. If, however, as is far more likely, the amount in the Net Settlement Fund is not sufficient to permit payment of the total claim of each Authorized Claimant, then each Authorized Claimant shall be paid the percentage of the Net Settlement Fund that each Authorized Claimant's claim bears to the total of the claims of all Authorized Claimants. Payment in this manner shall be deemed conclusive against all Authorized Claims.

31. To date, there have been no objections to the Plan of Allocation and Lead Counsel respectfully submit that the Plan of Allocation is fair and reasonable, and should be approved.

## V. LEAD COUNSEL'S REQUEST FOR AN AWARD OF ATTORNEYS' FEES AND EXPENSES

32. Absent the Settlement, there was a real possibility that the Class would be unable to obtain a meaningful recovery. Lead Counsel undertook this prosecution entirely on a contingent-fee basis and assumed significant risk in bringing these claims.

33. Lead Counsel respectfully request that the Court award attorneys' fees of 20% of the $3,600,000 Settlement Amount, or $720,000. Lead Counsel believe such a fee is reasonable and appropriate in light of the result obtained and the resources expended by Lead Counsel in prosecuting the case, and the inherent risk of nonpayment from representing the Class on a contingent basis. Lead Counsel further request an award of $20,042.03 in litigation expenses. The legal authorities supporting the requested fees and expenses are set forth in Lead Counsel's separate fee memorandum, submitted herewith.

### A. Time, Labor, and Fee Percentage Requested

34. Lead Counsel have devoted a significant amount of time and resources in the research, investigation, and prosecution of this Litigation.

- 12 -

4895-1294-9799.v1

35.     Lead Counsel have substantial experience representing investors in securities class action cases, including in this District.  The identification and background of Robbins Geller and Robbins LLP, are included as exhibits to the separate fee and expense declarations submitted by Lead Counsel ("Fee Declarations").

36.     Lead Counsel's representation of the Class required considerable pre-filing investigation, including, *inter alia*: locating former employees of CPI and conducting interviews; analyzing a massive amount of public information; thoroughly researching the law pertinent to the claims and defenses asserted; consulting with a forensic accountant; drafting an amended complaint; opposing Defendants' motion to dismiss; drafting lengthy mediation briefs; and preparing for and participating in a full-day mediation session.

37.     Lead Counsel's experience and advocacy were required in presenting the strengths of the case during mediation in an effort to achieve the best possible settlement and convince Defendants, their insurers, defense counsel, and the Mediator of the risks Defendants faced from not settling.

38.     The fee request is within the range approved by judges in this District, as set forth in Lead Counsel's separate fee memorandum.

39.     The fee request is also reasonable when cross-checked against the lodestar Lead Counsel incurred in prosecuting the Action.  Included with Lead Counsel's declarations are schedules that summarize the lodestar of each firm's personnel who performed work on the case, as well as expenses incurred by category after having both been reviewed and reduced in the exercise of billing judgment.  In particular, the Fee Declarations, and the fee and expense schedules contained within, indicate the amount of time spent on this case by each attorney and member of the

- 13 -

professional support staff employed by Lead Counsel, and the lodestar calculation based on their current billing rates.

40. Lead Counsel have expended 1,771 hours in the investigation, prosecution, and resolution of the Action. Lead Counsel's lodestar is $1,227,933.25. Given Lead Counsel's request of fees of $720,000, the multiplier is a modest 0.58.

**B. The Risk, Magnitude, and Complexity of the Litigation**

41. As detailed above, the Action involved complex issues of law and fact that presented considerable risk to Lead Plaintiff's case. This case involved litigating complex violations of Sections 11, 12(a)(2) and 15 of the Securities Act, and Sections 10(b) and 20(a) of the Exchange Act. When Lead Counsel undertook this representation, there was no assurance that Lead Plaintiff would survive a motion to dismiss, that Lead Plaintiff would obtain class certification, or that he would prevail at summary judgment, trial, and/or any appeals. Therefore, there was no assurance Lead Counsel would recover any payment for their services.

42. Lead Counsel accepted the representation of the Class on a contingent basis in this securities class action even though any payment for Lead Counsel's services – assuming a recovery was obtained – was likely to be delayed for several years. Cases such as this present formidable challenges as there are numerous risks of adverse rulings in favor of defendants at each stage of litigation. If the case had not settled, Lead Counsel were fully prepared to litigate this case through discovery, class certification, summary judgment, trial, and appeal. Each of those stages of litigation poses considerable challenges and expense in cases of this nature.

**C. Quality of the Representation**

43. Lead Counsel worked diligently to obtain an excellent result for the Class. From the outset, Lead Counsel employed considerable resources and spent considerable time researching and

4895-1294-9799.v1

investigating the facts to support a pleading that could survive a motion to dismiss and position the Litigation for class certification. Theories of damages were complex and Lead Counsel devoted much time working with the consulting expert to analyze class-wide damages. Moreover, Lead Plaintiff's claims involved complex accounting issues necessitating in-depth consultation with a forensic accountant.

44. The recovery obtained for the Class is the direct result of the significant efforts of highly skilled attorneys who possess substantial experience in the prosecution of complex securities class actions. Lead Counsel are among the most experienced securities practitioners in the country. The Settlement represents a substantial recovery for the Class, one that is attributable to the diligence, determination, hard work, and reputations of Lead Counsel.

45. The quality of opposing counsel is also important in evaluating the quality of Lead Counsel's work. Defendants were represented by experienced lawyers from Wilmer Cutler Pickering Hale and Dorr LLP and Shearman & Sterling LLP, well-regarded defense firms. Defense counsel have reputations for vigorous advocacy in the defense of complex cases such as this. The ability of Lead Counsel to obtain a favorable settlement in the face of such quality opposition confirms the excellence of Lead Counsel's representation.

46. When Lead Counsel undertook to represent Lead Plaintiff and the Class, it was with the expectation that they would have to devote a significant amount of time and effort in their prosecution and advance large sums of expenses on discovery and experts. The time spent by Lead Counsel on this case was at the expense of the time that they could have devoted to other matters. Lead Counsel undertook this case solely on a contingent-fee basis, assuming a substantial risk that the case would yield no recovery and leave Lead Counsel uncompensated. Unlike counsel for Defendants, who are paid an hourly rate and paid for their expenses on a regular basis, Lead Counsel

- 15 -

4895-1294-9799.v1

have not been compensated for any time or expenses since this case began. When Lead Counsel undertook to represent Lead Plaintiff and the Class in this matter, it was with the knowledge that Lead Counsel would spend many hours of hard work against capable defense lawyers with no assurance of ever obtaining any compensation for their efforts. The only way Lead Counsel would be compensated was to achieve a successful result.

47.    As discussed above, the Settlement is a very good result for the Class in light of the risks and obstacles to recovery presented, including the risk of dismissal, the difficulty in certifying a class, opposing summary judgment, and prevailing at trial and appeal. Instead of facing additional years of uncertain, costly and time-consuming litigation, the Settlement will provide Class Members the certainty of a significant recovery now.

## VI.    THE REQUESTED EXPENSES ARE FAIR AND REASONABLE

48.    Lead Counsel seek expenses in the amount of $20,042.03 in connection with the prosecution of the Litigation. *See* Fee Declarations, submitted herewith.

49.    Lead Counsel submit that the modest expenses are reasonable and were necessary for the successful prosecution of this Litigation. Lead Counsel were aware that they may not recover any of these expenses unless and until this Action was successfully resolved against Defendants. Accordingly, Lead Counsel took steps to minimize expenses whenever practicable without jeopardizing the vigorous and efficient prosecution of Lead Plaintiff's claims.

50.    The requested expenses reflect routine and typical expenditures incurred in the course of litigation, such as document processing, consultant fees, and mediation fees. Lead Counsel believe these expenses are reasonable and were necessary for the successful prosecution of the Litigation.

4895-1294-9799.v1

## VII.  CONCLUSION

51.     In light of the significant recovery to the Class and the substantial risks of this Litigation, as described above and in the accompanying memoranda in support of final approval of the Settlement and an award of attorneys' fees and expenses, Lead Plaintiff and Lead Counsel respectfully submit that the Settlement and Plan of Allocation should be approved as fair and reasonable.  In addition, as a result of the recovery obtained in the face of substantial risks, including the contingent nature of the fees and the complexity of the case, Lead Plaintiff and Lead Counsel respectfully submit that the Court should award attorneys' fees in the amount of 20% of the Settlement Amount, plus expenses of $20,042.03, plus the interest earned thereon at the same rate and for the same period as that earned on the Settlement Fund until paid.

I declare under penalty of perjury that the foregoing is true and correct.

DATED this 5th day of August, 2022, at Melville, New York.



*s/ Alan I. Ellman*
ALAN I. ELLMAN

- 17 -

4895-1294-9799.v1